**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Jennifer Finlayson-Fife, | Case No: 24-cv-2452 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| Meredith Weber, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF MEREDITH WEBER'S MOTION
TO DISMISS**

**Introduction**

Weber is a former therapeutic client and employee of Plaintiff, who, as Plaintiff states, previously sued Plaintiff in the case entitled, *Weber v. Finlayson-Fife, Ph.D., et al.*, case number 2021 L 003640, in the Circuit Court of Cook County, Illinois.[1] Plaintiff's Complaint, Ex. 1, ¶ 10. Subsequently, according to the Complaint, Weber anonymously appeared on the "Very Bad Therapy" podcast and discussed her experience having ethical boundaries violated in therapy but did not name Plaintiff by name while making these statements. Ex. 1, ¶¶ 17-18. Plaintiff now seeks to retaliate by filing a Strategic Lawsuit Against Public Participation ("SLAPP") to infringe upon Weber's freedom of speech. Furthermore, the confidentiality and non-disparagement portions of the parties' Settlement Agreement are unenforceable as a matter of law, and Plaintiff has failed to adequately plead her complaint given the failure to allege actual malice. For these reasons, Plaintiff's Complaint should be dismissed.

---

[1] Federal Rule of Evidence 201 permits courts to take judicial notice of a fact not in reasonable dispute because it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." FRE 201(c)(2). Although outside materials usually cannot be considered when evaluating a motion to dismiss, courts may take judicial notice of matters of public record, and some have taken notice of filed complaints in related cases (*ABN Amro, Inc. v. Capital International Ltd.*, No. 04 C 3123, 2007 U.S. Dist. LEXIS 19601, at \*\*24-27 (N.D. Ill. Mar. 16, 2007) (citing *Global Relief Foundation v. New York Times Co.*, No. 01 C 8821, 2002 U.S. Dist. LEXIS 17081 (N.D. Ill. Sep. 9, 2002), at \*5.). Therefore, Weber requests this Court take judicial notice of her Complaint filed in case number 21 L 003640, attached as Ex. 2.

**Argument**

In evaluating Weber's motion to dismiss, the court must accept the complaint's factual allegations, *see, e.g., Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 465-66 (7th Cir. 2010), but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *id.* at 465 (quotation omitted), nor will a "formulaic recitation of a cause of action's elements" suffice to avoid dismissal, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). In addition, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). A claim is facially plausible provided "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The pleading standard Rule 8…demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

I.  **Counts I-III must be dismissed because Weber's activity is protected by the First and Fourteenth Amendments, the Illinois Constitution, and Illinois' Anti-SLAPP statute.**

The First Amendment provides robust protection of freedom of speech and freedom of association. U.S. Const. Amend. 1. In turn, those liberties

3

are protected by the due process clause of the Fourteenth Amendment, as well as Sections 4-5 of Article I of the Illinois Constitution. U.S. Const. Amend. 14; Illinois Const., Art. I, §§ 4-5. District courts "sitting in diversity must apply the choice of law principles of the forum state. . . to determine which state's substantive law governs the proceeding," and, as this is a substantive issue, Illinois state law applies. *West Bend Mutual Insurance Co. v. Arbor Homes LLC*, 703 F.3d 1092, 1095 (7th Cir. 2013). Illinois' Citizen Participation Act, 735 ILCS 110/1 et seq., aims to prevent Strategic Lawsuits Against Public Participation, otherwise known as "SLAPP" suits, due to their chilling effect on the exercise of those freedoms. 735 ILCS 110/5.

Under the Citizen Participation Act, a lawsuit must be dismissed if (1) the movant's acts "were in furtherance of his right to petition, speak, associate, or otherwise participate in government to obtain favorable government action"; (2) the plaintiff's claims are "solely based on, related to, or in response to" the defendant's acts in furtherance of his constitutional rights; and (3) the plaintiffs fail to produce clear and convincing evidence that the movant's acts were not genuinely aimed at solely procuring favorable government action." *Chi. Reg'l Council of Carpenters v. Jursich*, 2013 IL App (1st) 113279, 986 N.E.2d 197, 201 (Ill. App. Ct. 1st Dist. 2013). The movant bears the burden of proof under the first two prongs of the test, after which the burden shifts to the nonmovant." *Garrido v. Arena,* 2013 IL App (1st) 120466, 993 N.E.2d

488, 496 (Ill. App. Ct. 1st Dist. 2013). A mere dismissal of SLAPP lawsuits is insufficient when the Act seeks to "protect and encourage public participation in government to the maximum extent permitted by law." *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 939 N.E.2d 389, 396 (Ill. 2010) (citing 735 ILCS 110/5).

### A. Weber satisfies the first prong of the test because the communications at issue were an exercise of constitutionally and statutorily protected right to free speech.

In applying the first prong of this test, the court evaluates whether the suit is the type of suit the Act was intended to address. *Sandholm v. Kuecker*, 2012 IL 111443, 962 N.E.2d 418, 430 (Ill. 2012). Plaintiff claims that on or about August 7, 2023, without mentioning Plaintiff by name and without even claiming Weber used her own name, Weber appeared on a podcast and "alleged that [Plaintiff] set up an 'illegal' practice without proper licensing, advertised psychotherapy illegally across state lines, provided fraudulent paperwork, committed ethical boundary violations ... among other criminal, unethical and abhorrent conduct." Ex. 1, ¶¶17-18. However, even if true, these communications are exactly the kinds of activities the legislature sought to protect, as shown by the Act's own stated public policy. *See* 735 ILCS 110/5 ("The information, reports, opinions, claims, arguments, and other expressions provided by citizens are vital to effective law enforcement..."). Even based on the allegations in Plaintiff's complaint, Weber's communications detailed information that would and should be of interest to protect the

5

citizenry of Illinois. Moreover, Weber's communications similarly constitute a protected activity because Weber was exercising her freedom of speech. 735 ILCS 110/15. *See, also, Wright Development Group,* 238 Ill. 2d 620, 939 N.E.2d 389, 400 (Ill. 2010), ("the Act does not limit the protected rights to petitioning the government only. The Act plainly includes the rights to 'speech' and 'association' as well.") Weber discussed her experiences with having her boundaries violated in therapy- a current issue within the LDS community which is being publicly debated and has received media attention. Group Ex. 3, (available at https://www.propublica.org/article/utah-lds-church-therapy-inappropriate-touching; https://local.sltrib.com/utah-therapist-built-reputation-for-helping-gay-latter-day-saints-they-say-he-sexually-abused-them/).[2]

Weber was well within her constitutional right to advocate for therapists maintaining ethical boundaries and transparency with their clients, to act in furtherance of her right to petition, speak, associate, to participate in government to obtain favorable government action by raising awareness and encouraging therapist accountability, and to advocate for victims and the significant harm that can be caused by

---

[2] The Court can take judicial notice of these articles as they "can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned" given that Weber only seeks to use the articles for the proposition that there is a public controversy, not that the specific allegations of any article are correct. FRE 201. There can be no dispute that these articles were published online and thus there is a controversy.

individuals such as Plaintiff. Therefore, Weber indisputably satisfies the first prong of the test.

### B. Weber satisfies the second prong of the test because the claim is meritless and retaliatory.

### i. The claim is meritless.

Turning to the second prong, to establish that the suit was "solely based on" the defendant's exercise of his political rights, it must be shown that the suit "was meritless and was filed in retaliation against [her] protected activities in order to deter [her] from further engaging in those activities." *Goral v. Kulys*, 2014 IL App (1st) 133236, 21 N.E.3d 64, 76 (Ill. App. Ct. 1st Dist. 2014), citing *Garrido*, 2013 IL App (1st) 120466, 993 N.E.2d 488, 496 (Ill. App. Ct. 1st Dist. 2013). A claim is "meritless" under the Act if the defendant "disproves some essential element of the [plaintiff's] claim." *Id*.

As discussed below, the provisions of the agreement that are allegedly breached are unenforceable under Illinois law. As these provisions form the basis of the claims, and they are invalid and unenforceable as a matter of law, the essential element of the Plaintiff's claim is missing. As also discussed below, Plaintiff's defamation claim is not sufficiently pled and is missing the essential element of malice.

### ii. The claim is retaliatory.

To determine whether a claim is "retaliatory," the courts look to two factors: (1) the proximity in time between the protected activity and the filing of the complaint, and (2) whether the damages requested are

reasonably related to the facts alleged in the complaint and are a "good-faith estimate of the extent of the injury sustained." *Ryan v. Fox TV Stations, Inc.,* 2012 IL App (1st) 120005, 979 N.E.2d 954, 962-63 (Ill. App. Ct. 1st Dist. 2012). In this case, both of the above factors weigh in Weber's favor. Weber appeared on the "Very Bad Therapy" podcast on August 7, 2023. Ex. 1, ¶ 17. Plaintiff argues, "[m]ultiple people identified [Plaintiff] based on Weber's Statements and proceeded to notify [Plaintiff] of Weber's Statements," and that Weber's statements were "injurious to [Plaintiff's] reputation in the community." Ex. 1, ¶ 19. Plaintiff declines to even name these people or any real effect therefrom. Less than a year later, Plaintiff filed her complaint in this matter. The proximity, which is a critical legal factor in determining whether it is retaliatory, between the protected activity and the filing of this complaint tends to show this lawsuit is retaliatory.

Furthermore, Plaintiff is seeking excessive damages disproportionate to the grievances asserted in her complaint. In *Hytel Group, Inc.,* the court found that the plaintiff's defamation suit was retaliatory because "the extraordinarily high damages" it sought—$8 million—were "intended to strike fear into the defendant." *Hytel Group, Inc. v. Butler,* 405 Ill. App. 3d 113, 938 N.E.2d 542, 556 (Ill. App. Ct. 2d Dist. 2010). Here, Plaintiff is seeking damages for "reputation and standing in the community," the "return of all compensation received pursuant to the Settlement Agreement," among liquidated damages, attorneys' fees and other

8

damages. Ex. 1, ¶25, ¶ 29, ¶ 33. A plain reading of the Settlement Agreement itself shows that there is no basis for the return of the amounts under the Settlement Agreement. The demand for this amount, for which Platintiff advances no legal theory, cannot be seen as anything other than an attempt to "strike fear" in Weber. Moreover, the request for the return of all compensation ignores the fact that Plaintiff, as primary consideration for the compensation paid, received a release and dismissal from Weber's claim seeking *significant* damage for the conduct of Plaintiff that led to the lawsuit and settlement. There is no argument to be made under the Settlement Agreement that Plaintiff would be entitled to the return of "all compensation received."  These circumstances suggest that Plaintiff's suit was designed to punish Weber for exercising her right to speak freely about therapist-client boundaries and ethics, rather than to seek recompense for Weber's acts.

As Weber met the first two elements, the burden shifts to Plaintiff regarding the third element, to produce clear and convincing evidence that the Weber's acts were not genuinely aimed at solely procuring favorable government action. No evidence is pled, and the case must be dismissed, with fees being awarded to Weber under 735 ILCS 110/25.

## II. Counts I-II must be dismissed because the confidentiality and non-disparagement provisions of the Settlement Agreement are unenforceable.

The Workplace Transparency Act (the "Act"), 820 ILCS 96/1 *et seq.*, applies to contracts entered into, modified, or extended on or after the

9

effective date of the Act (January 1, 2020). 820 ILCS 96/1-10(c). The Act

applies to the settlement Weber entered into with Plaintiff in 2022. The

Act provides:

> (a) An employee, prospective employee, or former employee and an employer may enter into a valid and enforceable settlement or termination agreement that includes promises of confidentiality related to alleged unlawful employment practices, so long as:
> . . .
> (5) the settlement or termination agreement is provided, in writing, to the parties to the prospective agreement and **the employee, prospective employee, or former employee is given a period of 21 calendar days to consider the agreement before execution**, during which the employee, prospective employee, or former employee may sign the agreement at any time, knowingly and voluntarily waiving any further time for consideration; and
>
> (6) unless knowingly and voluntarily waived by the employee, prospective employee, or former employee, he or she **has 7 calendar days following the execution of the agreement to revoke the agreement and the agreement is not effective or enforceable until the revocation period has expired**.

820 ILCS 96/1-30(a)(5)-(6) (bold added).

Noncompliance with the Act's provisions renders any promise

of confidentiality void and severable, while the remainder of the

agreement remains valid and enforceable. *Howard v. Proviso Twp.*

*High Sch. Bd. Of Educ.*, 2023 U.S. Dist. LEXIS 11024, *16 (citing

820 ILCS 96/1-30(c)).

The Act applies to the relationship here, as the underlying

claims emanated from the employment relationship, as well as the

professional relationship, between the parties, and how Plaintiff

took advantage of Defendant's disability (which Plaintiff herself

10

diagnosed). Ex. 2, ¶38. Here, Plaintiff did not comply with 820 ILCS 96/1-30(a)(6), as the agreement is effective upon signature, depriving her of the 7 days following execution of the settlement to revoke it.

Due to Plaintiff's noncompliance with the Workplace Transparency Act, the confidentiality provision, as well as the non-disparagement provision which similarly restricts Defendant's discussion of the unlawful employment practices, is void and severable. *Howard v. Proviso Twp. High Sch. Bd. Of Educ.*, 2023 U.S. Dist. LEXIS 11024, *16 (citing 820 ILCS 96/1-30(c)). As the provision is unenforceable, the claims must be dismissed. Weber is entitled to her fees to challenge the clause under this section. 820 ILCS 96/1-35.

### III. Count III must be dismissed because Plaintiff has failed to plead actual malice, which is required as Plaintiff is at least a limited-purpose public figure.

*Jacobson v. CBS Broadcasting, Inc.*, provides, "to prevail on a claim for defamation, a plaintiff must show that the alleged defamatory expression was somehow exempt from the first amendment protection of free speech and free press." 2014 IL App (1st) 132480, 19 N.E.3d 1165, 1175 (Ill. App. Ct. 1st Dist. 2014) (internal citation omitted). Generally, private individuals only need to show that the defendant negligently publicized the alleged defamatory falsehood, but "[w]here the plaintiff is found to be a public figure, [the plaintiff] must prove, by clear and convincing evidence, that the defendant acted with 'actual malice' in making the

11

defamatory expression." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Kessler v. Zekman*, 250 Ill. App. 3d 172, 620 N.E.2d 1249 (Ill. App. Ct. 1st Dist. 1993)). The *Gertz* standard provides that there are two classifications of public figures: general purpose public figures ("individuals who have achieved 'such pervasive fame or notoriety' that they 'become a public figure for all purposes and in all contexts") and "limited purpose" public figures, "which turns upon the nature and extent of the individual's participation in the controversy that lead to the defamation." *Id* at 1176. When individuals "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,' they become public figures for the limited range of issues associated with those controversies." *Id.* Illinois uses a three-part test to determine whether an individual is a limited-purpose public figure (*see Kessler*, 250 Ill. App. 3d 172, 620 N.E.2d 1249 at 1255): (1) it requires a public controversy (meaning "an issue that is being debated publicly, the outcome of which impacts the general public or some portion of it in an appreciable way"), however, "[a] matter of general public interest or concern is not sufficient"; (2) "the plaintiff must have undertaken some voluntary act seeking to influence the resolution of the issues involved"; and (3) "the alleged defamation must be germane to the plaintiff's participation in the controversy." *Jacobson*, 2014 IL App (1st) 132480, 19 N.E.3d 1165 at 1176-77 (internal citations omitted).

12

Plaintiff indicates in her Complaint that she is so well-known that, without even being mentioned by name, "multiple people identified" Plaintiff based on Weber's statements. Ex. 1, ¶19. On her own website, www.finlayson-fife.com, Plaintiff advertises having appeared on Huffpost, the Washington Post, NPR, the Salt Lake Tribune, and LDSLiving, a Latter-day Saints lifestyle website; owning a Facebook group with 20,000 members; that she has written multiple publications; and that she has her own podcasts available on multiple major platforms. Group Ex. 4 (available at www.finlayson-fife.com [various sublinks thereto]) (accessed April 18, 2024).[3] She is therefore a public figure, and most certainly a limited-purposes public figure.

In this case, there is a public controversy regarding therapists crossing ethical boundaries within the LDS community and abusing their position of trust. *See* Group Ex. 3. This issue has received significant media attention and is being debated publicly, and the outcome impacts the general public or portion of it in an appreciable way as it pertains to what is appropriate in therapy and whether clients can trust that their provider will adhere to ethical requirements. Next, Plaintiff has "undertaken some voluntary act seeking to influence the resolution of the issues involved," as she often provides commentary on abuse and scandals within the LDS community, including therapists who have been

---

[3] Where a party refers to another party's website in its briefing, the district court may take judicial notice of the entire contents of that website. *See Goplin v. Weconnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018).

13

reprimanded by the Mormon church. Group Ex. 5 (available at

https://www.facebook.com/finlaysonfife/posts/some-of-you-have-

reached-out-asking-me-to-share-my-thoughts-about-the-potential-

/10158146584055872/; and

https://www.sltrib.com/religion/2018/03/28/mormon-land-lds-

therapist-discusses-the-mtc-scandal-new-church-interview-guidelines-

and-what-more-her-faith-should-do-to-prevent-sexual-abuse-and-

protect-victims/) (accessed April 26, 2024).[4] Finally, Weber's alleged

defamation is germane to Plaintiff's participation in the controversy as

Weber's statements go directly to Plaintiff's duplicitous conduct where

she projects a position of trust and authority yet abuses that authority,

precisely the subject of the controversy. Therefore, Plaintiff qualifies as a

limited-purpose public figure under the *Gertz* standard and is required to

prove actual malice. *Jacobson*, 2014 IL App (1st) 132480, 19 N.E.3d

1165 at 1175-77.

The actual malice standard provides, "a defamation defendant

escapes liability unless the plaintiff proves that the defendant published

the defamatory falsehood either with knowledge that it was false, or with

a reckless disregard of whether it was false or not." *Id.* (citing *Gertz*, 418

U.S. at 327-28; *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

---

[4] Group Ex. 5 contains a post from Plaintiff's own Facebook page and a published news article on a podcast which Plaintiff appeared on, so the court may take judicial notice of these documents under FRE 201 and *Goplin*, 893 F.3d at 491 (7th Cir. 2018).

Plaintiff has not alleged any malice in her Complaint whatsoever and has not proven that Weber published the alleged defamatory falsehood with knowledge that it was false or with reckless disregard for the truth. Therefore, Plaintiff's claim does not allege sufficient factual matter to state a claim for relief that is plausible on its face, so Count III fails and must be dismissed. *Iqbal*, 556 U.S. at 678 (2009).

## CONCLUSION

For the reasons stated herein, Plaintiff's Complaint should be dismissed with prejudice, with an award of fees to Weber.

Dated: April 26, 2024            Respectfully submitted,

/s/Michael D. Haeberle
Michael D. Haeberle (#6309164)
Patterson Law Firm, LLC
200 W. Monroe, Ste. 2025
Chicago, IL 60606
Tel.: 312-223-1699
Fax: 312-223-8549
mhaeberle@pattersonlawfirm.com
*Attorney for Defendant Weber*

15

**EXHIBIT 1**

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 4/23/2024 9:15 AM

FILED
2/20/2024 3:20 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L001918
Calendar, N
26481297

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| JENNIFER FINLAYSON-FIFE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: **2024L001918** |
| | ) | |
| v. | ) | |
| | ) | |
| MEREDITH WEBER, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Jennifer Finlayson-Fife ("JFF") complains against Defendant Meredith Weber ("Weber"), as follows:

### INTRODUCTION

1. JFF and Weber are parties to a Settlement Agreement.

2. The Settlement Agreement included a "CONFIDENTIALITY AND NON-DISPARAGEMENT" Provision.

3. Despite receiving generous consideration to support the confidentiality and non-disparagement requirements, Weber proceeded to violate the provision and speak publicly about the Settlement and Plaintiff JFF.

4. JFF brings this suit for Breach of Contract and Defamation based on Weber's public statements that were disseminated online via a podcast.

5. The Settlement Agreement provides "Any suit or proceeding brought hereunder shall have its situs and venue in ILLINOIS." (A copy of the "Settlement Agreement" is attached as Exhibit A).

### PARTIES

6. JFF is an individual who resides in Cook County, Illinois.

7.      Weber is an individual who resides in the State of Utah.

JURISDICTION AND VENUE

8.      This Court has specific jurisdiction over Weber, because all events alleged in this Complaint took place in Cook County, Illinois, and the contract provides that it shall be litigated in this jurisdiction.

9.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101.

STATEMENT OF FACTS

10.     Weber previously sued JFF in the Cook County Law Division, Case Number 21L3640.

11.     On or about March 15, 2022, JFF and Weber executed the Settlement Agreement.

12.     Pursuant to the Settlement Agreement, Weber received a settlement payment, and agreed to release JFF from potential liability.

13.     With regard to the Settlement Agreement's confidentiality terms, Weber agreed to keep JFF's identity confidential by "not identifying names, titles, education, religious affiliation, geographical location, or life coaching activities," and, if necessary, by "changing the facts that form the basis of [Weber's] Complaint to protect against disclosure" of JFF.

14.     With regard to the Settlement Agreement's non-disparagement terms, Weber agreed that she would "not at any time make any disparaging statements or representations, either directly or indirectly, whether in writing or orally, by word or gesture, to any person whatsoever" about JFF. Disparaging statement was defined broadly to include "any communication which, if publicized to another, would cause the recipient of the communication to question the business condition, integrity, competence, good character, professional conduct, or product quality of the person or entity to whom the communication relates."

2

15.     The Settlement Agreement provided that Weber would pay "fair, adequate, and just compensation for the loss of such consideration, the loss of benefit of the bargain, injury to reputation, increased potential exposure to additional claims, embarrassment, and injury to standing in the community." The damages included, but were not limited to, $50,000.00, plus any attorney's fees or costs.

16.     The Settlement Agreement further required Weber to indemnify JFF for all causes of action related to the incident underlying her lawsuit, including attorney's fees.

17.     On or about August 7, 2023, Weber appeared on the internet podcast entitled "Very Bad Therapy," in an episode called, "The Shrink Next State." In this podcast, Weber alleged that her therapist set up an "illegal" practice without proper licensing, advertised psychotherapy illegally across state lines, provided fraudulent paperwork, committed ethical boundary violations, acted as a "cult leader," engaged in an "affair," "grooming," child "neglect," and "indentured servitude," among other criminal, unethical and abhorrent conduct.

18.     Although Weber did not mention JFF expressly by name, Weber provided extensive and detailed information about JFF that was sufficient to allow the listening audience to conclude that Weber was speaking about JFF. The information Weber provided about JFF, included but was not limited to, facts about JFF's extensive online presence, Facebook ads, Skype sessions, JFF's years of experience, the high regard with which JFF was held in their "shared community", JFF's hobbies, religious attendance, children, children's activities, spouse, and that JFF's residence was in the Midwest, "four or five states" west of Weber's home on the East Coast. (The statements in Paragraphs 17 and 18 are collectively referred to herein as "Weber's Statements").

3

19.     Multiple people identified JFF based on Weber's Statements and proceeded to notify JFF of Weber's Statements.

20.     Weber's Statements are false, disparaging, and injurious to JFF's reputation in the community.

COUNT I—BREACH OF CONTRACT (Confidentiality)

21.     JFF realleges paragraphs 1-20.

22.     The Settlement Agreement is a valid, enforceable Contract.

23.     Weber breached the Settlement Agreement by failing to keep JFF's identity confidential.

24.     JFF has done everything required under the Settlement Agreement.

25.     JFF has suffered damages to her reputation and standing in the community.

WHEREFORE, Jennifer Finlayson-Fife prays that this Court:

A.      Enter judgment in her favor;

B.      Award her damages to compensate for the reputational harm;

C.      Order Weber to return all compensation received pursuant to the Settlement Agreement;

D.      Award her reasonable attorneys' fees and costs of this suit; and

E.      Grant such other relief as is just.

COUNT II—BREACH OF CONTRACT (Non-Disparagement)

26.     JFF realleges paragraphs 1-20.

27.     Weber breached the Settlement Agreement by making public statements that caused recipients of the communication to question the business condition, integrity, competence, good character, and professional conduct of JFF.

4

FILED DATE: 2/20/2024 3:20 PM  2024L001918

28. JFF has done everything required of her under the Settlement Agreement.

29. JFF has suffered damages to her reputation and standing in the community.

WHEREFORE, Jennifer Finlayson-Fife prays that this Court:

A. Enter judgment in her favor;

B. Award her $50,000.00 in liquidated damages;

C. Order Weber to return all compensation received pursuant to the Settlement Agreement;

D. Award her reasonable attorneys' fees and costs of this suit; and

E. Grant such other relief as is just.

### COUT III—DEFAMATION (*Per Se*)

30. JFF realleges paragraphs 1-20.

31. Weber stated that her therapist set up an "illegal" practice without proper licensing, advertised psychotherapy illegally across state lines, provided fraudulent paperwork, committed ethical boundary violations, acted as a "cult leader," engaged in an "affair," "grooming," child "neglect," and "indentured servitude," among other criminal, unethical and abhorrent conduct.

32. These statements are false.

33. These statements are defamatory *per se* as they impute the commission of a criminal offense, impute an inability to perform or want of integrity in the discharges of duties related to JFF's employment, impute prejudice to JFF's profession or business, and accuse JFF of adultery or fornication.

WHEREFORE, Jennifer Finlayson-Fife prays that this Court:

A. Enter judgment in her favor;

5

FILED DATE: 2/20/2024 3:20 PM   2024L001918

B.  Award her damages to compensate for the harm to her personal and professional reputation in excess of $50,000.

C.  Grant such other relief as is just.

Respectfully Submitted,

JENNIFER FINLAYSON-FIFE

By:  /s/ Steven P. Mandell
One of her attorneys

Steven P. Mandell
Bryan G. Lesser
MANDELL MENKES LLC
333 W. Wacker Drive, Suite 450
Chicago, IL 60606
Telephone: 312-251-1000
Firm No. 38081
Email: smandell@mandellmenkes.com
        blesser@mandellmenkes.com

**Civil Action Cover Sheet - Case Initiation** **(12/01/20) CCL 0520**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Jennifer Finlayson-Fife

v.

Meredith Weber

**2024L001918**

No. _____

FILED DATE: 2/20/2024 3:20 PM   2024L001918

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ❑ Yes ❑ No

FILED
2/20/2024 3:20 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L001918
Calendar, N

**(FILE STAMP)**

### PERSONAL INJURY/WRONGFUL DEATH

CASE TYPES:
- ❑ 027 Motor Vehicle
- ❑ 040 Medical Malpractice
- ❑ 047 Asbestos
- ❑ 048 Dram Shop
- ❑ 049 Product Liability
- ❑ 051 Construction Injuries (including Structural Work Act, Road Construction Injuries Act and negligence)
- ❑ 052 Railroad/FELA
- ❑ 053 Pediatric Lead Exposure
- ❑ 061 Other Personal Injury/Wrongful Death
- ❑ 063 Intentional Tort
- ❑ 064 Miscellaneous Statutory Action (Please Specify Below**)
- ❑ 065 Premises Liability
- ❑ 078 Fen-phen/Redux Litigation
- ❑ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES

CASE TYPES:
- ❑ 007 Confessions of Judgment
- ❑ 008 Replevin
- ❑ 009 Tax
- ❑ 015 Condemnation
- ❑ 017 Detinue
- ❑ 029 Unemployment Compensation
- ❑ 031 Foreign Transcript
- ❑ 036 Administrative Review Action
- ❑ 085 Petition to Register Foreign Judgment
- ❑ 099 All Other Extraordinary Remedies

By: Steven P. Mandell
_____

(Attorney)                    (Pro Se)

### COMMERCIAL LITIGATION

CASE TYPES:
- ☒ 002 Breach of Contract
- ❑ 070 Professional Malpractice (other than legal or medical)
- ❑ 071 Fraud (other than legal or medical)
- ❑ 072 Consumer Fraud
- ❑ 073 Breach of Warranty
- ❑ 074 Statutory Action (Please specify below.**)
- ❑ 075 Other Commercial Litigation (Please specify below.**)
- ❑ 076 Retaliatory Discharge

### OTHER ACTIONS

CASE TYPES:
- ❑ 062 Property Damage
- ❑ 066 Legal Malpractice
- ❑ 077 Libel/Slander
- ❑ 079 Petition for Qualified Orders
- ❑ 084 Petition to Issue Subpoena
- ❑ 100 Petition for Discovery

** _____

_____

Primary Email: smandell@mandellmenkes.com

Secondary Email: docket@mandellmenkes.com

Tertiary Email: sbrocious@mandellmenkes.com

**Pro Se Only:** ❑ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 4/23/2024 9:15 AM

FILED
2/20/2024 3:20 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L001918
Calendar, N
26481297

FILED DATE: 2/20/2024 3:20 PM   2024L001918

# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS

FOR AND IN CONSIDERATION of the sum of Eight Hundred Thousand Dollars and No cents ($800,000.00), the receipt and sufficiency of which is hereby acknowledged, the undersigned, MEREDITH WEBER, including all present and former spouses, heirs, devisees, legatees, executors, administrators, representatives, agents, transferees, assigns, subrogees, grantees, indemnitees/indemnitors, predecessors, successors, and attorneys, hereinafter collectively referred to as "RELEASOR" hereby fully and forever releases, remises, acquits, satisfies, and discharges JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE, DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC, THRIVING RELATIONSHIPS, PLLC, COLUMBIA CASUALTY COMPANY and any CNA ENTITY, as well as each of their estates, heirs, executors, administrators, successors-in-interest, assigns, predecessors and/or successors, parent companies, companies, sister companies, suborders, subsidiaries, entities, business units, divisions, affiliates and/or associations, owners, directors, members, managers, officers, employees, partners, representatives, shareholders, attorneys, independent contractors, subcontractors, insurers, underwriters, agents, subrogates, assigns, leasers, lessees, franchisees, and servants hereinafter collectively referred to as "RELEASEES" who are or might be liable directly or vicariously in any way from any and all, and to the broadest extent allowed by law, claims, actions, causes of action, demands, rights, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, liens, med pay, personal injury protection, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, expenses, compensation, rights, attorney fees, costs, loss of services, wrongful death, expenses, compensation and damages whatsoever, whether common law, statutory or extra contractual, which the RELEASOR now has or which may hereafter accrue in law or in equity including all known and/or unknown, foreseen and/or unforeseen, asserted and/or unasserted, contingent, inchoate, suspected and/or unsuspected, developed and/or undeveloped damage and the consequences thereof on account of or in any way growing out of, resulting or to result from MEREDITH WEBER's interactions with RELEASEES, including, but not limited to, the allegations referenced in the complaint filed by RELEASOR in the Circuit Court of the Cook County, Illinois, County Department, Law Division, Case No. 2021 L 003640 (hereinafter collectively referred to as the "INCIDENT").

This SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS and all of the terms herein are collectively referred to hereinafter as the "AGREEMENT." RELEASOR and RELEASEES are collectively referred to hereinafter as the "PARTIES".

In further consideration for the payment set forth above, the RELEASOR represents and covenants that the RELEASOR will dismiss any pending actions with prejudice.

The RELEASOR and RELEASEES have agreed to settle in order to avoid the inconvenience, distractions, and inherent uncertainties associated with any legal proceeding, and the additional legal fees and expenses of continuing this dispute. This AGREEMENT represents a compromise of a disputed claim and any liability, wrongdoing, malfeasance, misfeasance, or negligence on the part of the RELEASEES is expressly denied.

RELEASOR and her attorneys represent and warrant that there is no Centers for Medicare & Medicaid Services ("CMS") lien or claim that is applicable to the matters released in this Settlement Agreement and have determined that CMS has not paid any claims related to this case.

RELEASOR and her attorneys also acknowledge that neither she nor her counsel or any other representative received a notification of a contractual right of reimbursement of medical costs paid by any private insurance company for the medical care associated with the allegations and injuries described in the Complaint. Should any private insurance company seek to exercise its rights, and/or request reimbursement,

FILED DATE: 2/20/2024 3:20 PM    2024L001918

for any medical costs paid on its behalf for the medical care associated with the allegations in the Complaint, RELEASOR agrees to defend, indemnify and hold harmless RELEASEES in connection with any dispute, conflict, claim, demand, or other relief sought by any private insurance company. RELEASOR denies that RELEASOR has been notified about any other medical/insurance liens or that any other medical care provider or insurance carrier has notified RELEASOR of a contractual right to reimbursement of the medical costs paid for RELEASOR's medical care and the proceeds of this settlement received by RELEASOR. To that end, RELEASOR hereby agrees to defend, protect, indemnify and hold harmless the RELEASEES if any person, firm, entity or corporation shall assert, attempt to assert or attempt to collect on any such claim or lien by reason of the foregoing matter and/or relating to this AGREEMENT.

As a further consideration and inducement for this settlement, the RELEASOR agrees to defend, indemnify, protect and hold the RELEASEES harmless from any and all liens, rights of subrogation, indemnification claims, contribution claims, defense claims, losses, liability, actions, damages, causes of action, judgments, costs and expenses, including attorney's fees, whatsoever made by or sustained by or arising from any person, corporation, partnership, state or federal government, governmental agency, hospital, or any other medical provider, health care provider, disability or insurance benefits provider, workers compensation carrier, Medicare, Medicaid or any other entity arising in whole or in part out of the INCIDENT, or in any way connected to the INCIDENT.

The RELEASOR agrees and acknowledges that no promise, inducement, or AGREEMENT, not expressly contained in this AGREEMENT, has been made to her. This AGREEMENT supersedes all previous agreements or understandings, whether written or oral, and contains the entire agreement by and among the RELEASOR and RELEASEES with respect to the INCIDENT. This AGREEMENT may not be altered, modified, or amended except in a writing signed by the RELEASOR and RELEASEES. The RELEASOR represents and warrants that she has the authority to enter into this AGREEMENT, and she intends to be legally bound by it.

The RELEASOR represents and warrants that no other person or entity has any interest in the claims, demands, obligations, or causes of action referred to in this AGREEMENT; that she has the sole right and exclusive authority to execute this AGREEMENT and to receive the sums specified in it; and that there has not been, nor will there be, an assignment or other transfer of any claim, interest right which the RELEASOR may have arising in whole or in part out of the INCIDENT or in any way connected to the INCIDENT.

In entering into this AGREEMENT, it is understood and agreed that the RELEASOR relied wholly upon the RELEASOR's own judgment, belief and knowledge of the nature, extent and duration of said injuries and damages. No representations or statements made by the RELEASEES or by any person or persons representing the RELEASEES or by any physician or therapist employed or engaged by the RELEASEES regarding said injuries and damages or regarding any other matters arising in whole or in part out of the INCIDENT, or in any way connected to the INCIDENT have influenced the RELEASOR to any extent whatsoever in entering into this AGREEMENT.

The parties understand and agree that the origins of the claims at issue in this lawsuit sound in personal physical injury and physical sickness for, among other things, pain, suffering and emotional distress arising out of such physical injury and sickness. All sums set forth herein constitute damages on account of personal injuries or physical sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Settlement Payment is therefore understood and agreed to be allocated solely and exclusively to those alleged damages. While the parties have negotiated this allocation at arm's length and in good faith, neither party has made any warranty or representation with respect to the income tax consequences of the Settlement Payment under this Agreement, and neither party is in any manner relying on the other or their attorneys for an assessment of such tax consequences. The parties are advised to consult

with their own tax advisors with respect to any such tax consequences and the issuance, vesting and payment of the Settlement Payment. Consistent with parties' intent that the Settlement Payment shall be made on account of Plaintiff's personal physical injuries and sickness, Defendants – including any insurer or other party that makes the Settlement Payment on behalf of Defendants – shall not issue any Form 1099 other information return to Plaintiff with respect to the Settlement Payment.

The RELEASOR hereby declares that she has had the benefit of advice from her attorneys, or the opportunity to seek advice of counsel, and the terms of this AGREEMENT have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise of any and all claims arising in whole or in part, or in any way connected to the INCIDENT.

RELEASOR hereby acknowledges and agrees that RELEASOR expressly waives and assumes the risk of any and all claims for damages against the RELEASEES which exist as of this date but of which the RELEASOR does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect RELEASOR's decision to enter into this AGREEMENT. The RELEASOR understands that this claim is being settled as a business decision only and that payment of the sums specified herein are being made as a complete compromise of matters involving disputed issues of law and fact and the RELEASOR thereby assumes the risk that the facts or law may be otherwise than RELEASOR believes.

## CONFIDENTIALITY AND NON-DISPARAGEMENT

1.      Except as necessary to enforce the terms of this AGREEMENT, RELEASOR and RELEASEES hereto agree that the name of the parties to the settlement, the terms of this AGREEMENT, and any fact concerning its negotiation, execution or implementation ("Confidential Settlement Information') is confidential and not to be disclosed, communicated, posted, or published in any manner or forum directly or indirectly, to anyone, including but not limited to, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA, ATLA, or similar publication or database for attorneys, bar associations, legal organizations, or databases, and/or any other persons or entities not expressly excluded herein, except as expressly authorized in this paragraph and paragraph four below. The RELEASORS and RELEASEES may disclose the terms of this AGREEMENT to: (i) a court pursuant to subpoena or order; (ii) taxing authorities as necessary to comply with any statute; (iii) financial advisors; (iv) legal counsel; (v) otherwise as required by law; and (vi) to any other person or entity upon written consent of the party adverse to them in this AGREEMENT. To the extent there is an inquiry as to the status of the claim, RELEASOR AND RELEASEES shall be directed to state: "This matter has resolved" or "This matter has settled."

2.      RELEASOR agrees to keep as confidential the name of RELEASEES, including Dr. Jennifer Finlayson-Fife in her communications with anyone except as expressly authorized in paragraph four below, and RELEASOR agrees to further protect against disclosure of RELEASEES identities by a) not identifying RELEASEES by their names, titles, education, religious affiliation, geographical location, or life coaching activities, b) changing identifiable information about the facts of RELEASOR'S claims, and c) otherwise changing the facts that form the basis of RELEASOR'S Complaint to protect against disclosure of RELEASEES identity, to any person not expressly excluded herein, except as expressly authorized in paragraph four below.

3.      RELEASOR and RELEASEES hereto agree that they will not contribute to, cooperate with, or encourage any publicity regarding this AGREEMENT including, but not limited to, its terms, the parties, or any individual health care providers previously consulted by Dr. Jennifer Fife related to RELEASOR'S claims,

which might be pursued by any third party or entity, whether legal or non-legal, including but not limited to, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA, ATLA, or similar publication or database for attorneys, bar associations, legal organizations, or databases, or any other persons or entities not expressly excluded herein. The undersigned agree that violation of confidential settlement information shall constitute a breach of this agreement which shall release the RELEASEES from its obligations under this provision.

4. Nothing in this AGREEMENT prevents RELEASOR from discussing her history, her claims or her injuries that form the basis of her Complaint with RELEASOR'S individual medical and individual counseling providers (both physical and mental) and RELEASOR'S local church leaders, which is defined as her local Bishop and Stake President. Nothing in this AGREEMENT prevents RELEASOR from discussing her history, her claims or her injuries that form the basis of her Complaint with her immediate family members (defined as her spouse, parents, siblings, or any children she may have), and Mary Heller. RELEASOR expressly agrees that she has advised and obtained the agreement of her immediate family members (as defined herein) and Mary Heller upon receipt of the confidential information that said persons: (1) will keep confidential the names of the parties to the settlement, the terms or existence of this AGREEMENT, and any fact concerning its negotiation, execution or implementation, and/or RELEASOR's claims; (2) will not disclose, communicate, post, or publish in any manner or forum directly or indirectly, to anyone, including but not limited to, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA, ATLA, or similar publication or database for attorneys, bar associations, legal organizations, or databases, and/or any other persons or entities not expressly excluded herein; and (3) will not contribute to, cooperate with, or encourage any publicity regarding this AGREEMENT, including, but not limited to, its terms, the parties, or any individual health care providers, which might be pursued by any third party or entity, whether legal or non-legal, including but not limited to, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA, ATLA, or similar publication or database for attorneys, bar associations, legal organizations, or databases, or any other persons or entities not expressly excluded herein. Upon disclosure of confidential information to RELEASOR'S immediate family members (as defined herein) and Mary Heller, those persons shall be given a copy of this AGREEMENT. RELEASOR agrees that violation of this provision by RELEASOR'S immediate family members (as defined herein) and Mary Heller who receive confidential information will constitute a breach of this agreement which shall release RELEASEES from its obligations under this AGREEMENT and shall entitle RELEASEES to the relief described in paragraph seven below.

5. RELEASOR agrees that she shall not at any time make any disparaging statements or representations, either directly or indirectly, whether in writing or orally, by word or gesture, to any person whatsoever, or any another entity including but not limited to, any state or federal agency, professional organization, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA, or ATLA, about the RELEASEES. RELEASOR expressly agrees that she has advised and obtained the agreement of the persons described in paragraph four who receive confidential information that said persons shall not at any time make any disparaging statements or representations, either directly or indirectly, whether in writing or orally, by word or gesture, to any person whatsoever, or any other entity including but not limited to, any state or federal agency, professional organization, news media, digital and/or social media, internet source/website/blogs, television, radio, Lexis, Westlaw, the Jury Verdict Reporter, National Jury Verdict Search, National Jury Verdict Settlement search, bar organizations, ITLA or ATLA, about the RELEASEES. For purposes of this paragraph, a disparaging statement or

representation is any communication which, if publicized to another, would cause the recipient of the communication to question the business condition, integrity, competence, good character, professional conduct, or product quality of the person or entity to whom the communication relates. A disparaging statement does not include those statements or representations made by RELEASOR to those persons identified in paragraph four who receive confidential information. The undersigned agree that violation of non-disparagement shall constitute a breach of this agreement which shall release the RELEASED PARTIES from its obligations under paragraphs one and three of this AGREEMENT and shall entitle RELEASEES to the relief described in paragraph seven below.

6.      Nothing in this AGREEMENT shall prevent RELEASOR, RELEASEES, or the persons identified in paragraph Four (4) from responding to any requests for information from any state or federal court, administrative agency or other governmental body.

7.      The undersigned acknowledge, stipulate, and agree to provide fair, adequate, and just compensation for the loss of such consideration, the loss of benefit of the bargain, injury to reputation, increased potential exposure to additional claims, embarrassment, and injury to standing in the community that the RELEASEES would incur should the undersigned, their attorneys, agents, or representatives disclose Confidential Settlement Information or disparage RELEASEES in violation of this agreement. Accordingly, RELEASOR hereby agrees that if a Mediator (RELEASOR will propose four possible mediators, each in the Chicago area, and RELEASEES will choose one of the four mediators) finds her liable, or her respective attorneys, agents, or representatives liable, for disclosing any Confidential Settlement Information or disparaging RELEASEES in violation of this AGREEMENT, RELEASEES shall be entitled to receive an appropriate monetary amount in liquidated damages from RELEASOR, in the amount of Fifty Thousand Dollars ($50,000.00), plus any attorney's fees and/or costs that are incurred in collecting said liquidated damages. RELEASOR acknowledges, stipulates, and agrees that the amount of said liquidated damages is wholly compensatory, and not punitive. RELEASOR and RELEASEES agree that the mutual promises made under this Section, entitled "Confidentiality and Non-Disparagement," will remain in effect forever. In the event that a Mediator does not find any alleged violation, the RELEASOR, attorneys and/or representatives shall be entitled to receive reimbursement of any attorneys' fees and costs incurred in defending the charge of an alleged violation from RELEASEES.

To the extent that any term or provision of the AGREEMENT is deemed void or not in compliance with the applicable law, that term or provision alone will be void, while all other terms or provisions will be enforceable. The RELEASEES shall have the opportunity to modify any such provision to conform to such law.

RELEASOR and RELEASEES shall bear their own attorneys' fees and costs incurred in the litigation and through the execution of this AGREEMENT.

The undersigned hereby acknowledges full and final settlement and satisfaction of any and all claims, demands, actions and causes of action of whatever kind or character which RELEASOR has or may have against the RELEASEES by reason of the INCIDENT including but not limited to any claims for bad faith or excess judgment. RELEASEES shall not be estopped or otherwise barred from asserting and expressly reserve the right to assert, any claim or cause of action they may have against the Undersigned or any others.

This AGREEMENT shall be construed and interpreted in accordance with the laws of the State of ILLINOIS. Any suit or proceeding brought hereunder shall have its situs and venue in ILLINOIS.

Facsimile signatures on the AGREEMENT with notarization are deemed acceptable and a photocopy may be used in place of originals for any purpose.

**I HAVE READ THIS AGREEMENT AND UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS CONTAINED IN IT.**

BY: _Meredith Weber (signature)_
MEREDITH WEBER

STATE OF _Virginia_ )
                                    ) ss
COUNTY OF _Henrico_ )

On the _15_ day of _March_____, before me personally appeared MEREDITH WEBER, who presented _____ as identification or who is known to me to be the persons described in and who executed the foregoing SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS, and who acknowledged to me that he/she executed it as his/her own free act and deed.

_Shelia Quash (signature)_
Notary Public

Approved as to Form, Content, and Confidentiality & Non-Disparagement:

BY: _Lawrence B. Finn_
The Finn Law Firm

BY: _(signature)_
Jenner Law, P.C.

BY: _(signature)_
Hall Prangle & Schoonveld, LLC

Page 6 of 7

**EXHIBIT 2**

FILED
4/6/2021 9:09 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
12853929

STATE OF ILLINOIS    )

                      ) SS.          ATTORNEY CODE 44952

COUNTY OF COOK    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| **MEREDITH WEBER,** | |
| **Plaintiff,** | |
| *versus* | **COURT NO.** 2021L003640 |
| **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE, DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC.** | |
| **Defendants.** | |

### COMPLAINT AT LAW AND JURY DEMAND

The Plaintiff, **MEREDITH WEBER**, through her attorneys, **THE FINN LAW FIRM** and **JENNER LAW, P.C.,** and complaining against Defendants, **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE, DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC**, states as follows:

### COMMON ALLEGATIONS OF FACT

1.      Plaintiff, **MEREDITH WEBER**, currently resides at 2713 Maple Wood Road, Richmond, Henrico County, Virginia 23228.

2.      Defendant in this action, **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE**, and **DR.**

FILED DATE: 4/6/2021 9:09 PM  2021L003640

FILED DATE: 4/6/2021 9:09 PM   2021L003640

**JENNIFER FINLAYSON-FIFE) (**hereafter **"JENNIFER FINLAYSON-FIFE, PHD"),** upon information and belief, currently resides at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

3. At all times material hereto, Defendant **JENNIFER FINALYSON-FIFE, PHD** was participating in psychotherapy treatment of her client, **MEREDITH WEBER**.

4. At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD** was a licensed clinical professional counselor in the state of Illinois.

5. At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD**, held herself out to the public as having a Doctor of Philosophy in Counseling Psychology conferred by Boston College.

6. At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD**, held herself out to the public as a psychotherapist and counselor who specialized in treating members of The Church of Jesus Christ of Latter-day Saints ("LDS").

7. At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD,** was a therapist and counselor, who engaged in psychotherapy counseling and otherwise engaged in mental health counseling including assessment, evaluation, diagnosis, monitoring, and treatment of psychological and psychiatric conditions including diagnosis of conditions such as narcissistic personality disorder and borderline personality disorder, of patients including **MEREDITH WEBER**.

8. At all times material hereto, Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, accepted **MEREDITH WEBER** as a patient and undertook, intended and agreed, expressly or impliedly, to assess, evaluate, test, diagnose, monitor, care for, instruct, treat and provide psychotherapy and/or other mental health counseling and treatment to **MEREDITH WEBER**.

FILED DATE: 4/6/2021 9:09 PM   2021L003640

9.      This is a professional malpractice action in which a licensed clinical professional counselor, **JENNIFER FINLAYSON-FIFE, PHD**, licensed in Illinois, provided clinical psychotherapy and counseling to **MEREDITH WEBER** and in doing so, engaged in multiple violations of the standard of care, including boundary violations, culminating in severe and lasting injuries to **MEREDITH WEBER**.

10.     In 2014, Plaintiff Meredith Weber was first introduced to Defendant **JENNIFER FINLAYSON-FIFE, PHD**, and her role as a counselor and therapist through **JENNIFER FINLAYSON-FIFE, PHD'S** Facebook advertising.

11.     In or around August 2017, **MEREDITH WEBER** reached out to Defendant requesting individual counseling with the goal of improving her life and her marriage.

12.     Initially, **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** she could not take on a regular client until October 2017 but offered **MEREDITH WEBER** a one-time appointment (something that was not publicly referenced on **JENNIFER FINLAYSON-FIFE, PHD'S** website) for which **MEREDITH WEBER** would have to fill out case paperwork prior to her one-time appointment.

13.     **MEREDITH WEBER** was instructed to fill out a life coaching agreement and a Beck Depression Inventory II ("BDI II"). The American Psychology Association recognizes the BDI II as a tool for measuring characteristic attitudes and symptoms of depression.

14.      **MEREDITH WEBER** filled out the requested documents including the BDI II noting, in part, she has "more the occasional death wish…I am way too wimpy to

3

consider self-harm." **MEREDITH WEBER** sought **JENNIFER FINLAYSON-FIFE, PHD'S** services due to both, "personal and marital problems."

15.     On those documents **JENNIFER FINLAYSON-FIFE, PHD'S** title was Jennifer Finlayson-Fife, Ph.D., LCPC, and under her name the title "Licensed Psychotherapist."

16.     **MREDITH WEBER** signed the contract with the understanding that she was entering into a therapy relationship with Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, a licensed psychotherapist.

17.     **JENNIFER FINLAYSON-FIFE, PHD** initiated the first appointment by Skype and thereafter took **MEREDITH WEBER** on as a regular therapy client. **JENNIFER FINLAYSON-FIFE, PHD** understood **MEREDITH WEBER'S** goal was to seek psychotherapy from **JENNIFER FINLAYSON-FIFE, PHD**, and in line with that goal, shortly after meeting her, diagnosed **MEREDITH WEBER** with depression. She continued to treat **MEREDITH WEBER** by Skype, by phone, by email and in-person until **JENNIFER FINLAYSON-FIFE, PHD** ended the therapeutic relationship on April 9, 2019.[1]

18.     **MEREDITH WEBER** was not provided with any information or warnings concerning the risks of engaging in psychotherapy or counseling. **MEREDITH WEBER** was never given the impression that **JENNIFER FINLAYSON-FIFE, PHD** was engaging in life coaching with her. **MEREDITH WEBER** always understood the relationship to be a therapeutic relationship, and **JENNIFER FINLAYSON-FIFE, PHD,**

---

[1] Prior to moving to Chicago, Ms. Weber participated in therapy with Dr. Fife from her home in Richmond, VA. Dr. Fife continued therapy in-person when Ms. Weber moved to Chicago. After leaving Chicago, Ms. Weber again participated in therapy from her home in Richmond, VA.

4

understood that.

19.     During the first five months of treatment, **MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** convened approximately every other week for therapy. **MEREDITH WEBER** shared her family origin and her past history with other therapists. **MEREDITH WEBER** shared the current state of her marriage, as well as her close relationship to her in-laws. In only their third session, **JENNIFER FINLAYSON-FIFE, PHD** noted in her own therapy case notes the impression that **MEREDITH WEBER** felt no sense of family outside of her in-laws. **JENNIFER FINLAYSON-FIFE, PHD** also explored **MEREDITH WEBER'S** family history and understood **MEREDITH WEBER** had a difficult relationship with her parents, specifically her mom, and at times had a difficult childhood.

20.     Shortly after beginning treatment with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER'S** marriage significantly worsened. **JENNIFER FINLAYSON-FIFE, PHD** first met **MEREDITH WEBER'S** husband during her fifth therapy session and observed he, "had little to say—mostly because he didn't want to validate M's desire to get professional help for the marriage. He knows she wants this and he doesn't want to give her what she wants. She does a lot of the work to solve the marriage or make it better and I think he enjoys this kind of control over her." **JENNIFER FINLAYSON-FIFE, PHD'S** initial impressions of Mr. Weber would carry through to her therapy of **MEREDITH WEBER**.

21.     In October 2017, during a therapy session, **JENNIFER FINLAYSON-FIFE, PHD** mentioned to **MEREDITH WEBER** that **JENNIFER FINLAYSON-FIFE, PHD** needed extra help at her home in Chicago, and suggested **MEREDITH WEBER**

5

FILED DATE: 4/6/2021 9:09 PM  2021L003640

may be able to come and stay with **JENNIFER FINLAYSON-FIFE, PHD** and her family in Chicago. In speaking about this**, JENNIFER FINLAYSON-FIFE, PHD** would tell **MEREDITH WEBER** in an email on February 21, 2018 that **MEREDITH WEBER** would be "such a great help to the family**."**

22.     After **JENNIFER FINLAYSON-FIFE, PHD** proposed the possibility of **MEREDITH WEBER** moving to Chicago to help her family, **MEREDITH WEBER** took this option seriously. With this option in mind, and after an altercation with her husband in January 2018, **MEREDITH WEBER** moved out of her home and left her husband and moved into a family member's home.

23.     When **MEREDITH WEBER** moved out of the martial home, she brought up **JENNIFER FINLAYSON-FIFE, PHD'S** offer to move to Chicago and stay with her. **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** that it "could work at some point," but admitted at that *"…generally the guidelines to therapists are to not engage clients in more familiar activities (like employment) etc for a period (such as a year) following a therapeutic relationship."* (emphasis added) **JENNIFER FINLAYSON-FIFE, PHD** then acknowledged that that is not a "rigid rule" but one to be aware of. On the same day, upon information and believe, **JENNIFER FINLAYSON-FIFE, PHD** stopped using her work email address to communicate with **MEREDITH WEBER** and began emailing **MEREDITH WEBER** from her personal email – jennifife@gmail.com.

23.     After initially suggesting the move to Chicago, **JENNIFER FINLAYSON-FIFE, PHD** expressed reservations about the "mixing of roles." She told **MEREDITH WEBER**, "[i]f you had left your marriage months ago or were divorced I

FILED DATE: 4/6/2021 9:09 PM   2021L003640

think I would feel different about it, but because it looks like I'm facilitating your departure or invested in it, it feels off to me."

25. Discussions about **MEREDITH WEBER** moving to Chicago continued and **JENNIFER FINLAYSON-FIFE, PHD** acknowledges ethical guidelines for therapists strongly advise that she not enter into dual role relationship such as a client and an employee. However, **JENNIFER FINLAYSON-FIFE, PHD** immediately justifies the move by telling **MEREDITH WEBER** that her own home would be "safe haven" and secure place**.**

26. **JENNIFER FINLAYSON-FIFE, PHD** expands upon this by telling **MEREDITH WEBER** she believes "everything would be fine" if she did move in as she has *"worked happily with lots of helpers in our home who have been very happy living with us."*

27. Although **JENNIFER FINLAYSON-FIFE, PHD** describes her home as a "safe haven," she did not provide **MEREDITH WEBER** with any resources for secure places or safe havens, other than moving to Chicago. **JENNIFER FINLAYSON-FIFE, PHD** did not refer **MEREDITH WEBER** to any alternative housing or employment options, throughout the five-month period from January 2018, when she left her husband, to when she ultimately moved to Illinois in June 2018.

28. After **MEREDITH WEBER** expresses frustration that helping **JENNIFER FINLAYSON-FIFE, PHD** in her home is not an option and acknowledges **JENNIFER FINLAYSON-FIFE, PHD'S** fear that someone may report her, **JENNIFER FINLAYSON-FIFE, PHD** then tells **MEREDITH WEBER**, even after acknowledging ethical guidelines frown upon dual relationships, that she wants to find a way to

7

"legitimately" make it work.

29.     **JENNIFER FINLAYSON-FIFE, PHD** subsequently asks **MEREDITH WEBER** to tell her who she has told about their relationship. **JENNIFER FINLAYSON-FIFE, PHD** also asks **MEREDITH WEBER** to tell her who knows that **MEREDITH WEBER** might come work in Chicago. She discloses to **MEREDITH WEBER** that she is most concerned with people who would have feelings about her leaving [Virginia]. **JENNIFER FINLAYSON-FIFE, PHD** is asking **MEREDITH WEBER** to keep secretes about their therapy relationship and plans to move to Chicago.

30.     **MEREDITH WEBER**, believing that **JENNIFER FINLAYSON-FIFE, PHD** was acting in her best interest, disclosed that only a small number of people know about the "clinical" relationship and the two friends who know would never say anything. **MEREDITH WEBER** told **JENNIFER FINLAYSON-FIFE, PHD**, "I'd be happy to do or tell people whatever in order to make things safe." **MEREDITH WEBER** understood from **JENNIFER FINLAYSON-FIFE, PHD** that she was not to mention her plans to move to Chicago in connection with her clinical relationship with **JENNIFER FINLAYSON-FIFE, PHD** to anyone.

31.     On March 15, 2018, **JENNIFER FINLAYSON-FIFE, PHD** secured **MEREDITH WEBER** a live-in nanny job at the home of another LDS family in her ward, but with the intention that **MEREDITH WEBER** would still work for her during her free time over the summer.

32.     **JENNIFER FINLAYSON-FIFE, PHD** arranged **MEREDITH WEBER'S** employment and housing near her own house. Over email, **JENNIFER FINLAYSON-FIFE, PHD** specified that any work **MEREDITH WEBER** did for

8

FILED DATE: 4/6/2021 9:09 PM   2021L003640

**JENNIFER FINLAYSON-FIFE, PHD** would be secondary to the work she did for her primary employer, her nanny job. The clear plan was that **MEREDITH WEBER** would work as a nanny and a helper to **JENNIFER FINLAYSON-FIFE, PHD** and her family.

33. **MEREDITH WEBER** was incredibly grateful for the opportunity and believed **JENNIFER FINLAYSON-FIFE, PHD** was treating her differently from her other clients because they held a different, closer relationship. While planning for their summer in Chicago, **JENNIFER FINLAYSON-FIFE, PHD** continued to provide **MEREDITH WEBER** with therapy and marriage counseling in the form of opinions about **MEREDITH WEBER'S** husband. **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** that she thought Mr. Weber was manipulating her and exploiting her fear of her in-law's disapproval. **JENNIFER FINLAYSON-FIFE, PHD** noted, "it shows his manipulativeness and self-service."

34. During the discussions about her move to Chicago, **MEREDITH WEBER** offered to stop her sessions with **JENNIFER FINLAYSON-FIFE, PHD** and wondered whether it would help if she transitioned to another counselor. **JENNIFER FINLAYSON-FIFE, PHD** says if **MEREDITH WEBER** works for her over the summer it is a good idea, she says "blending too much can diffuse the therapeutic relationship." But she reassures **MEREDITH WEBER** even when working for her in Chicago, **MEREDITH WEBER** "would still get a lot of input from me as i am often working in the kitchen alongside helpers etc. So it would not be the end of conversations with me, just not the same therapy frame."

35. **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER** continue to have discussions and **JENNIFER FINLAYSON-FIFE, PHD** provides her

9

FILED DATE: 4/6/2021 9:09 PM   2021L003640

with the name of another therapist to have "as back up." Discussions continue and as **JENNIFER FINLAYSON-FIFE, PHD** helps prepare **MEREDITH WEBER** to confront her in-laws, Mr. Weber's parents, about deficiencies in their relationship. **JENNIFER FINLAYSON-FIFE, PHD** agrees to help **MEREDITH WEBER** prepare for this. On April 4, 2018, during this process, **JENNIFER FINLAYSON-FIFE, PHD** tells **MEREDITH WEBER**, "[m]aybe as you get closer to coming to Chicago, we can think about you switching to another therapist. This is a tenuous time so it Not the right time to switch anything yet." **MEREDITH WEBER** cannot recall any additional discussions about changing therapists until the end of their psychotherapy relationship. **JENNIFER FINLAYSON-FIFE, PHD** never referred **MEREDITH WEBER** to a new therapist and she never told her she had to find a new therapist.

36.    **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER** met for the first time in-person in May 2018 in Boston for one of **JENNIFER FINLAYSON-FIFE, PHD'S** conferences. To make the conference more affordable, **JENNIFER FINLAYSON-FIFE, PHD** arranged for **MEREDITH WEBER** to stay with one of **JENNIFER FINLAYSON-FIFE, PHD's** friends. **MEREDITH WEBER'S** flight was delayed and so **JENNIFER FINLAYSON-FIFE, PHD** made special accommodations to allow her to participate virtually for part of the conference. At the conference, **MEREDITH WEBER** felt **JENNIFER FINLAYSON-FIFE, PHD** singled her out, making her a special and important person to **JENNIFER FINLAYSON-FIFE, PHD.** **MEREDITH WEBER** was invited to socialize with **JENNIFER FINLAYSON-FIFE, PHD** and her friends after hours during the conference, where she listened as **JENNIFER FINLAYSON-FIFE, PHD** and her friends shared personal stories about their lives,

10

FILED DATE: 4/6/2021 9:09 PM  2021L003640

completely unrelated to treatment. **MEREDITH WEBER** felt very special because **JENNIFER FINLAYSON-FIFE, PHD** took an interest in her outside of the therapy relationship and wanted **MEREDITH WEBER** to be a part of her life.

37.     **At JENNIFER FINLAYSON-FIFE, PHD's** invitation**, MEREDITH WEBER** moved to Chicago in June 2018 where she continued therapeutic treatment. **JENNIFER FINLAYSON-FIFE, PHD** did not encourage **MEREDITH WEBER** to seek therapy elsewhere and showed no hesitation to treat **MEREDITH WEBER** while also employing her in her home. **JENNIFER FINLAYSON-FIFE, PHD** continued to schedule sessions, and otherwise treat and bill **MEREDITH WEBER** for her therapy needs.

38.     **JENNIFER FINLAYSON-FIFE, PHD** kept a running "tab" of outstanding bills that **MEREDITH WEBER** had for therapy and allowed **MEREDITH WEBER** to "work off the tab" by working for **JENNIFER FINLAYSON-FIFE, PHD.** It was understood that **MEREDITH WEBER** would track her hours working for **JENNIFER FINLAYSON-FIFE, PHD** and **JENNIFER FINLAYSON-FIFE, PHD** would apply the pay for those hours to cover the outstanding therapy bill. To earn her hours, **MEREDITH WEBER** would babysit **JENNIFER FINLAYSON-FIFE, PHD's** children, take the children to music lessons, grocery shopping for the family, preparing meals for the family, organizing the house, taking the children out of the house for various activities, schedule doctor's appointments for **JENNIFER FINLAYSON-FIFE, PHD** or her family members, assist **JENNIFER FINLAYSON-FIFE, PHD** with selling personal property items online, and otherwise filling in any role **JENNIFER FINLAYSON-FIFE, PHD** needed. **JENNIFER FINLAYSON-FIFE, PHD** would then apply the money owed

11

to **MEREDITH WEBER** for her work to the running balance or tab that she kept for therapy. **JENNIFER FINLAYSON-FIFE, PHD** created a google sheet to track the hours and payment information.

39.     In addition to working off her therapy balance, **MEREDITH WEBER** would take **JENNIFER FINLAYSON-FIFE, PHD's** children on outings for ice cream, shopping, ice skating, and other activities. Sometimes, **MEREDITH WEBER** would use her own money to pay for the activities and **JENNIFER FINLAYSON-FIFE, PHD** would reimburse her via Venmo. **MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** attended LDS church services together and social events such as cook-outs. **MEREDITH WEBER** was the only non-family member invited to **JENNIFER FINLAYSON-FIFE, PHD's** fourth of July cookout, where she was introduced to many of **JENNIFER FINLAYSON-FIFE, PHD's** family members and integrated into her inner circle. **JENNIFER FINLAYSON-FIFE, PHD** provided **MEREDITH WEBER** with her own bicycle as a means of getting around the city. **JENNIFER FINLAYSON-FIFE, PHD** left a key for **MEREDITH WEBER** when she was not home that would allow **MEREDITH WEBER** to come and cook dinner for **JENNIFER FINLAYSON-FIFE, PHD** and her family during the day, while they were out, and **MEREDITH WEBER** would leave it in the refrigerator with instructions on how to heat it up. **MEREDITH WEBER** frequently came and made dinners for **JENNIFER FINLAYSON-FIFE, PHD's** family. **MEREDITH WEBER** was performing work for **JENNIFER FINLAYSON-FIFE, PHD** in her home at the same time **JENNIFER FINLAYSON-FIFE, PHD** was seeing other therapy clients. **MEREDITH WEBER** was referred to as a "helper" of **JENNIFER FINLAYSON-FIFE, PHD's. JENNIFER FINLAYSON-FIFE, PHD**

12

acknowledged she has had many helpers over the years.

40.     During **MEREDITH WEBER's** time in Chicago from June to August 2018 she participated in ten therapy sessions with **JENNIFER FINLAYSON-FIFE, PHD.** Two of those therapy sessions included her husband, Mr. Weber. **JENNIFER FINLAYSON-FIFE, PHD** continued to formally treat **MEREDITH WEBER** as a patient even as **MEREDITH WEBER** worked as her employee, babysitter and confidant. **JENNIFER FINLAYSON-FIFE, PHD** also treated **MEREDITH WEBER** informally through conversations and social interactions throughout their time together in Chicago. **MEREDITH WEBER** also attended church with **JENNIFER FINLAYSON-FIFE, PHD,** social gatherings, and even exercise classes.

41.     **JENNIFER FINLAYSON-FIFE, PHD** was scheduled to leave the country at the end of the summer of 2018 for work, but planned to continue therapy with **MEREDITH WEBER** via Skype, telephone and email. **JENNIFER FINLAYSON-FIFE, PHD** encouraged **MEREDITH WEBER** to live at **JENNIFER FINLAYSON-FIFE, PHD's** family home in Chicago while she was gone and manage her home, as well as AirBnB her home. **MEREDITH WEBER** elected to return to Virginia and attempt to work on her marriage. **MEREDITH WEBER** continued her therapy relationship with **JENNIFER FINLAYSON-FIFE, PHD** and saw her approximately once a week throughout September of 2018. **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER'S** sessions became a little less frequent per **JENNIFER FINLAYSON-FIFE, PHD's** busy schedule from October to December 2018.

42.     Over the course of 2018, **MEREDITH WEBER** was integrated heavily into **JENNIFER FINLAYSON-FIFE, PHD's** personal life. **MEREDITH WEBER** and

13

FILED DATE: 4/6/2021 9:09 PM 2021L003640

**JENNIFER FINLAYSON-FIFE, PHD** were personal Facebook friends and Instagram friends. **MEREDITH WEBER** became friends with **JENNIFER FINLAYSON-FIFE, PHD's** son on Facebook and remains friends with **JENNIFER FINLAYSON-FIFE, PHD's** brother on Facebook. **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER** exchanged communications via another social medium, Marco Polo, by sending videos to each other. At least some of these videos were personal videos, including one in which **JENNIFER FINLAYSON-FIFE, PHD**, her husband and her son were walking home from an ice cream shop and recording a video for **MEREDITH WEBER**.

43.     In December 2018, **JENNIFER FINLAYSON-FIFE, PHD** was traveling for a tour and less available to **MEREDITH WEBER**. During their scheduled sessions, **MEREDITH WEBER** was struggling to update **JENNIFER FINLAYSON-FIFE, PHD** on everything in her life. Therefore, in late December 2018, **JENNIFER FINLAYSON-FIFE, PHD** suggested that **MEREDITH WEBER** call her "off the clock" while she was driving with her family, to catch her up. **MEREDITH WEBER** felt again that she had a special relationship with **JENNIFER FINLAYSON-FIFE, PHD** and she did not treat every patient like she treated **MEREDITH WEBER**.

44.     In January 2019, **MEREDITH WEBER** expressed her wish to **JENNIFER FINLAYSON-FIFE, PHD** that she was interested in becoming a counselor or therapist one day and wished **JENNIFER FINLAYSON-FIFE, PHD** to mentor her while she worked towards that goal. **JENNIFER FINLAYSON-FIFE, PHD** admitted that she could not be a mentor or friend to **MEREDITH WEBER**, she was **MEREDITH WEBER'S** therapist and the relationship was a therapist/client relationship. **MEREDITH WEBER** continued to inquire further about their relationship, feeling as though she was

14

FILED DATE: 4/6/2021 9:09 PM   2021L003640

never treated as "just a patient" before she brought up the possibility of a mentor/mentee relationship.

45.     In February 2019, **JENNIFER FINLAYSON-FIFE, PHD** acknowledged she had been neglectful of several of her clients including **MEREDITH WEBER** due to being unavailable over the past weeks. **JENNIFER FINLAYSON-FIFE, PHD** went on to tell **MEREDITH WEBER** that she no longer wished to do therapy "over email" and wanted to wait to address issues during their sessions.

46.     Then, during a session in or around February 2019, **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** that she had features of borderline personality disorder**,** which had a deeply traumatic effect on **MEREDITH WEBER**. **MEREDITH WEBER** trusted **JENNIFER FINLAYSON-FIFE, PHD** more than anyone and felt as if this diagnosis meant she was "crazy" or "damaged." She did not understand it and did not understand where the diagnosis came from.

47.     **MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** continued to meet to participate in therapy through April 9, 2019, and **JENNIFER FINLAYSON-FIFE, PHD** continued to suggest that **MEREDITH WEBER** had either borderline personality disorder tendencies or otherwise had narcissistic personality disorder tendencies.

48.     **JENNIFER FINLAYSON-FIFE, PHD** terminated her therapy relationship with **MEREDITH WEBER** on April 9, 2019. **JENNIFER FINLAYSON-FIFE, PHD** failed to provide **MEREDITH WEBER** with a personal referral to another therapist.

49.     Throughout her treatment of **MEREDITH WEBER**, **JENNIFER**

**FINLAYSON-FIFE, PHD**, regularly referred to their relationship as "therapy," or "therapeutic." **JENNIFER FINLAYSON-FIFE, PHD** referred to herself as **MEREDITH WEBER'S** therapist, and to their work together as "therapy." **JENNIFER FINLAYSON-FIFE, PHD** did not refer to their work as "coaching" or refer to herself as **MEREDITH WEBER'S** life coach rather than therapist in their correspondence.

50.     The end of the professional and personal relationship was devastating to **MEREDITH WEBER**.

51.     Following the end of therapy with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** experienced a severe and debilitating trauma that prevented her from taking part in many of her normal activities and led her to consider self-harm.

52.     **MEREDITH WEBER** consulted with multiple therapists seeking help for the trauma she suffered. In May 2019 she began seeing Ellen Thurmond, LCSW who was able to treat her close to her home. Ms. Thurmond continues to provide psychotherapy to **MEREDITH WEBER** today approximately once or twice a week.

53.     **MEREDITH WEBER** was referred to Ms. Thurmond by Dr. David Schnarch's office. Dr. Schnarch's office provided Ms. Thurmond as an option for a therapist that practiced Dr. Schnarch's techniques and was close to **MEREDITH WEBER's** home in Virginia.

54.     **MEREDITH WEBER** continued to suffer from panic attacks and anxiety. In June 2019 she experienced severe chest pain and shortness of breath. A few days later she was treated at Patient First where it was noted that she suffered from a panic attack. She was referred to a psychiatrist for panic disorder.

55.     In August 2019, **MEREDITH WEBER** began treating with a licensed

16

FILED DATE: 4/6/2021 9:09 PM   2021L003640

psychiatrist, Dr. Steven Welton. **MEREDITH WEBER** presented to Dr. Welton with acute anxiety, depression, suicidal ideations, sleep issues and components of post-traumatic stress disorder ("PTSD"). Dr. Welton diagnosed **MEREDITH WEBER** with PTSD and symptoms consistent with dysthymia. **MEREDITH WEBER** was prescribed various mediations. Dr. Welton continues to treat **MEREDITH WEBER** for her injuries approximately once every other month.

56. **MEREDITH WEBER** also consulted with other professionals including a trauma coach and other psychotherapists and psychiatrists to treat her injuries. Because of her experience with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** had difficulty trusting her medical providers and often sought second opinions to verify the information provided. This was something she did not know to do when she was treating with **JENNIFER FINLAYSON-FIFE, PHD**.

57. From late 2019 to early 2020, **MEREDITH WEBER'S** symptoms worsened. Around the one-year anniversary of **JENNIFER FINLAYSON-FIFE, PHD's** termination of care, **MEREDITH WEBER** experienced more severe stress, anxiety, depression and other behavioral symptoms. She entered a partial hospitalization program wherein she would spend a significant amount of time with professionals treating her injuries.

58. In May 2020, **MEREDITH WEBER** presented for a check-in as part of her partial hospitalization program at Henrico Doctor's Hospital. At this appointment, she was suffering from severe anxiety and suicidal ideations. Her doctors were concerned about her health and immediate safety, and she agreed to check herself into the hospital for treatment.

17

59.      **MEREDITH WEBER** checked herself into the hospital for in-patient psychiatric treatment for approximately five days. She was incredibly anxious about admitting herself for many reasons, including the ongoing pandemic that was sweeping the country.

60.      **MEREDITH WEBER** was discharged from the hospital on May 11, 2020 with the primary diagnosis of major depressive disorder, recurrent severe, and generalized anxiety disorder. Upon discharge, she immediately restarted the partial hospitalization program. **MEREDITH WEBER'S** partial hospitalization programs generally involved spending her entire day in therapy but spending her nights at home.

61.      **MEREDITH WEBER** completed the partial hospitalization program in June 2020 and began a second program through another Tucker Pavilion Chippenham Hospital. She attended that program as an outpatient where she participated in frequent group and individual therapy sessions. Weber attended this program for approximately two months. These programs allowed **MEREDITH WEBER** to focus almost completely on her therapy. **MEREDITH WEBER** also found group therapy was helpful in overcoming some of her mistrust of her own medical providers, including Ms. Thurmond and Dr. Welton.

62.      In addition to in-patient and out-patient therapy and psychiatric care, **MEREDITH WEBER** has also required prescription medication including antidepressants, medications for anxiety and insomnia, and also an antipsychotic medication.

63.      **MEREDITH WEBER'S** stress and anxiety also manifested in various physical ways including skin problems and clenching of her jaw, both requiring special

18

treatment.

64.     While in the midst of completing the hospitalization programs, **MEREDITH WEBER** felt she made more progress during group therapy sessions, in addition to her one-on-one sessions. In September 2020, she began attending group therapy at Richmond Creative Counseling approximately once a week. She continues to participate in group therapy today.

65.     **MEREDITH WEBER** has suffered significant physical and psychological injuries because of **JENNIFER FINLAYSON-FIFE, PHD'S** treatment and subsequent termination including severe and debilitating emotional distress, pain and suffering, and loss of enjoyment of life. **MEREDITH WEBER** has been diagnosed with severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame. She experiences feelings of panic, anxiety, shame and traumatic loss and feelings as if she is not good enough.

66.     **JENNIFER FINLAYSON-FIFE, PHD's** improper and unprofessional therapy, and extreme boundary violations, devastated **MEREDITH WEBER**. Her reactions to **JENNIFER FINLAYSON-FIFE, PHD's** treatment are ongoing and are consistent with individuals suffering from trauma including depression, insomnia and anxiety. **MEREDITH WEBER** has suffered overwhelmingly harmful effects from the treatment that **JENNIFER FINLAYSON-FIFE, PHD** provided, including significant

19

psychological injuries that also manifested in a physical way. Perhaps most severe, **MEREDITH WEBER** experienced suicidal ideations.

67.    To this day, **MEREDITH WEBER** continues to suffer from anxiety, depression, insomnia, obsessive tendencies, and has difficulty concentrating and maintaining focus. **JENNIFER FINLAYSON-FIFE, PHD's** abuse, mistreatment and betrayal caused **MEREDITH WEBER** irreparable harm. The extreme feeling of shame, betrayal, and an overwhelming sense of helplessness and hopelessness has severely impacted her self-esteem and feelings of self-worth. **MEREDITH WEBER** has significant difficulty trusting her treating doctors and continues to seek out additional doctors for fear that if one support system falls, she will not be completely abandoned and lost as she was when **JENNIFER FINLAYSON-FIFE, PHD** abruptly terminated their relationship. **MEREDITH WEBER'S** lack of trust in her treating healthcare providers has made it significantly more difficult for her to open herself to the ameliorative treatment that her doctors recommend, and that she requires to improve her current condition. The lack of trust is a huge impairment to any offered treatment.

68.    **MEREDITH WEBER** continues to see her medical providers on a weekly basis and must continue her to see her providers regularly for the foreseeable future.

69.    Attached hereto as Exhibit "A" is the Affidavit of the attorney in this cause, filed pursuant to 735 ILCS 5/2-622(a)(1), together with a report from a reviewing Health Professional.

**JURISDICTION AND VENUE**

70.    That from approximately September 2017 to April 9, 2019, **JENNIFER FINLAYSON-FIFE, PHD** provided therapy and counseling to **MEREDITH WEBER**

20

FILED DATE: 4/6/2021 9:09 PM   2021L003640

via skype, phone, email, text and in-person from or at the Defendant's home, 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

71.     This Court has jurisdiction over this action pursuant to Ill. Const. art. VI, § 9. The amount in controversy exceeds $50,000.00, exclusive of interest and costs.

72.     Venue is proper in this Court because the Defendants reside in Cook County, no real property is involved in this action, and a substantial part of the events or omissions giving rise to this claim occurred in this County.

## COUNT I – NEGLIGENCE

The Plaintiff, **MEREDITH WEBER**, for Count I of the Complaint at Law, complains against Defendant, **JENNIFER FINLAYSON-FIFE, PHD,** as follows:

1-72.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 72 above as paragraphs 1 through 72 of Count I, as if set forth in their entirety herein.

73.     At all times relevant hereto, it was the duty of the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, to possess and apply the knowledge and use the skill and care ordinarily used by a licensed clinical professional counselor providing services to clients such as **MEREDITH WEBER**.

74.     At all times relevant hereto, it was the duty of the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, to possess and apply the knowledge and use the skill and care ordinarily used by a psychotherapist or counselor providing services to clients such as **MEREDITH WEBER**.

21

FILED DATE: 4/6/2021 9:09 PM   2021L003640

75.     At all relevant times hereto, the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, was under a duty to comply with various regulations and ethical codes in providing services to clients such as **MEREDITH WEBER**, including but not limited to:

(a)     Illinois statutes and regulations, including Illinois Administrative Code 68 ILAC § 1375, *et seq*.; 68 IL ADC 1375 *et seq*.;

(b)     American Counseling Association Code of Ethics; and

(c)     American Psychological Association, Ethical Principles of Psychologists and Code of Conduct.

76.     That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, violated her duties and was negligent in her care and treatment of **MEREDITH WEBER** in one or more of the following respects:

(a)     Carelessly and negligently engaging in a nonprofessional relationship with her client;

(b)     Carelessly and negligently engaging in psychotherapy while engaging in a dual relationship with Plaintiff;

(c)     Carelessly and negligently failing to offer all pertinent facts regarding services rendered prior to the administration of professional services;

(d)     Carelessly and negligently abandoning or neglecting Ms. Weber and failing to refer, transfer or make appropriate arrangements for the continuation of treatment following termination;

(e)     Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy;

(f)     Carelessly and negligently failed to enlist Ms. Weber's support network, which Dr. Fife should have known had important meaning in Ms. Weber's life, as a positive resource in her treatment of Ms. Weber;

(g)     Carelessly and negligently imposed her own personal values on Ms. Weber;

22

FILED DATE: 4/6/2021 9:09 PM  2021L003640

(h)  Carelessly and negligently engaged in a personal virtual relationship with Ms. Weber, while she was providing counseling and psychotherapy to Ms. Weber, through social media or otherwise;

(i)  Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries;

(j)  Carelessly and negligently exploited Ms. Weber as a personal "helper" to herself and her family while providing therapy and counseling to Ms. Weber;

(k)  Carelessly and negligently bartered with Ms. Weber for Ms. Weber's services to herself and her family in exchange for therapy services; and

(l)  Carelessly and negligently failed to ensure continuation of care or an appropriate clinical and administrative process, upon termination of care, and failed to maintain open communication to allow for Ms. Weber's continuation of care.

77.  That as a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

78.  As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

23

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

## COUNT II – INFORMED CONSENT

The Plaintiff, **MEREDITH WEBER**, for Count II of the Complaint at Law, complains against Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, as follows:

1 – 78.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 78 of Count I as paragraphs 1 through 78 of Count II, as if set forth in their entirety herein.

79.     At all times relevant hereto, the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, was under a duty to provide informed consent to **MEREDITH WEBER**, including the risks, benefits and warnings of the nature of the care the Defendant would be providing to **MEREDITH WEBER** and this duty continued regarding all care administered by **JENNIFER FINLAYSON-FIFE, PHD** to **MEREDITH WEBER**.

80.     That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, breached her duty to provide informed consent in her care and treatment of **MEREDITH WEBER** in one or more of the following respects:

(a)     Failing to provide a written agreement that detailed the nature of the care and treatment to be rendered to Ms. Weber;

(b)     Carelessly and negligently asking Ms. Weber to sign a life coaching agreement prior to their first appointment, before Ms. Weber knew whether she would be able to engage Dr. Fife as her therapist, while Dr. Fife acknowledged on her website, "I refer to myself as a coach when working across state lines to avoid any potential licensing issues (that are currently undefined with Internet-based therapy)";

24

FILED DATE: 4/6/2021 9:09 PM 2021L003640

(c)     Carelessly and negligently asking Ms. Weber to sign a life coaching agreement prior to their first appointment, before Ms. Weber knew whether she would be able to engage Dr. Fife as her therapist, while Dr. Fife acknowledged on her website, "Note for clients outside of Illinois: Given the current ambiguity around licensing and providing out of state clinical services, all work with Dr. Finlayson-Fife across state lines will fall under the umbrella of "coaching" until further licensing regulation has been established. Just be aware that coaching sessions (and generally all out of state therapy services) are not reimbursed by insurance companies.";

(d)     Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy; and

(e)     Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries;

81.     That as a direct and proximate result of one or more of the aforementioned acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

82.     That as a direct and proximate result of one or more the aforementioned acts and/or omissions by Defendant **JENNIFER FINLAYSON-FIFE, PHD, MEREDITH WEBER** consented to treatment she otherwise would not have consented to.

83.     As a direct and proximate result of one or more of the aforementioned acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD, MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited

25

FILED DATE: 4/6/2021 9:09 PM    2021L003640

to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

### COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

1 – 83.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 83 of Count II as paragraphs 1 through 83 of Count III, as if set forth in their entirety herein.

84.    That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, owed a duty to **MEREDITH WEBER** to refrain from activity which carries with it a foreseeable, and unreasonable, risk of causing emotional or mental harm to the patient, **MEREDITH WEBER**.

85.    That as a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

26

FILED DATE: 4/6/2021 9:09 PM   2021L003640

86.     As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC, and THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs

### COUNT IV – NEGLIGENCE PER SE

1 – 86.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 86 of Count III as paragraphs 1 through 86 of Count IV, as if set forth in their entirety herein.

87.     At all relevant times hereto, Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, a licensed clinical professional counselor, held herself out as a licensed psychotherapist, owed a duty to **MEREDITH WEBER** pursuant to state rules and regulations.

88.     At all relevant times hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD,** breached her duty to **MEREDITH WEBER** by failing to comply with the laws and regulations of State of Illinois and incorporated ethical regulations, including, but not limited to, the following:

(a)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68,

27

FILED DATE: 4/6/2021 9:09 PM   2021L003640

§ 1375.225(a)(2), Engaging in any action that violates or diminishes the civil or legal rights of clients.

(b)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(5), Bringing personal or professional biases into the counseling relationship.

(c)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(8), Engaging in any nonprofessional relationships with clients, former clients, client's romantic partners, or client's family members should be avoided, except when the interaction is potentially beneficial to the client. All potentially beneficial relationships must be documented in case notes, and conducted with full client consent. When unintentional harm occurs to the client, or former client, or to an individual significantly involved with the client or former client, due to the nonprofessional interaction, the counselor must show evidence of an attempt to remedy that harm.

(d)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(9), Failing to offer all pertinent facts regarding services rendered to the client prior to administration of professional services.

(e)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(b)(c), Failing to take appropriate steps to protect the privacy of a client and avoid unnecessary disclosures of confidential information. The right to privacy belongs to clients and may be waived. A written waiver shall be signed by the client and the information revealed shall be in accordance with the terms of the waiver.

(f)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(1), Performing, or pretending to be able to perform, professional services beyond one's scope of practice and one's competency, as defined by education, training, supervised experience, State and national professional credentials, and appropriate professional experience.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

(g)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(2), Abandoning or neglecting clients and/or failing to refer and/or make appropriate arrangements for the continuation of treatment, when necessary, during interruptions, such as vacations or illness, and following termination.

(h)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(3), Failing to use techniques/procedures/modalities that are grounded in professionally accepted theory and/or have an empirical or scientific foundation.

(i)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(4), Failing to establish and maintain client records and case notes, including failing to inform clients of issues related to the difficulty of maintaining the confidentiality of electronically transmitted communication.

(j)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(5), Failing to inform clients of the benefits and limitations of using information technology applications in the counseling process and in business/billing procedures.

(k)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(6), Advertising shall not be deceptive, misleading or false. Counselors should claim or imply only professional credentials possessed and are responsible for correcting any misrepresentations of their credentials by others. Professional credentials include highest relevant degrees, accreditation of graduate programs, national voluntary certifications, government-issued certifications or licenses, professional membership, or any other credential that might indicate to the public specialized knowledge or expertise in professional counseling.

(l)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(8), Knowingly offering or providing services to a client when

29

FILED DATE: 4/6/2021 9:09 PM   2021L003640

the counselor's ability to practice is impaired. Failing to seek assistance for problems that reach the level of professional impairment, and, if necessary, limiting, suspending or terminating his or her professional responsibilities until such time it is determined that it is safe to resume work. Causes of impairment may include, but are not limited to, the abuse of mood altering chemicals and physical or mental problems; offering professional services when the counselor's personal problems or conflicts may harm a client or others.

(m)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(f), The Division hereby incorporates by reference "The American Counseling Association Code of Ethics and Standards of Practice", April 2005, approved by the American Counseling Association, 5999 Stevenson Avenue, Alexandria, Virginia 22304, with no later amendments or editions.

(n)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(g), Licensed Professional Counselors and Licensed Clinical Professional Counselors are responsible for professional conduct consistent with every standard, in addition to the ones summarized in this Section, published in the 2005 American Counseling Association Code of Ethics.

(o)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.1, Client Welfare, including Primary Responsibility and Support Network Involvement.

(p)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.2, Informed Consent in the Counseling Relationship, including Informed Consent, Types of Information Needed and Clients Served by Others.

(q)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.4, Avoiding Harm and Imposing Values, including Avoiding Harm and Personal Values.

(r)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.5, Prohibited Noncounseling Roles and Relationships including Personal Virtual Relationships with Current Clients.

(s)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.6, Managing and Maintaining

30

FILED DATE: 4/6/2021 9:09 PM   2021L003640

Boundaries and Professional Relationships, including Extending Counseling Boundaries, Documenting Boundary Extensions, Role Changes in a Professional Relationship, and Nonprofessional Interactions or Relationships (Other Than Sexual or Romantic Interactions or Relationships).

(t)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.10, Fees and Business Practices, including Bartering.

(u)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.11, Termination and Referral, including Appropriate Transfer of Services.

(v)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.12, Abandonment and Client Neglect.

(w)     American Counseling Association Code of Ethics, Section C, Professional Responsibility, Section C.1, Knowledge of and Compliance with Standards.

(x)     American Counseling Association Code of Ethics, Section H, Resolving Ethical Issues.

(y)     American Counseling Association Code of Ethics, 2014 Edition, Incorporating Relevant Sections including Section H, Distance Counseling, Technology and Social Media.

(z)     American Psychological Association: Ethical Principles of Psychologists and Code of Conduct, Principle A: Beneficence and Nonmaleficence, Section 3, Human Relations, including Avoiding Harm, Multiple Relationships, Exploitive Relationships, Informed consent and Bartering with Clients/Patients.

89.     The statutes, ordinances and administrative regulations outlined herein have the force of law.

90.     The statutes, ordinances and administrative regulations outlined herein are intended to protect against the type of injury suffered by **MEREDITH WEBER**.

91.     Plaintiff **MEREDITH WEBER** is within the class intended to be protected by the aforementioned statues, ordinances or administrative regulations.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

92.    Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, is prima facie guilty of negligence due to her violations of the rules and regulations outlined herein.

93.    That as a direct and proximate result of one or more of the aforementioned violations by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

94.    As a direct and proximate result of one or more of the aforementioned violations by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

### COUNT V – DEFACTO MERGER, MERE CONTINUATION, SUCCESSOR LIABILITY

1 – 94.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 94 of Count IV as paragraphs 1 through 94 of Count V, as if set forth in their entirety herein.

FILED DATE: 4/6/2021 9:09 PM   2021L003640

95.     Defendant, **FINLAYSON-FIFE, LLC**, is a limited liability company organized or admitted on June 25, 2020 in the State of Illinois. The managers for **FINLAYSON-FIFE, LLC** are Thriving Relationships, PLLC (#08745722), John Finlayson, and Jennifer Fife. **FINLAYSON-FIFE, LLC** and all managers have a place of business and conduct business at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

96.     Defendant, **THRIVING RELATIONSHIPS, PLLC**, is a professional limited liability company organized or admitted on June 24, 2020 in the State of Illinois. The manager and registered agent for **THRIVING RELATIONSHIPS, PLLC** is Jennifer Fife. **THRIVING RELATIONSHIPS, PLLC** and its agent and manager have a place of business and conduct business at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

97.     During her treatment of **MEREDITH WEBER**, Defendant, **JENNIFER FINLAYSON-FIFE, PHD** operated under the name **DR. JENNIFER FINLAYSON-FIFE** or **DR. JENNIFER FIFE**. During her treatment of **MEREDITH WEBER**, **JENNIFER FINLAYSON-FIFE, PHD's** website address was www.finlayson-fife.com and the copyright holder for the website was identified as **JENNIFER FINLAYSON-FIFE**.

98.     Sometime after her treatment of **MEREDITH WEBER**, Defendant, **JENNIFER FINLAYSON-FIFE, PHD** changed the copyright holder for her website to **FINLAYSON-FIFE, LLC**. Upon information and belief, **JENNIFER FINLAYSON-FIFE'S** business is currently operated as **FINLAYSON-FIFE, LLC** and/or **THRIVING RELATIONSHIPS, PLLC**.

99.     Defendants, **FINLAYSON-FIFE, LLC** and **THRIVING RELATIONSHIPS, PLLC**, are successors in interest to **JENNIFER FINLAYSON-**

33

FILED DATE: 4/6/2021 9:09 PM   2021L003640

**FIFE, PHD**, and liable for the debts and liabilities of **JENNIFER FINLAYSON-FIFE, PHD**.

100. Defendants, **FINLAYSON-FIFE, LLC** and **THRIVING RELATIONSHIPS, PLLC,** are liable as a defacto merger, mere continuation or under a theory of successor liability for the debts or liabilities of **JENNIFER FINLAYSON-FIFE, PHD**, because (a) there was an express or implied agreement of assumption of liability, (b) the transaction amounted to a consolidation or merger of the purchaser or seller corporation, (c) the purchaser is merely a continuation of the seller, or (d) the transaction was for the fraudulent purpose of escaping liability.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC,** in an amount in excess of $50,000.00, exclusive of interest and costs.

### JURY DEMAND

### PLAINTIFF DEMANDS A TRIAL BY A JURY OF TWELVE.

> **THE FINN LAW FIRM**
> Attorneys for the Plaintiff
>
> By: /s/ Lawrence B. Finn
> **LAWRENCE B. FINN**

Firm I. D. No. 44952
**THE FINN LAW FIRM**
20 N. Clark Street
Suite 3300
Chicago, IL  60602
312-962-0425
312-332-3550 FAX
LFinn@FinnLawAssociates.com

34

FILED DATE: 4/6/2021 9:09 PM   2021L003640

Robert K. Jenner (*pro hac vice* to be filed)
Kathleen R. Kerner (*pro hac vice* to be filed)
JENNER LAW, P.C.
1829 Reisterstown Road, Suite 350
Baltimore, MD  21208
Telephone: (410) 413-2155
Facsimile: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

FILED
4/6/2021 9:09 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 4/6/2021 9:09 PM   2021L003640

STATE OF ILLINOIS      )
                              ) SS.                  **ATTORNEY CODE 44952**
COUNTY OF COOK      )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| **MEREDITH WEBER,**<br><br>          **Plaintiff,**<br><br>    *versus*<br><br>**JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE**, and **DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC.**<br><br>          **Defendants.** | **COURT NO.** 2021L003640 |

### AFFIDAVIT OF KATHLEEN R. KERNER

I, Kathleen Kerner, being duly sworn, deposes and states that:

1.   I am one of the attorneys for the Plaintiff, Meredith Weber, in this matter.

2.   I have consulted and reviewed the facts surrounding the care and treatment of Meredith Weber**,** with a physician licensed to practice medicine in all its branches who I reasonably believe is  (i) knowledgeable in the relevant issues involved in this particular action, (ii) practices or has practiced or teaches or has taught within the last 6 years in the same areas of health care or medicine that is at issue in this particular action, and (iii) qualified by experience or has demonstrated competence in the subject of this case; and who has determined in a written report, after a review of Meredith Weber's available medical records  and other pertinent

1

FILED DATE: 4/6/2021 9:09 PM   2021L003640

materials that there is a reasonable and meritorious cause for the filing of this action.

3. I have concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for the filing of this action.

4. A true and correct copy of the report of the reviewing physician, with information that would identify the reviewing health professional redacted, is attached hereto as Exhibit A.

FURTHER AFFIANT SAYETH NOT.

_____
Kathleen R. Kerner


Under penalties as provided by law pursuant to Section 1-109 if the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be upon information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Kathleen R. Kerner

ARDC # 6200559
Lawrence B. Finn
**THE FINN LAW FIRM**
115 S. LaSalle St., Suite 2600
Chicago, IL  60603
Phone: 312-962-0425
Fax:    312-332-3550
LFinn@FinnLawAssociates.com

Robert K. Jenner (*pro hac vice* to be filed)
Kathleen R. Kerner (*pro hac vice* to be filed)
JENNER LAW, P.C.
1829 Reisterstown Road, Suite 350
Baltimore, MD  21208
Telephone: (410) 413-2155
Facsimile: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

2

**Meredith Weber v. Jennifer Finlayson-Fife, Ph.D.**

**HEALTH PROFESSIONAL REPORT PURSUANT TO 735 ILCS 5/2-622**

1.      I am a physician licensed to practice medicine in the State of Virginia in all its branches.  I am Board Certified in General Psychiatry and Child/Adolescent Psychiatry.

2.      I have practiced medicine in the same area of health care or medicine that is at issue in this particular action within the last six years.  I am knowledgeable in the relevant issues involved in this particular matter.  I am qualified by experience and I have demonstrated competence in the subject of this case. During my practice, I have regularly evaluated and treated patients with chronic debilitating medical conditions, including patients with severe and debilitating depression, anxiety, post-traumatic stress disorder, suicidal ideations, and other psychiatric conditions. I have also cared for patients who have been hospitalized through in-patient programs and out-patient partial hospitalization programs as a result of their psychiatric conditions.

3.      I have read and reviewed records pertaining to the care and treatment rendered to Meredith Weber by Jennifer Finlayson-Fife, PhD ("Dr. Fife"), a licensed clinical professional counselor, from August 8, 2017 to April 9, 2019. Those records also contained emails and text messages exchanged between Ms. Weber and Dr. Fife along with the original agreement entered into between Dr. Fife and Ms. Weber at the initiation of care.

4.      I understand that during the professional relationship between Dr. Fife and Ms. Weber, Dr. Fife flagrantly violated boundaries. Dr. Fife's practices of responding substantively to Ms. Weber email communications and requests, sometimes almost immediately, and habit of scheduling sessions or additional time on demand contributed to a perceived ever-present availability that solidified Ms. Weber's attachment to Dr. Fife in an intensive way. Dr. Fife then facilitates Ms. Weber's move out of state to a home nearby Dr. Fife and employs her as a part time nanny and to complete other tasks. Dr. Fife allows Ms. Weber to track her hours and applies the money to Ms. Weber's outstanding therapy bill. Dr. Fife continued to treat Ms. Weber throughout Ms. Weber's time employed in Dr. Fife's home. After Ms. Weber returns to Virginia and makes an effort to reconnect with her husband, Dr. Fife continues to provide support and encouragement, in essence being the good, kind, caring, maternal figure that the patient was seeking. When Dr. Fife later attempts to re-set the therapeutic frame, Ms. Weber is understandably confused and slowly begins to experience a sense of betrayal and disappointment. While Ms. Weber becomes increasingly obsessive, Dr. Fife becomes increasingly clinical, affectively distant, and begins to get consultation for herself. Dr. Fife pathologizes Ms. Weber by diagnosing her as borderline and in some ways tries to make Ms. Weber believe all she is experiencing is of her own making. It is really moot as to whether Ms. Weber may be borderline or not, but rather Dr. Fife uses this as a tool to justify her need for distance and ultimately termination of care. After Dr. Fife terminates Ms. Weber from care, Ms. Weber underwent significant treatment with Ellen Thurmond LCSW, me, and through inpatient and partial hospitalization programs. This treatment has centrally been

**EXHIBIT A**

FILED DATE: 4/6/2021 9:09 PM    2021L003640

about Ms. Weber's ambivalence in trusting mental health care professionals and how to attach when her fear of abandonment is so intense. This monumental hurdle for Ms. Weber continues to play out in her treatment today.

5.     I am familiar with the standard of care applicable to licensed clinical professional counselors, such as Dr. Fife, providing care and treatment to patients like Meredith Weber under the same or similar circumstances in this case. Dr. Fife was required to provide Ms. Weber the necessary psychotherapy care, treatment and services to help her meet her goals and improve her life and her marriage, in light of her needs. Dr. Fife knew that Ms. Weber had an intense, dysfunctional, emotionally abusive relationship with her own mother. Dr. Fife also knew that Ms. Weber indicated her intense need for her mother-in-law's love and approval as even a driving force to keep her in the relationship with her husband. Despite these clear signals, Dr. Fife then proceeded to suggest that Ms. Weber come to Chicago "to clear her head and determine the future of her marriage." Dr. Fife even outlines her own concerns that this would be a boundary violation, but then proceeds to violate the boundary. Dr. Fife asks Ms. Weber to collude with her in this violation by urging her not to speak of this to others or inform contacts in Chicago of the nature of their relationship. In this she reinforces Ms. Weber's very special role as a "special patient." Although Dr. Fife moved Ms. Weber to another person's house in Chicago, Dr. Fife began to put together an array of work for Ms. Weber to complete for Dr. Fife that included Ms. Weber caring for Dr. Fife's children, making dinner for Dr. Fife's family, cleaning, selling a piano, taking exercise classes together, and "hanging out" with Dr. Fife and her friends. In the midst of all of this, Dr. Fife continued to conduct "therapeutic sessions" at times with Ms. Weber, but also with Ms. Weber's husband at times. They "traded" therapy time for Ms. Weber's hourly wage. Dr. Fife expresses intense appreciation for Ms. Weber's care of her children trading text messages and clearly operating on some "friendship" level. Dr. Fife has created this idealized mother figure for Ms. Weber and in turn Ms. Weber was "all in." The standard of care requires that Dr. Fife set and maintain boundaries for the benefit of her client, Ms. Weber. Dr. Fife's actions violate the standard of care for a reasonable psychotherapist under similar circumstances.

6.     Based on my experience, training, and knowledge, and my review of the records, it is my opinion to a reasonable degree of medical and psychotherapeutic certainty, that the care provided to Ms. Weber from Dr. Fife was psychotherapeutic in nature. Although Dr. Fife labeled herself as a coach as well as a licensed clinical professional counselor, she clearly provided psychotherapy to Ms. Weber. Dr. Fife's own words reflected that she was practicing within a therapeutic frame and colluded to keep Ms. Weber from talking about the violations of the therapeutic frame.

7.     Based upon my experience, training, and knowledge, and my review of the above records, it is my opinion to a reasonable degree of medical and psychotherapeutic certainty, that the care provided to Ms. Weber from Dr. Fife fell below the minimum standard of care applicable to such a provider under the circumstances:

2

(a) Carelessly and negligently engaging in a nonprofessional relationship with her client; or

(b) Carelessly and negligently engaging in psychotherapy while engaging in a dual relationship with Ms. Weber; or

(c) Carelessly and negligently failing to offer all pertinent facts regarding services rendered prior to the administration of professional services; or

(d) Carelessly and negligently abandoning or neglecting Ms. Weber and failing to refer, transfer or make appropriate arrangements for the continuation of treatment following termination; or

(e) Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy; or

(f) Carelessly and negligently failed to enlist Ms. Weber's support network, which Dr. Fife should have known had important meaning in Ms. Weber's life, as a positive resource in her treatment of Ms. Weber; or

(g) Carelessly and negligently imposed her own personal values on Ms. Weber; or

(h) Carelessly and negligently engaged in a personal virtual relationship with Ms. Weber, while she was providing counseling and psychotherapy to Ms. Weber, through social media or otherwise; or

(i) Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries; or

(j) Carelessly and negligently exploited Ms. Weber as a personal "helper" to herself and her family while providing therapy and counseling to Ms. Weber; or

(k) Carelessly and negligently bartered with Ms. Weber for Ms. Weber's services to herself and her family in exchange for therapy services; or

(l) Carelessly and negligently failed to ensure continuation of care or an appropriate clinical and administrative process, upon termination of

3

FILED DATE: 4/6/2021 9:09 PM   2021L003640

FILED DATE: 4/6/2021 9:09 PM   2021L003640

care, and failed to maintain open communication to allow for Ms. Weber's continuation of care.

8.      It is my further opinion that one or more of the above described deviations from the standard of care, whether individually, or in combination, caused or contributed to cause  Ms. Weber to suffer harm including severe depression, anxiety, components of post-traumatic stress disorder, sleep disturbance, suicidal ideations, and dysthymia, and require medical treatment from LCSW Ellen Thurmond, myself, partial hospitalization programs, in-patient hospitalization, as well as significant other counseling care and pharmaceutical care as a result of her injuries.

9.      In my opinion, for the reasons stated above, there is a reasonable and meritorious basis for filing a cause of action against Dr. Fife for her negligent actions and omissions as described above with respect to the care and treatment rendered to Ms. Weber.


Date:   April 2, 2021                                         _____
                                                             Steven J. Welton, M.D.
                                                             4801 Hermitage Road, Suite 103
                                                             Richmond, Virginia 23227

4

FILED
4/6/2021 9:09 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
12853929

STATE OF ILLINOIS )

              ) SS.                        ATTORNEY CODE 44952

COUNTY OF COOK )

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

|  |  |
|---|---|
| **MEREDITH WEBER,**<br><br>      **Plaintiff,**<br><br>      *versus*<br><br>**JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE, DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC.**<br><br>      **Defendants.** | **COURT NO.** 2021L003640 |

**AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222 (B)**

      Pursuant to Supreme Court Rule 222 (B), counsel for the above-named plaintiff certifies that plaintiff seeks money damages in excess of Fifty Thousand and 00/100ths Dollars ($50,000).

                    By: /s/ Lawrence B. Finn
                         Lawrence B. Finn
                         One of the Attorneys for Plaintiff

      Under penalties as provided by law pursuant to Section 1-109 if the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be upon information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

                      /s/ Lawrence B. Finn
                       Lawrence B. Finn

Attorney I.D.: 44952
Lawrence B. Finn
**THE FINN LAW FIRM**
20 N. Clark Street, Suite 3300
Chicago, IL 60602
Telephone: 312-962-0425
Facsimile: 312-332-3550
LFinn@FinnLawAssociates.com

# EXHIBIT 3

**Spring Member Drive:** Protect journalism that gets results.     **DONATE NOW**

**PI PROPUBLICA**



Austin Millet at his home in Oregon. Millet is one of several men who have come forward to say that therapist Scott Owen abused them during sessions paid for with funds from The Church of Jesus Christ of Latter-day Saints. Amanda Lucier for ProPublica

# These Men Say Their Utah Therapist Touched Them Inappropriately During Sessions Paid for by the LDS Church

A spokesperson for the church said it does not vet the therapists its bishops recommend and pay for, saying "it is up to church members" to "make their own decisions."

**by Jessica Miller, The Salt Lake Tribune**

Oct. 12, 2023, 8 a.m. EDT

**Co-published with The Salt Lake Tribune**

*This article was produced for ProPublica's Local Reporting Network in partnership with The Salt Lake Tribune. Sign up for Dispatches to get stories like this one as soon as they are published.*

**This story discusses sexual assault.**

Three additional men have come forward to say a therapist recommended and paid for by The Church of Jesus Christ of Latter-day Saints touched them inappropriately during counseling sessions related to struggles with their sexuality. The men's statements follow allegations by three others, previously reported by The Salt Lake Tribune and ProPublica, that clinical mental health counselor Scott Owen touched them sexually during therapy.

The three who most recently came forward said their counseling sessions were paid for with money donated by church members to help those in need. The church said it has no process in place to vet the therapists its church leaders recommend.

The disclosures follow an investigation by the news organizations this summer detailing allegations against Owen, who gave up his license as a mental health worker in 2018.

Austin Millet, one of the men who have spoken out in recent weeks, said he saw Owen in 2010 while attending Brigham Young University, in Provo, Utah. At that time, he was questioning if he was gay and struggling with how that fit in with the theology of his Latter-day Saint faith.

His bishop suggested he try therapy, Millet recalled, and said he wouldn't need to worry about the cost — the church would pay the bill. He said the lay leader referred him to a local practice, Canyon Counseling. One of its co-owners, his bishop told him, was a specialist in helping gay LDS men be in romantic relationships with women. Owen was also a bishop during that time, according to the three men The Tribune/ProPublica spoke with for this story.

Millet said that when an employee at Canyon Counseling later called Millet, then 23, to set up an appointment, he was told payment was taken care of.

"It was kind of like, 'Oh, don't worry, we're taking care of it behind the scenes,'" Millet remembered. "'And your job is to just show up.'"

But Millet said his therapy sessions in Owen's Provo office quickly turned physical and then sexual — with the therapist cuddling with him, kissing him and groping him.

Owen has not responded to allegations that he touched a number of clients inappropriately and did not answer detailed questions sent to him last week.

The Tribune/ProPublica report in August showed that Utah's Division of Professional Licensing and LDS church officials had known about allegations of inappropriate touching involving Owen and were slow to act. Utah licensing officials say that, given the evidence they had, they believe they responded appropriately. The church said in response that it takes all matters of sexual misconduct seriously and "this case was no exception." The church said it annotated Owen's membership record in 2019 with a confidential marking intended to alert bishops that he was someone whose conduct has threatened the well-being of other people or the church.

In response to the more recent allegations, the church has said that it allows its church leaders to pay for therapy for its members, but added it could not say how much money, if any, bishops have paid to Owen specifically.



Owen Obtained by The Salt Lake Tribune

Sam Penrod, a spokesperson for the church, said it does not screen therapists that its leaders are paying. He said that Family Services, a nonprofit arm of the church, maintains a list of licensed professionals that bishops can refer to when recommending therapy. It does not individually vet those mental health workers, he added. That, he said, falls to individual church members.

"It is up to Church members who are referred to a therapist by a bishop or other referral to make their own decisions when it comes to using a licensed therapist," Penrod wrote in an email.

Millet, now 36, said going to therapy with Owen was his bishop's "firm counsel." It was that same bishop who had given him the required ecclesiastical recommendation to attend BYU, and he feared that not following what his bishop said could impact his academic career. Losing his bishop's endorsement meant he would not have been able to attend the church-owned university.

"Since he referred me to Scott, who was another bishop at the time, it seemed that this was required of me academically and religiously," Millet said. "Trying to say no to either of them would have been overwhelming at that time in my life."

Sexual touching in a therapy session is considered unethical by all major mental health professional organizations, and Utah licensers consider it "unprofessional conduct" that can lead to discipline. It's also

illegal in Utah.

State licensers stopped Owen from practicing in 2018 after investigating at least three complaints of inappropriate touching in a two-year period. Penrod has said that the LDS legal department also learned of alleged inappropriate conduct that same year. The August article from the Tribune/ProPublica revealed that one former patient had reported the alleged abuse to both his bishop and state licensers in 2016.

Since that article was published, other entities have responded: Police in Provo are investigating. Brigham Young University has reevaluated its relationship with Owen's business. And Canyon Counseling cut ties with him before announcing in September that it was closing altogether.

But the church has not publicly reevaluated its own role in referring these men to a therapist they now say abused them.



Canyon Counseling in Provo, Utah Leah Hogsten/The Salt Lake Tribune

## "Bishop Pay"

According to the church handbook, bishops can pay for clothes, food or medical services for members who are in need. The money for this comes from member donations after monthly Fast Sundays, a prayer-filled day when members are encouraged to donate what money they would have spent on food and drink to help the poor and needy.

Church guidance tells bishops that this money, called "fast offerings," should be used to pay for only essential items, like food, clothes or housing. It may also "be used to pay for personal services such as counseling, medical care, or vocational training."

The handbook gives little guidance as to how a bishop should recommend a therapist or other medical professional or how to ensure a church member is receiving quality care. It says that when a church member is seeking counseling about "intimacy," a bishop should refer them to "professionals who specialize in such counseling and whose beliefs and practices are consistent with Church doctrine."

The term "bishop pay" is listed as an option for form of payment on several websites of Utah-based therapists, usually on the same page as insurance forms and other pay rate information. Several Utah-based therapy businesses require that anyone using this payment method also sign a confidentiality waiver allowing therapists to share patient information with the patient's bishop.

When asked what privacy expectations a church member can expect when a bishop pays for their therapy, Penrod said church leaders may follow up with a therapist to ensure the member is keeping their appointments and "pursuing goals set by the therapist."

"Otherwise," he said, "it is Family Services policy that HIPAA principles are closely followed and the content of sessions including diagnostics, progress notes and observations are not shared with anyone, including bishops, without a release signed by the client."

HIPAA is a federal law to protect people's medical records from being shared by health care providers without a patient's knowledge.

Owen is one of several Utah therapists who have received church funds for sessions who in recent weeks have been accused of abusive behavior.

One therapist was charged last month with aggravated child abuse after the children of her business partner in an online self-improvement program were found malnourished at the therapist's home. Her niece said during a Mormon Stories podcast interview that she handled the billing for the practice and that many clients' bills were paid by their local church leaders.

Another therapist is facing felony charges for allegedly physically abusing a client during counseling sessions. His life coaching and therapy website offers an option for billing to be sent to bishops. It also includes a form that requires patients whose treatment is paid for by the church to agree to waive their privacy rights and allow a therapist to share any health information with their bishop "without limitation."

Neither of these mental health professionals have entered a plea to the charges against them.

Mark, who is being identified by his middle name to protect his privacy because not all of the experiences detailed here are known to people in his life, is another of the three former patients who came forward after publication of the earlier article. He told The Tribune and ProPublica about therapy sessions the church paid for where, he said, Owen held him.

Mark began to see Owen in 2008, he said, after his church leader suggested therapy. Mark had been in the middle of a disciplinary process with the church at that time after being unfaithful to his wife with a man.

At that time, many Latter-day Saint authorities taught that being gay was a choice, and the church opposed measures to allow same-sex couples to marry. The church has since said that sexuality is not a choice, but still does not allow its members to be married to someone of their same sex.



Mark, who is being identified by his middle name to protect his privacy, was referred to Owen at a time when he was being disciplined by the church. He said he didn't feel like he had any other choice but to go. (Trent Nelson/The Salt Lake Tribune)

Mark, who is bisexual, had been disfellowshipped — now called "membership restricted" — which means that while he was encouraged to attend church, he was not allowed to take the sacrament, or Communion, enter a Latter-day Saint temple or give sermons. It is considered a step below the most severe action the church can take against its members, which is excommunication, now termed "membership withdrawal."

Though he's no longer a believing member, Mark said it was important to him at the time to follow the guidance of his faith leader and attend counseling with Owen in order to get back into good standing with the church.

"There's definitely a bit of pressure there," he said. "Like what if I say no? Is that going to make my bishop think that I'm not repentant?"

Mark remembers paying a portion of the therapy cost for the handful of sessions he had with Owen. His bishop, he said, picked up the rest of the bill.

Like other former patients who spoke to The Tribune, Mark recalled how Owen had told him that he had a "fear of intimacy" and suggested that they embrace as they sat on a couch in Owen's office. Mark did not see Owen for long, relocating shortly after their therapy sessions started.

Millet, the then-BYU student, saw Owen a year later. He said his therapy sessions began similarly, and that Owen also said he was teaching Millet to be "intimate" without being sexual. He trusted Owen because he was a therapist and a church leader, and he remembers that at first the embraces felt powerful — and positive.

"I'm this vulnerable gay kid from BYU," Millet recalled. "I was just craving this physical touch. And it was wonderful."

But the touching, Millet said, gradually became more sexual, and he found the sessions confusing. Owen directed Millet to take his clothes off during many sessions, Millet remembers, while the therapist remained clothed. They would often kiss, he said, with Owen touching Millet's thighs or his bottom.

Millet kept seeing Owen for a year and a half, he said, until the therapist ended their sessions when Millet became engaged to a woman.

## "We Opened an Investigation"

Even after Owen surrendered his license in 2018 in response to several patient complaints to licensers of inappropriate touching, there was no criminal investigation, and he appears to have continued to play an active role in his business. A woman who worked at Canyon Counseling for about six months last year — and who asked that her name not be used because she works as a therapist and doesn't want to be associated with the business — said that Owen led monthly training sessions with the young therapists who worked there and recalled that he taught them about "how to incorporate theology and religion into therapy."

The woman, whose past employment with Canyon Counseling was verified by The Tribune, said Owen had told her that he no longer saw patients because Canyon Counseling's "business was booming" and one of the owners needed to focus their work on handling that growth. Owen did not respond to questions asking about his role in the business after he surrendered his license.

Melanie Hall, a spokesperson for Utah's licensing division, said a therapist who teaches isn't required to be licensed if they are not also treating patients.

It was only after the publication of the Salt Lake Tribune/ProPublica investigation, however, that Owen's role in the business changed dramatically. First, on Aug. 15, less than two weeks after the article appeared, Owen was removed from state business records as Canyon's Counseling registered agent. Soon after, the practice noted on its website that Owen has "no ownership nor any other affiliation in any manner" with the business.

The business itself also faced repercussions. This summer, BYU's Student Center — where four Canyon Counseling therapists worked — began reevaluating its relationship with the business "as it learned of concerns about one of the owners," according to university spokesperson Carri Jenkins. She said that

because Owen had never practiced there, the Student Health Center was previously unaware that he had surrendered his license.

Then, in late September, Canyon Counseling announced it was closing altogether. A therapist who worked there at that time, Shawn Edgington, has since reopened the business as Palisades Counseling.

Edgington said his business has "no ties" to Owen, adding that "any alleged abuse by Mr. Owen is completely unacceptable and not condoned in any manner by Palisades Counseling."

"Palisades Counseling and its therapists, do NOT tolerate abuse of any kind," he wrote in an email. "Any kind of abuse of women, children, or anyone is completely unacceptable and will not be tolerated in any form by Palisades Counseling and its therapists."

Neither the church nor Utah licensers would comment on whether they reported Owen to police. But Provo police officials said the first time they learned that a former therapist in their city had been accused of sexual abuse was after the news organizations published their investigation in August.

"We opened an investigation after we saw your initial report," Provo's Capt. Brian Taylor told a Tribune reporter, "and we have offered interviews to anyone who has something to say about their experience at Canyon Counseling, with Dr. Scott Owen. And we continue to do that."

Taylor said the investigation is still open, and the Provo police are seeking to speak with other people with allegations of abuse involving Owen. He said they have been in contact with "more than one" alleged victim so far.

It's the first time local police have looked into whether Owen's purported therapy practices are illegal.

In Utah, with few exceptions, the state licensing division is not legally required to forward information to law enforcement. At least one state — Ohio — mandates that medical boards report felonies to the police. The Federation of State Medical Boards encouraged boards in a 2020 report to err on the side of reporting physicians to the police in cases of allegations of sexual misconduct.

"Best practices dictate that boards have a duty to report to law enforcement anytime they become aware of sexual misconduct or instances of criminal behavior," the report recommended.

Hall, the spokesperson for Utah's licensing division, said licensers do collaborate and report crimes to police agencies "often," though she would not not explain under what circumstances they would do so.

Mollie Simon contributed research.

# Utah Therapist Built a Reputation for Helping Gay Latter-day Saints. These Men Say He Sexually Abused Them.

*Jessica Miller, The Salt Lake Tribune Aug. 3, 2023*

DONATE



Andrew, who is identified by a pseudonym to protect his privacy, said he was sexually abused by a therapist he was seeing to address his struggles with being both gay and a member of The Church of Jesus Christ of Latter-day Saints. (Objects in this image have been darkened and blurred to protect Andrew's identity.) (Leah Hogsten/The Salt Lake Tribune)

Several patients complained to the church or the state licensing board about inappropriate touching during therapy sessions. It was years before the therapist gave up his license.

*This article was produced for ProPublica's Local Reporting Network in partnership with The Salt Lake Tribune.*

Editor's note: This story discusses allegations of sexual assault.

Andrew was feeling crushed by the cultural expectation to get married.

Twenty-two years old, he had just returned from a mission for The Church of Jesus Christ of Latter-day Saints and was attending a singles' ward in Provo, Utah — a local congregation of unmarried college students.

But Andrew is gay. And marriage between a man and a woman is a central tenet of the Latter-day Saint faith, which teaches that the highest level of heaven is reserved only for married, heterosexual couples. Same-sex marriage is not an option in the church.

So in the fall of 2015, he did as many Latter-day Saints do when they are having a crisis: He went to his bishop.

The lay leader suggested trying therapy, Andrew remembered. In fact, the bishop said he had just gotten a referral that same day for a local therapist named Scott Owen who worked well with gay men who were members of their faith. Owen co-owned a Provo therapy business called Canyon Counseling and, at that time, was also a regional leader in a Provo-area stake, a cluster of congregations that is similar to a Catholic diocese.

The coincidental timing — that his bishop learned of Owen on the same day Andrew disclosed his internal struggles — felt miraculous.

"It was like, God has a plan," Andrew said. "This is going to work out. Everything seems dark and depressing. But this therapist is going to fix everything."

But that's not what happened. For five months beginning in October 2015, Andrew said, the clinical mental health counselor groped him, encouraged him to undress and kissed him during sessions. Andrew said Owen told him that the touching was a therapeutic way to learn how to accept love and intimacy.

Andrew, now 30, is being identified by a pseudonym to protect his privacy. The Salt Lake Tribune does not generally name alleged sexual assault victims without their permission.

Sexual touching in a therapy session is considered unethical by all major mental health professional organizations, and it is defined in Utah rules as "unprofessional conduct" that could lead to a mental health worker losing their license or other discipline. It's also illegal in Utah.

By March 2016, Andrew had reported Owen to both his bishop and to state licensing officials. A new investigation from The Tribune and ProPublica shows how Utah licensers allowed Owen to continue practicing and church leaders repeatedly heard concerns but took several years to take official action. For nearly two years after Andrew's report, Owen provided therapy to clients, some of whom were men referred for "same-sex attraction" counseling. During that time, at least three more patients allege they were sexually abused by Owen, including two who reported him to the state licensing body in 2018. Those reports ultimately led Owen to agree to surrender his license.

Owen's case is indicative of a flawed and misleading system: Officials within Utah's Division of Professional Licensing encourage the public to look to the agency's disciplinary records to vet a professional, yet those records rarely offer a full picture of misconduct. Despite Owen's pattern of alleged inappropriate behavior, his publicly available disciplinary records reference touching but never disclose that the accusations against him were sexual in nature. This is one of a number of shortcomings identified by The Tribune and ProPublica while reporting on how Utah officials fail to supervise medical professionals and to adequately address patient reports of sexual assault.



Scott Owen (Obtained by The Salt Lake Tribune)

Owen, a large-framed bald man with dark blue eyes who speaks with a drawl, built a reputation over his 20-year career as a therapist with Christian values who could help Latter-day Saint men with same-gender attraction. He gave public lectures so often about pornography and masturbation, Owen told a crowd of LGBTQ+ church members in 2016, that he had earned the nickname "The Porn King."

Although Owen, now 64, responded to an initial email from a reporter, he did not answer detailed questions sent to him via certified mail.

Officials with DOPL say that, given the evidence they had from Andrew's complaint, they believe they responded appropriately. But, communications between Andrew and an investigator suggest that the agency's actions rested largely on Owen's denial that anything improper had happened and a failed polygraph test officials asked Andrew to take — a tool that experts say is known to be specifically unreliable with victims of sexual abuse, and that some states ban for that reason.

Church spokesperson Sam Penrod said the faith made an annotation on Owen's personal church record in spring of 2019 — three years after Andrew's initial report to his bishop. An annotation is a confidential marking intended to alert a bishop to someone whose conduct has threatened the well-being of other people or the church. It can affect what roles members are asked to fill within their congregation.

Penrod said in an email: "The Church takes all matters of sexual misconduct very seriously. This case was no exception."

Both the church and the licensing division declined to comment on whether they reported the therapist to the police. Provo police officials said they had no record of ever receiving any report of sexual abuse against Owen.



Owen co-founded Canyon Counseling in Provo, Utah, in 1998. (Leah Hogsten/The Salt Lake Tribune)

## Touching in therapy

Owen pushed physical boundaries from the very start, Andrew said. After their first session, Owen ended their meeting with a quick hug. At his second appointment, Andrew said, Owen held him in a longer embrace.

"I'm doing this because I know you're uncomfortable with love," Andrew remembered Owen telling him as they hugged. "I want you to get used to it." Such touching, he recalled Owen saying, would be "a key step in my therapy."

Andrew did feel uncomfortable. But he remembered Owen seemed genuine and truthful in their therapy sessions — even "Christ-like" in his caring.

Growing up in the Latter-day Saint faith, Andrew was taught to trust men in positions of authority. There was also the expectation to talk with his bishop about deeply personal sexual details during one-on-one interviews. These annual closed-door discussions generally start when members become teenagers and typically explore whether they are following the faith's rules; they have been criticized by some parents and therapists as being "inappropriate" and "intrusive."

These interviews, Andrew said, left him with a skewed view of what was appropriate in a mentoring relationship.

"I felt like a lot of the times I didn't understand what normal boundaries to have around sexuality," he said, in part because of how he was instructed to relate to religious leaders. "You have to air it all to these particular people in your life — and then you hide it desperately from everyone else."

In the late 1960s, church leaders took a hard stance against even identifying as gay, including "homosexuality" in a list of behaviors that could result in excommunication. Bishops and church leaders in subsequent years were taught that being gay was a reversible condition, and church leaders would send gay men to conversion therapy or advise they could be fixed by marrying a woman.

By the time Andrew began seeing Owen in 2015, the church had publicly acknowledged that its members do not have a choice in being attracted to the same sex; today, church policy says a gay member can remain in good standing if they remain celibate and never marry someone of their same gender.

"At the time, I knew it might not be possible for me to get married, and that would still be OK in the church framework," Andrew recalled. But, he added, "so much of the LDS dream is based on marriage that that was crushing and really depressing to me."

So Andrew kept going to therapy, even as he said Owen began touching him more, at times rubbing his back or his bottom during hugs. Owen encouraged him to undress during some therapy sessions, Andrew said, which evolved into what he describes as "makeout sessions." Looking back now, it's clear to Andrew that this was inappropriate — but in the moment, he felt desperate and confused.

Andrew reasoned with himself that he was not physically attracted to Owen when they touched, which would be similar if he married a woman. Maybe it was a way for him to learn how to express romantic feelings he didn't have or to fake it until those feelings came.

"I couldn't accept that I was being taken advantage of," Andrew said. "That's a hard thing to be like, 'Oh, I've been sexually abused this whole time.'"

"This was supposed to be my miracle," he added.



Decorations in Andrew's room (Leah Hogsten/The Salt Lake Tribune)

## A reprimand

Andrew decided to stop therapy in February 2016, as he wrestled with whether what had happened had been abusive. He confided in a friend during late-night study sessions on Brigham Young University's campus a few days later. In an interview corroborating Andrew's account, she recalled urging him to tell someone.

Within a week of stopping therapy, Andrew again found himself confiding in his bishop.

Andrew recalled feeling like his church leader, who works as a livestock and pasture insurance agent, seemed confused about how to help a gay member of the church — and whether this type of touching in therapy was supposed to be helpful. He referred Andrew to

another therapist who, Andrew said, told him Owen's alleged conduct was a "gross violation" of patient boundaries.

Andrew went back to his bishop with this information, but the lay leader never reported that information to church authorities. The church's general handbook for members makes it clear that if a bishop or stake president "learns of abuse of a spouse or another adult," they are supposed to call a confidential hotline for guidance from lawyers and clinical professionals.

The bishop, whom The Tribune and ProPublica are not identifying to protect Andrew's identity, said that he struggled to process what Andrew told him, and that he felt it was sufficient that he had encouraged Andrew to report Owen to state licensing officials at DOPL. The division is responsible for licensing Utah professionals, from medical doctors to armed security guards to massage therapists. It is also charged with investigating misconduct and can revoke a license or put someone on administrative probation.

By then, Andrew had stopped seeing Owen. Andrew's bishop questions now whether he should have said something to a higher church leader, but he said he felt the faith's guidance for when bishops should report alleged abuse to church authorities pertained more to "something happening that needs to be stopped, like when there's abuse in the home." The bishop added that he didn't feel he knew how he should help members who were struggling with their sexual identity and their faith.

"A bishop is supposed to be a spiritual guide. Not a psychologist, not a family therapist. So I felt equipped to listen and love them, absolutely," he said. "But as far as to help them process what it means and how to be a part of this religion and be gay — I never figured that out."

Andrew followed his bishop's guidance and went to licensers in early March 2016. In a statement Andrew wrote for investigators — which he shared with The Tribune and ProPublica — Andrew described the escalating touching and accused Owen of touching parts of his genital area at their last appointment.

"I left feeling disgusted in what had happened," Andrew wrote about their last appointment, "and vowed to never return."

To conduct their investigation, licensing officials offered the therapist a polygraph test. He refused, according to DOPL. They also asked Andrew if he would wear a recording device, he said, and go to Owen's office to ask him about the touching. Andrew said he didn't feel like he could go through with that.

That's when the investigator asked Andrew if he would take a lie detector test.

Andrew said the investigator reasoned to him that if he could pass one, it could bolster what essentially was a case of one person's word against the other.

The polygraph did not go well, Andrew said — the results suggested he was being deceptive.

"I had so much trauma," Andrew said. "And so, certainly, when they asked me questions about the particular things that happened in therapy, it's going to elicit a very strong emotional response."

Researchers say this is a common response for trauma victims, and many recommend that sexual abuse victims not undergo polygraph exams. Half of states have laws explicitly prohibiting law enforcement from conducting a polygraph test with someone reporting a sexual assault, with some barring any government employee from requiring an alleged sexual assault victim to take one. There is no law in Utah that puts limits on the use of polygraph tests on victims.

Melanie Hall, the spokesperson for DOPL, acknowledged that an investigator did "offer the option" of a polygraph test to both Owen and Andrew. She said that it is "extremely rare" for a polygraph to be used as part of an investigation, but that the agency doesn't track how often.

Andrew's failed polygraph sent his own mental health spiraling. He wrote in an email in October 2016 that he no longer wanted to participate in the investigation unless someone else came forward.

A month later, Owen was given a public reprimand from licensers for the one inappropriate action he admitted to: that he gave Andrew hugs. Owen admitted in licensing documents that he "inappropriately touched a client in a non-sexual manner."

Hall said the "overwhelming majority" of DOPL's disciplinary actions are negotiated settlements — where a licensed professional admits to lesser conduct than what is alleged by those who say they've been harmed.

Owen later told the Clinical Mental Health Counselor Licensing Board, in a hearing in Salt Lake City at which he received an official reprimand, that his client had been struggling with a family issue, and that it was "not uncommon" for him to hug his patients.

But he denied Andrew's allegations to the board, calling it "quite a story he concocted."

"I readily agreed and admitted to giving him hugs at the end of the session and that sort of stuff," Owen said during the meeting, adding that someone at DOPL told him that he should

"know better" than to hug someone who was seeking therapy for same-sex attraction.

Owen said that he had changed his practices.

"I don't do that anymore," he said. "I have just been a little bit stunned and burned by this. I'll shake hands, and I don't even like to shake hands until my office door's open and completely out in the reception area with my receptionist there."

Owen left the meeting that day with a reprimand but no other limitations on his license — and no need to tell his other patients.

## 'I felt betrayed'

At precisely the time DOPL was investigating Owen, and then publicly reprimanded him, another man living in Provo and attending the same religious university as Andrew was questioning whether the way the therapist touched him during sessions had crossed the line.

Jonathan Scott had been seeing Owen for three years — and he would continue to see him for nine months more after the reprimand. His allegations bear a striking resemblance to Andrew's, but he was not aware of the licensing reprimand — and it would be years before he realized that his experience was not unique.



Jonathan Scott began therapy sessions with Scott Owen in 2013 as an effort to heal from childhood sexual abuse. Scott said that the therapist touched him inappropriately but that he did not initially recognize Owen's alleged actions as abuse. (Leah Hogsten/The Salt Lake Tribune)

Jonathan Scott, a reserved 32-year-old with curly ash brown hair, first started seeing Owen in 2013 as a lanky BYU student struggling to deal with childhood trauma from being sexually abused by his Boy Scout leader in Illinois. His parents found Owen online and met with him first; Jonathan Scott's father recalls Owen saying that he could help their son have safe relationships with adult men.

Jonathan Scott said his new therapist reminded him of the man who sexually abused him when he was a kid. They had similar nervous tics, and the way each man had looked at him felt the same. They were both middle aged and had the large frame and roundness of a teddy bear.

"That was kind of the point," Jonathan Scott remembers. Unlike his abuser, Owen was supposed to be "a safe, good man who is supposed to help me reestablish trust with men."

But Jonathan Scott said Owen frequently touched him under his clothing while hugging him during sessions.

Like Andrew, he said this touching gradually escalated. Eventually, he said, his sessions felt like nothing more than 40 minutes of cuddling. Also like Andrew, he told himself that to heal he needed to learn to accept touch. And because he was raised in the church, he added, he wasn't going to question a religious leader.

"You justify things. You let things slide. But did it feel comfortable? No, it didn't feel comfortable. It didn't feel safe," he said. "But I was told I needed to work through that."

Jonathan Scott ended therapy in 2017 when he moved. He never contacted DOPL, or the police, himself. It was only two years later that his partner — upset with the thought that Owen had never faced consequences — was searching online and found the reprimand. She corroborated details of his account in an interview with The Tribune.

It felt like a betrayal, Jonathan Scott said, to learn that Owen had denied touching Andrew around the same time he says the therapist had been groping him.

"When I found out that there were others, I felt not alone," he said. "I felt justified in my anger of what I thought had happened to me. I felt even less trust in authority."

Hall said that DOPL may, in some cases, require a disciplined licensee to inform their patients of unprofessional conduct, though that didn't happen in Owen's case. Utah has no law requiring this type of disclosure, and there are only three states that do require medical professionals disciplined for sexual misconduct to disclose that to their patients.

"DOPL and/or the licensing board may decide to implement this requirement," Hall said, "if there is strong concern about an individual treating others without first informing them and receiving consent from the patient."

But a search of more than 3,200 filings obtained from DOPL's website, some from as early as 2010, shows the state has rarely required disclosure of unprofessional conduct to individual patients.

## A surrendered license

Owen continued to practice for nearly two years after the reprimand. It would take two more people coming forward before the licensing process was able to take meaningful action.

One of those was Sam, a 43-year-old man who now lives in Arizona. As a Latter-day Saint who was attracted to other men, Sam struggled to feel accepted, his brother Jason recalled. One fall day in 2017, Sam called Jason sobbing to tell him about a therapist he had been going to: how Owen had made him feel loved; how the therapist told him that he could help him learn to accept intimacy; how the sessions had become sexual.

Sam later detailed his experiences in a written timeline, an account that a friend later also shared in a letter to the church: It started in January 2017 with a hug and by August had escalated to mutual masturbation.

He declined an interview request relayed through his brother. Sam and his brother are identified by pseudonyms for this article, and information about Sam's experience was gleaned from interviews and records provided by his brother and Troy Flake, a friend Sam confided in at the time.

In February 2018, DOPL received another report alleging Owen engaged in sexual misconduct. Details of the complaint were redacted in response to a public records request. And in April, Sam himself spoke to a DOPL investigator.

"Just got off the phone with the investigator," Sam wrote in a text message to his brother. "It was pretty rough to explain to him all of what happened, but I'm glad I got through it and started this process."

He wrote that the investigator had "accumulated accounts from several of Scott's clients."

Within weeks of Sam speaking to the investigator, Owen surrendered his license as part of an agreement with Utah's licensing division. According to the DOPL order, investigators believed that Owen inappropriately touched "a number" of clients in a five-year period beginning in 2013. There was no reference to the sexual nature of those contacts. And when Owen surrendered his license, he was able to give it up while neither agreeing with nor denying licensers' findings.

## Reports to church leaders

Utah's licensing division wasn't the only entity that had knowledge of Owen's activities for years before he was censured. There was also the church.

Andrew had gone to his bishop back in 2016, but church officials say their legal department did not learn of any alleged inappropriate conduct involving Owen until two years later, after DOPL had already begun to investigate.

As with Andrew, Sam first relayed his concerns to a trusted church leader. In the timeline Sam created, which he had shared with Flake, he wrote that Owen at times had told him that he "didn't need to run off and talk to my bishop about" their counseling sessions.

If he wanted help processing what was happening, Sam wrote in that document, Owen suggested he talk with Alan Hansen, a psychologist who was also Owen's business partner at Canyon Counseling. Hansen's role as Sam's stake president at that time meant he was also in charge of overseeing thousands of church members who make up local congregations in their area.



A patient of Owen's twice raised concerns with Alan Hansen, co-owner of Canyon Counseling, about inappropriate touching during therapy. (Leah Hogsten/The Salt Lake Tribune)

In August 2017, Sam went to Hansen's church office on BYU's campus, where he disclosed that Owen had been "physical" with him during sessions.

He wrote in his timeline that Hansen encouraged him to keep attending therapy and gave him a priesthood blessing — a prayer of healing and encouragement given by adult men in their church. The blessing made Sam feel better, he wrote, and he continued seeing Owen for therapy for two months. But then, he added, he became too uncomfortable with the sexual touching he said happened inside the Canyon Counseling office.

In December, according to the timeline, he told Hansen again about Owen's touching. This time, though, he was more explicit — telling the church leader that Owen had kissed him and had engaged in heavy petting and other types of sexual touching.

"Alan acknowledged that some of Scott's actions clearly crossed some boundaries and that was likely due to Scott's own weaknesses," Sam wrote. "He also stated that Scott had done something like this before — and that there were others. I don't remember his exact language, but that was the effect of what he said."

Hansen did not respond to a list of questions sent to him, and he referred a reporter to the church's legal department. A church spokesperson did not address questions about Hansen.

Sam continued to tell other church leaders about Owen's behavior — and Hansen's dismissal of it. He also went to his previous bishop in Provo. Sam wrote in text messages to his brother that this church leader confronted Hansen about "essentially doing nothing about my situation with my previous therapist."

"He thinks it's possible that it's a releasable offense for the stake president," Sam wrote to his brother about the chance that church authorities would strip Hansen of his official role in their faith. But that didn't happen.

Penrod, the church spokesperson, did not respond to a question asking whether Hansen ever received disciplinary action for not reporting his business partner to church authorities.

He added that "local leaders who are themselves professional therapists should not refer members to affiliated therapists or practices in which they have a financial interest."

But concerns over Owen's behavior didn't end when he surrendered his license. Flake, Sam's friend, was worried that Owen could still be teaching in a church setting and was frustrated that he believed Hansen had known what was going on and took no action. More than a year later, in December 2019, he sent an email to church lawyers urging them to investigate.

A church attorney responded to his email later that same day, according to correspondence shared with The Tribune and ProPublica, telling Flake the firm would provide the information "to Owen's current leaders and let you know if we need additional information." The attorney made no mention of Hansen. Flake says he never heard from the church lawyers again.

The Tribune asked church officials in an email whether Hansen had ever been disciplined in connection to his business partner's actions, but the church did not respond to that question. Hansen's psychologist license is in good standing with the state, and no disciplinary action has been taken against him.

## 'There's been zero justice'

Years after they say they were sexually assaulted, several of Owen's former patients are connected now through one more person who says the ex-therapist sexually abused him nearly 40 years ago: Owen's own cousin, a Boise, Idaho, man named James Cooper.

Cooper wrote to his family in June 2020, telling them that Owen molested him in a shared bed during a trip to Colorado in the 1980s. The email describes how Cooper had learned that past winter that Owen had surrendered his license.

He also sent a separate email to Owen, who denied the allegation and replied: "I don't see this the same, but I am so sorry for your pain and hurt."

Cooper wrote in the email to his family that up until then "my strategy has been to forget and avoid Scott [Owen] as much as possible, and admittedly that means I was content to keep my head in the sand in this regard."

But after he read about Owen surrendering his license, Cooper wrote, it forced him to think about those who allege his cousin later hurt them. The 48-year-old man scoured the internet, searching for any potential victims and posting anonymously on Google reviews asking others to reach out to him.



Owen's cousin, James Cooper, alleged Owen molested him in the 1980s. More recently, Cooper sought out and connected former patients of Owen's who allege they were abused in therapy. (Sarah A. Miller for ProPublica)

That's how he connected with Andrew, Jonathan Scott and Sam's friend Flake; together, the men grappled with what to do next. All of them described long-term effects of Owen's alleged conduct and also a sense that there had been no meaningful consequences for him.

Both Andrew and Jonathan Scott have left the church, in part because of the alleged abuse. Sam has been devastated after realizing he had been taken advantage of, according to Flake, which has destroyed his ability to trust his own perception. And Jonathan Scott has thought about reporting Owen to the police, but he continues to struggle to trust authority figures.

"There's been zero justice, as far as I can see," Jonathan Scott said.

Owen today is listed as the registered agent for Canyon Counseling in public business records. It's not clear what his role in the business is, but in 2019, Flake called the police to report seeing Owen's truck in the Canyon Counseling parking lot, though he did not have a license to practice therapy.

An officer contacted Owen, who said he owns the business — but is not a therapist any more.

---

## *The Mental Health Profession Violations*

Scott Owen is one of at least 197 mental health professionals who have been disciplined by Utah licensers since 2012, according to a data analysis by The Salt Lake Tribune and ProPublica of available disciplinary documents on the state Division of Professional Licensing's website as of April 20, 2023. This database is not exhaustive, as older filings may no longer appear on the website.

Of those, 73 — or 37% — had been disciplined for sexual misconduct. Searches of DOPL's disciplinary records suggest that mental health professionals are more often disciplined for sexual-related misconduct than doctors or nurses. The Tribune and ProPublica also identified 28 other misconduct cases where a therapist had an inappropriate "dual relationship" with a client — such as a client sleeping over at a therapist's home or cleaning horse stalls together — that did not appear on paper to be explicitly sexual in nature.

Owen is one of five Utah mental health professionals identified by The Tribune and ProPublica who have been disciplined more than once for sexual conduct. Several of them continue to work in the therapy business in some capacity. Two others among the five were put on probation and allowed to continue working as therapists, according to disciplinary filings, while a third opened a life coaching business marketing himself as a "one of the few Ph.D.-level coaches" in southern Utah.

Utah licensers consider any sexual contact with a current patient to be misconduct, and sexual relationships with a former patient are not allowed within two years after they stop seeing a therapist.

When asked if the licensing division knew whether therapists were at higher risk for sexual misconduct, spokesperson Melanie Hall said DOPL is aware that certain license types "have a tendency towards certain types of violations." She didn't specifically address mental health professionals, but she gave certified public accountants as an example of professionals who have increased access to bank accounts and are more likely to commit financial fraud than other professionals who do not have that access.

The agency, she said, "takes these factors into account when investigating complaints, and takes appropriate disciplinary action when necessary."

The news organizations also asked Hall about whether DOPL reports cases to law enforcement. Under Utah law, it is illegal for a health professional to engage in sexual contact with their patient under the guise of providing treatment.

The licensing division, Hall said, is not legally required to forward information to law enforcement — just as the police are also not mandated to share information about a licensed professional they are investigating. The only exception to this, she said, is a requirement that drug thefts be reported to police.

Hall said that licensers do collaborate and report crimes to police agencies "often," though she did not explain under what circumstances they would do so. She said that licensers may encourage a patient to reach out to the police or decide that the case does not require a criminal investigation. She would not say whether anyone at DOPL ever reported Owen to the police.

*Editor's Note: Three sources for this story — Andrew, Sam and Jason — are identified only by pseudonyms because they requested anonymity. Two are alleged victims of sexual assault, and the third is the brother of one of those men. We have granted this request because of the risk to their standing in their communities if they were publicly identified. The Salt Lake Tribune and ProPublica typically use sources' full names in stories. But sometimes that isn't possible, and we consider other approaches. That often takes the form of initials or middle names. In this case, we felt that we couldn't fully protect our sources by those means. Their full names are known to a reporter and editors, and their accounts have been corroborated by documents and interviews with others.*

*This story was supported in part by a grant from the Fund for Investigative Journalism.*

Jeff Kao and Haru Coryne, ProPublica, and Will Craft, special to The Salt Lake Tribune, contributed data reporting. Mollie Simon, ProPublica, contributed research.

# EXHIBIT 4

Be the FIRST to hear about new events and SALES, sign up here!

✕

SIGN UP

menu

Dr. Jennifer
FINLAYSON-FIFE

cart (0)

Be the FIRST to hear about new events and SALES, sign up here!



## LIFE-CHANGING INPUT DELIVERED DIRECTLY TO YOUR PODCAST FEED

Dr. Jennifer has two highly-reviewed

podcasts to get you started on your journey of self and sexual development.

LEARN MORE

## TWO WAYS TO START LISTENING



## Room for Two Coaching Podcast

Listen to Dr. Jennifer coach real couples in real time! This unique podcast format helps you apply Dr. Jennifer's teachings directly to your own life and relationships.

**$97/year**

LEARN MORE



## Conversations with Dr. Jennifer

Dr. Jennifer is sought out by many podcasters for her expertise on relationships, sexuality, and spirituality. You can access hundreds of hours of free podcast content here.

**FREE**

START LISTENING



SUBSCRIPTION PODCAST EPISODES

August 28th, 2021

# Welcome to Room for Two!

Welcome to Room for Two

**Room for Two**

LISTEN NOW

---

April 16th, 2024



# Q&A Announcement!

Join us TONIGHT for a live Q&A Session with Dr. Jennifer! During the discussion, Dr. Finlayson-Fife will be taking questions about the TJ and Ashley series.

**Room for Two**

SUBSCRIBE

---

April 11th, 2024

# Compound (dis)Interest: The Accruing Costs of Placation and Control [TJ and Ashley - Part 4]

In this episode of Room for Two, Dr. Finlayson-Fife helps TJ and Ashley see how they have been stuck in an inferior / superior dynamic that makes collaboration with each other impossible. She further explains that the key to breaking out of their relational stalemate is for Ashley to stop avoiding / placating TJ and for TJ to step out of his superiority and start relating to Ashley as an equal partner, not as a problem to solve.

**Room for Two**

SUBSCRIBE

SUBSCRIBE NOW     LEARN MORE



**TOPICS**

View and Select a Topic...

April 9th, 2024

# Regret, Remorse, and Resentment

In this powerful discussion, Dr. Finlayson-Fife teases out the difference between regret, resentment, and remorse and offers clarity on what these unpleasant emotions can teach us about ourselves and the way we are showing up in our lives and relationships.

### Dr. Finlayson-Fife's Podcast Archive

**LISTEN NOW**

April 2nd, 2024

# Parenting and Partnership

In this NEW conversation with Crystal of The Parenting Coach Podcast, Dr. Finlayson-Fife discusses how we can create healthier, more collaborative partnerships even when our partner is not invested in creating positive change.

### The Parenting Coach

**LISTEN NOW**

March 20th, 2024

# Underinvested: The Disappointing Dividends of a Role-Based Marriage || Room for Two Teaser

TJ and Ashley's story is a familiar one for many. Their marriage started out happily enough. They were young college students and enjoyed each other a lot during their first few years together. But things changed when TJ started graduate school during an economic downturn. TJ felt a tremendous amount of anxiety about his financial future, given the dim prospects for most students at the time. Competition was fierce and in TJ's determination to ensure his family's economic stability, he dedicated himself to his studies, leaving little time or emotional bandwidth for anything else, including Ashley.

### Room for Two

**LISTEN NOW**

March 12th, 2024

# Learning to Love, Respect, and Accept Yourself

In this NEW episode, Dr. Finlayson-Fife joins Amber Brueseke of Biceps After Babies Radio to discuss the important role that self-honesty and self-definition play in our relationship to our bodies as well as in our emotional, spiritual, and relational development.

### Biceps After Babies Radio

**LISTEN NOW**

March 5th, 2024

# Navigating Desire Differences in Marriage

In this NEW episode, Dr. Finlayson-Fife takes questions from her audience about desire dynamics and the unique challenges faced by both the higher-desire spouse and the lower-desire spouse. In the discussion Dr. Finlayson-Fife discusses how couples can work together to create a more collaborative dynamic and what to do if only one spouse is interested in addressing the desire discrepancy.

### Dr. Finlayson-Fife's Podcast Archive

**LISTEN NOW**

February 13th, 2024

# Understanding Sexual Inhibitions

Recently, I joined Tammy Hill of the Live Your Why Podcast to discuss the meanings that keep many of us from fully experiencing the joy of our sexuality and what we can do to shift these common, but problematic meaning frames and create something better.

**Live Your Why**

**LISTEN NOW**

---

## View More Episodes

### LISTEN ELSEWHERE



   

  



## SUBSCRIBE TO "CONVERSATIONS WITH DR. JENNIFER"

The Conversations with Dr. Jennifer Podcast is a collection

of FREE podcast episodes, interviews, discussions, and media appearances all featuring Dr. Finlayson-Fife. All of these incredible resources have been gathered together and categorized by topic so that you can easily find answers to your relationship and sexuality questions.

SUBSCRIBE

## AS SEEN ON



**IHUFFPOSTI**

**KSL.com**

The Washington Post

LDSLiving

**n p r**

The Salt Lake Tribune

The advice offered through Dr. Finlayson-Fife's Podcast Archive is educational and informational in nature and is provided only as general information. It is not meant to establish a therapist-patient relationship or offer therapeutic advice, opinion, diagnosis treatment or to establish a standard of care. Although Dr. Finlayson-Fife is a trained psychotherapist, she is not functioning in the role of a licensed therapist during these sessions, but rather using her training to inform these sessions. Thus, the content is not intended to replace independent professional judgment. The content is not intended to solicit clients or patients; and should not be relied upon as medical or psychological advice of any kind or nature whatsoever. The information provided through the Content should not be used for diagnosing or treating a mental health problem or disease. The information contained in

these communications is not comprehensive and does not include all the potential information regarding the subject matter, but is merely intended to serve as one resource for general and educational purposes.



**ABOUT**

**BLOG**

**PODCAST**

**PUBLICATIONS**

**CONTACT**

**COURSES**

Strengthening Your Relationship

Enhancing Sexual Intimacy

The Art of Desire

The Art of Loving

How To Talk To Your Kids About Sex

Starting Strong: 7 Things Every Newlywed Should Know

10 Sex Myths That Are Undermining Your Happiness

Understanding Intimate Deception

**COACHING**

Room For Two

**WORKSHOPS**

2024 Couples' Tour - Spain and Southern France!

2024 Couples' Tour - Italy & Switzerland

The Art of Desire Women's Retreat in Oregon!

Two-Part Couples' Retreat In Oregon!

The Art of Loving Retreat - St. George, Utah

*Follow Me!*

© 2024 JFF Studios, LLC. All rights reserved.

Terms of Use     Privacy Policy

Be the FIRST to hear about new events and SALES, sign up here!

SIGN UP

menu

Dr. *Jennifer*
FINLAYSON-FIFE

cart (0)

Be the FIRST to hear about new events and SALES, sign up here!

BLOG

# Conflict in Relationships – Facebook Live Transcript

**Dr. Finlayson–Fife**                                     March 2nd, 2022

We're going to talk today about conflict in relationships.  I'm going to take up questions from the group and I also want to talk a lot about principles of good communication. And, perhaps not surprisingly, I'm going to be very focused on you and your ability to handle yourself in conflict because that's all you have control over anyway. Then I want to take some time and relate it to behavior in the group. We have new moderators that are going to be helping to oversee the many conversations that are going on in the group and help shape the culture to be one that is more respectful, one that is more self-defining, and less reactive. It's easy for the worst in us to emerge in these kinds of conversations because they are very close to the bone. They are charged conversations and often have charged meanings. And so the opportunity for your worst behavior to emerge is high. And so I'm just going to be making some parallels between communication in conflict in our marriage and with people that really matter to us. And then also expectations in terms of how you handle yourself around tough topics in the group.

So, let me read the question that I'm going to address. This person writes, "My husband and I have always struggled to resolve

conflict in our marriage. Lots of hostility and verbal and emotional abuse from both sides. We both have perpetuated terrible dynamics and patterns that I'm currently working to change. Recently, I hit rock bottom and I've researched so much about how to resolve conflict better. And I'm currently in therapy. I'm working on breaking some of the patterns, but it is rough. My husband will continue to use horrible techniques such as gaslighting, name-calling, and empty threats during arguments. Luckily, he never fulfills those threats and he never does anything about them, but they're hurtful nonetheless. I haven't been a pillar of goodness either. I've definitely done my fair share of abuse and have hurt him a lot too. I do my best to stay calm and use the 'When you do X I feel Y statements.' I do my best to bring it back on topic if he starts to kitchen sink it. Although, as you can imagine, I'm not perfect. It's very complicated as we agree on the important and big things in life. And when we have major hurdles like finances or house buying or something, we're completely on the same page. I love him very much. He doesn't cut me off from friends or family, and our finances are separate, so he doesn't try to control me in any way. He's aware of the name-calling and yelling and does apologize when he knows he's done something wrong. And I've seen changes, which is why I'm still in this. I don't feel physically unsafe or anything. We just really suck at the small disagreements, and I'm just feeling very, very discouraged. How do you stay in it and continue to break unhealthy patterns and dynamics even when your partner isn't at the same pace you are?"

Really good question, and I really respect what this person's doing in her question as she is acknowledging, "I am not just a victim of my husband's poor behavior. I have been in it with him. I have done many of these same things. And yet it's also true that the

conflict is wearing and taxing, and it's really, really hard to break the pattern." I appreciate that she is confronting her own role. And yet it's also very hard because a lot of times when you're in these patterns, they're so familiar and they're really easy to just get hooked in with the way that your spouse is doing it. Both because you know how to react to that and because in partnerships we're often getting each other where we're weak. It's a good strategy if you don't want to deal with yourself to go after the weak part of your spouse, and it's an easy and even intuitive thing to do.

A lot of times people come in and they say they have a communication problem, and in reality, couples aren't struggling with communication. They have this idea that if we would just say things better, we would understand each other better. But the people that are often complaining about communication challenges are often expert communicators. They can communicate an idea very effectively online, in writing, to their coworkers, and so on. So they're not struggling to get their ideas across. What they're struggling with is dealing with what they see about their spouse and what is true about them. And so we will often resort to communication patterns that have a different goal in mind than being understood. The goal is to prevail. The goal is to dominate the situation. When people say, "I get out of control with my anger," in my view the anger is a strategy. It's often a very familiar strategy. It's a strategy that they learned watching their parents, for example. It's a strategy that's worked in the marriage. If you get nasty and mean and intimidating, you'll often get your way. Right? This is what I talk about in the strengthening your relationship course when I talk about losing strategies. A losing strategy is the unbridled self-expression that is often designed to get other people to accommodate you. And so anger isn't about, "I just lost control." It's more about trying to control something through your anger. Another version of this is using victimhood to

get people to accommodate you. "I can't believe you said that. I'm so hurt. How could you say that when you know that's an insecurity of mine?" And you get other people to accommodate you and gravitate to you, even if they're doing it resentfully, which usually people are when they're getting manipulated through anger or neediness, but you still can have this sense of winning.

Someone wrote, "It's so ironic how wanting to win is so often a losing strategy."

Absolutely. Because in any partnership trying to prevail, which we do when we have difficulty regulating our sense of self, you might get the thing you want, but you will undermine friendship, trust, partnership, collaboration, and peace in the marriage. So that impulse to prevail is often working right against another goal that we often have but that gets put second, which is the goal of peace or the goal of friendship or the goal of collaboration. And so communication problems are not problems with the articulation of an idea, as people often think. Communication problems are really problems of self-regulation and trying to manage your legitimacy by dominating. By prevailing in the interaction we're trying to get our reality to dominate. We want that validation. We want other people to make us feel okay about ourselves. That's why most of us get married. You lock in somebody who's now promised God that they're going to love you no matter how immature you are. And then when they don't do that, you now have a right to critique them and act like a victim when their humanity shows up.

You can't be awake in the world and be in honest relationships

You can't be awake in the world and be in honest relationships and always get reinforcement. So the more we need that reinforcement, the weaker we are and the less likely we are to get it. And so to live well in the world is to tolerate when people don't reinforce you and don't reinforce what your experiences or your conception is. We often want to use the language of "I'm looking for safety" and "I want other people to be nice to me when I say what I think and feel," and of course, we need to respect each other. We need to be decent to each other. But I think what's more important than the idea of other people providing safety for me is for me to be strong enough and self-respecting enough that I can tolerate that others won't see things the same way, that others can be mean, that others can be not respectful, and still handle who I am and behave in a way that I believe is respect-worthy and decent. The locus of control needs to be inside of yourself to live life well. And what we do in our immaturity is we will turn it over to others and look for others to provide us with our sense of well-being. And especially the more the person matters to you, the more you do this and the more the topic is important to you or is linked to your sense of safety, the more likely you are to get reactive and try to control others around you. So if you demand protection and reinforcement, you'll always be weak and reactive because that locus of control would always be outside of you.

The author of the question is really clear that they actually love each other and that on the things that they agree on they actually do really quite well. They can make what might be, for some people, really challenging decisions around finances, around purchasing a house, for example. So she's saying there's a lot of good things and a lot of places where they share objectives and share a similar point of view, and then they do great. And this is true for so many couples that the things they agree on is where

life is peaceful and good enough. What happens when you don't agree or when you see the world differently than you, you start wondering if you married the right person. It's in that challenging spot that couples will often bring out their darkest selves because it's where they can't get reinforcement, and often this is around things that really matter. And so in this couple, when they don't agree with each other, then they go after each other and they try to take the other down. They use disparagement, name-calling, and personal attacks to keep their own sense of self together to get what they want, which is to get life to yield to them. And this is very normal human behavior, but behavior that will always undermine our relationships. So again, anger and victimhood are often losing strategies, not honest responses. It can be a way to get other people to yield to you. And you might get accommodation, but you'll never feel at peace in the relationship and you also don't feel at peace with yourself. This is really, really important because you can't make other people love you. You can't make other people respect you, but you can operate in a way that you have self-respect, that you have a deeper self-reference, that you are more able to self-regulate and therefore handle better and more constructively people seeing the world differently than you.

It takes courage because if your spouse is saying something mean they've given you all the license your regressive mind needs to go right after them and say mean things back and to say, "How dare you?" and to make this about who is going to dominate rather than staying on topic and bringing a decent, honest self into that conversation, even if your spouse does not. That takes a lot of courage, and what it really takes is loyalty to your highest self. Not a loyalty to managing the other so you feel okay. That's what our instinct is, but it keeps us trapped. We create the prison

that we operate in. The goal is to fight with yourself, not with your spouse.

Sara wrote, "It's a power struggle."

That's right, Sarah. It's a power struggle and you never win at a power struggle. You just don't because you keep that locus of control outside of you. And then you've always gotta fight with your spouse to feel okay about you. And it's a power struggle between a vertical relationship. Am I going to dominate or are you going to dominate?  Who's superior now, who's superior now?  And when you're constantly in that power struggle, there is no safety. There is no peace and your self-respect is hinging on your weak partner. And so the only way to be in a horizontal relationship, I talk about this in the Strengthening Your Relationship course, the only way to be in a same-as position is by being at peace with yourself. You don't have to prevail anymore to manage who you are. That's how you unhook from other people and start to build both more self-respect and more trustworthiness. And you're much easier, in fact, to be with because being with you doesn't mean you're in a struggle around who's the superior one. A lot of people live their lives constantly in vertical relationships. Most people do. Am I below this person, am I above this person?  And they're constantly trying to establish a sense of self by not being under people, or at least depending on people if they are under people, but that's outside of them. And the more we bring it into ourselves in an honest, integrity-based way, the freer we are.

A group member says, "I spent years trying to convince my now

ex-husband that there were better ways to approach disagreements. The meanness certainly took a toll. After great JFF advice, I stopped trying to convince."

Yeah, exactly. It's not about, "I'm going to change you." I work with a lot of people who spend their lives trying to get their spouse to be invested in the marriage, get their spouse to try to learn the skills of better communication or being nicer or whatever it is. And they're complicit in the idea that their sense of self and their hopes reside in that other person. And then the other person cannot try because they're hooked around this over-functioning/under-functioning dynamic. And the more you take on who you're going to be and what you're going to deal with and what you're going to choose, the more you develop self-respect and capacity for intimacy. But also keep the onus on the other person for their own behavior.

So here are some basic rules, and I talk about them much more in-depth and give a lot more examples in the Strengthening Your Relationship course, but let me just give you a taste of them. So the first is, and this is really hard because when you're in that angry, self-righteous state you think, "I finally get what's really going down here." Your regressed mind is telling you that you are a victim of your spouse's stupid ideas and that you see things as they really are when in fact you don't because your limbic brain is running the show. Your limbic brain is excellent for fending off the threat of a bear that's about to eat you, or a car that's about to hit you. It's pre-verbal. It is instinctive, reflexive, and it's faster than your prefrontal cortex in processing threats and reacting to threats. So we can all be grateful for our limbic brains in keeping us safe and alive. The problem occurs when the limbic brain

hijacks the prefrontal when you're trying to have a nuanced conversation about how you manage family resources or how you respond to a child who's struggling. This is not a good time for the limbic brain to come in and act like your spouse is the bear who's about to eat you for lunch because you are compromised in your thinking and you think you've got it all worked out and that you have a right to be aggressive. So don't speak or try to have difficult conversations when you're reactive and upset. And even you or your spouse could say, "I'm going to go calm down because I know everything that I'm going to do next will be impaired and mean. And so I'm going to go until I've settled down enough that I can actually come and talk decently and constructively." And if the goal is just to get out of the conversation and you're using the idea of calming down, of course, that's not adaptive to just not deal with conflict. A lot of people will never deal with things and say that that's strong. And it's not, because to be under reactive to life's problems is as problematic as being over-reactive to life's problems. But to think, "I want to have my full brain on board before I deal with one of the most nuanced or challenging troubles that we as a couple have." That's good judgment.

And so you want to think about, "What are the things that calm me down?" For a lot of people, movement is one of them. I think it's tied to getting out of a threatening situation. The more that you are in movement, the more your limbic brain will settle down. So going on a walk and thinking, or prayer, meditation, those can be things that help people settle down. So think about, "What is it that I need to do?" You want to seek wisdom and there are ways to do that. When you're regressed, you're in an impaired view of yourself and your spouse. And so you want to be in a wiser position and I think there are two ways to move into a wiser position.

First of all, calming down. It's hard to get wise if you're already in this angry, reactive place. One thing that calms me down is self-confrontation. Asking myself, "What is my role in this problem? What am I pretending not to know about my own role in these circumstances?" We're wired to see other people's limitations and to track other people's minds better than our own mind, so we can be really deluded about our own mind and be tracking our spouse's mind rather well.  The problem is that you then think it's all your spouse's problem and they think it's all your problem. And then you fight each other as if the way to resolve this is going to get the other person to agree and say, "You're right, it is my problem. I am the problem."  So it doesn't work that way. You have to look at, "How am I complicit in or a part of my spouse's behavior?" And that's a hard question because your mind wants to take you away from it. It's also easy to not see it. But the thing is, the only thing you actually have control over is, "What am I doing that this is a repeating pattern? What's my half of this dance? How do I make it easy for my spouse to do the dysfunctional thing he or she is doing? Why can they get away with that with me? What is it about me that this is something that has a sense to it in their world?" Now that's, of course, not the idea that I'm responsible for my spouse's behavior, but I'm part of the ecology of this recurring dynamic. And so, "What am I doing in it? And what do I need to address in myself around it?"

Another group member says, "The spouse who always wants to be better than their partner may get a partner who gives up trying to compete, and then no one wins." That's exactly right.

Someone else writes, "Can you speak to how disconnecting from this dependent position is different from creating distance?"

Yes, I will definitely do that. That's a good question. When you're hooked into somebody else's psyche, you're going to do one of two things. You're either going to try to control them through dominating and getting them to do what you want or control them through yielding to them, but you're still trying to get control over the dominant one. The big thing is that if you need somebody else's behavior to reinforce you, either "you are here and you protect me from life" or "you yield to me and my amazing ideas." In either case, you're going to be controlling, whether that's covert or overt. The other strategy is, "I'm going to disconnect from you because I can't handle my sense of self when I'm in your presence." So a lot of people that are walled off, as I talk about in the Relationship Course, are in fact overly reactive to other people's minds. That's why they need to be distant. That's why they don't invest themselves in the relationship. That's why they don't show much of who they are. That's why they're low desire. That's why they don't show up sexually because they can't sustain their sense of self while mapping and knowing their spouse's mind and desires. That's also undifferentiated, and it's just as undifferentiated as the enmeshed person who wants to control overtly or covertly.

So the goal of development is that you can belong to yourself and other people. You can be in the presence of knowing what your spouse's desires are and still be true to yourself. You can know your own mind. You can make a decision. And it might even be to do what your spouse wants, but you don't feel like you've lost yourself because you did what they wanted, you're saying, "I see

they want it, and I choose to do what they want. I want them to be happy. I want to do this, but it's being true to myself while I'm with them." Or to be able to say no to something and know that your spouse may be unhappy with you, but you're honoring something you need to honor in yourself genuinely.  And so you can tolerate that they aren't happy with you because you really can see or believe you're doing what is right for you and therefore the relationship.

So our differentiation and development is linked to our ability to be true to ourselves and others, to belong to our own mind while we're in deep connection with others.That's why being more able to self-regulate means you are more capable of intimacy. You're more tolerant of knowing how your spouse thinks differently than you, that they've experienced the world differently than you, that they think about faith or sex or money differently than you. Because you are willing to understand the world from their point of view without feeling you're going to get lost or that you can't hold the legitimacy of yours. And if their point of view actually changes or shapes your point of view then that's okay. Not because they've now won but because you're willing to take what's true wherever you find it and claim it in your life and in your mind. You want to be disabused of poor ideas if you want to live life well. Because if your ego is running that process, you need to think you're always right or somehow you never get anything wrong because that's not what you're beholden to. You want to live wisely and truthfully, and you trust yourself in that process enough to be open to what others think and feel and believe. Something, by the way, that I want to see more of in the group.

You want to calm yourself down, meditate, pray, think. Self-

conflicting is a big part of calming yourself down. "What am I pretending not to know about my role? Why would someone reasonable say or think what my spouse said or thought? How does their behavior make sense?" I mean, you may be aware of the parts that seem crazy, but what's the sense in it? What's their goal? How does it make sense in relationship to you? What role do you play in it? How do I make it easy for my spouse to do what they're doing? And these, very importantly, are the mechanisms that develop a more solid self. You are living more honestly. You're not a house divided. You're getting more aligned within yourself. You're living more truthfully, more honestly. How you become less dependent on other people's approval is by knowing who you are, knowing your own mind, and not running from what's true inside yourself. Those of us who don't know our own minds or the places that we're running from will want to control what other people show us about ourselves and will punish them for showing aspects of ourselves we don't want to deal with yet or ever. And so the more that you honestly confront that, the less you need other people to prop up the idea that you're good because you've dealt more firmly with who you are inside yourself. And that's the passageway into freedom. That's why my favorite scripture is, "the truth sets you free." The truth punctures reality, punctures your inflated sense of self, sobers you up, then sets you free because you grow out of your dependency on other people's approval. But you also become more able to really be close to someone because you can belong to yourself and be with them deeply and share yourself and your heart and your mind and your sexuality without feeling that you're being obliterated in the process.

Okay, so that's the first thing. The second thing is to self-define, and I'll talk about this as it relates to the group as well. Your communication when it's intimate is self-defining. It's not designed to prevail or to win or be the smartest guy in the room.

It's not about that. It's about showing who you are. Weak people need to control others. Strong people will control themselves. Strong people will let other people know who they are, and how they've come to be who they are because they don't have anything to manipulate or hide. They don't need to manage how they're seen because they are at peace enough with who they are as a flawed and worthy person. So, if communication is not about getting control of others or getting others to reinforce the world as you understand it, then you don't have to be aggressive in your speech.

One of the ways of tracking how you're in communication is by asking yourself, "Am I using 'I' statements?" You can use this as a tool to manage yourself. If you want to go into defining your spouse or defining someone else, speak in terms of, I think, I feel, I believe, I want, and I'm going to talk about who I am relative to this challenge. So you're defining yourself, but you're not defining reality for others. So you can use this as "I feel X when Y happens in these circumstances" or, "I believe X because of Y and Z experiences." But again, you're showing who you are without the agenda of getting other people to reinforce your view, defer to it, or embody it themselves.

The other principle is that before you speak, think, "Is what I'm about to say going to pull for something constructive or not?" Everybody's intelligence would go up dramatically if we would all do this. Ask yourself, "Is my participation in this conversation of conflict or difference going to pull for the best of my spouse or is going to pull for their indulgence or defensiveness?" If the conversation is going to pull for their defensiveness, their reactivity, their hostility, then a good question to ask yourself is

"Why am I saying it?" Meaning, what is the goal here? Because a lot of us are saying, "Oh, I have a goal of a closer relationship and that we work this out." But another goal is operating that you can't see, which is, "I want to win. I want to prove to you that I've always had the right point of view. And if you just get in line and be more like me, we'd be a lot happier." That's a more regressed goal, and it's the one that comes in and hijacks the conversation. And so you have to really think about, "I'm very much a part of this problem. I'm a part of my spouse's bad behavior. Do I have the courage to not be a part of it and actually stay constructive?" If you do, it feels a lot more exposed. It feels a lot less familiar and it's going to feel uncomfortable because you're not in your normal power struggle and turf battle. You're actually showing up in a kinder, more open-hearted, more honest, and stronger way. Dominance is not strength. Dominance is pretend strength. It is stronger to say, "This thing is hard for me. I don't yet know how to solve it. I do want to solve it. I want to solve it with you. Here's where I feel stuck." That's all self-definition. But it's not about fighting with your spouse. It's you fighting with yourself enough to come and expose something more honest, real, and workable.

Someone commented, "It was said of the poet Shelley, that he continually sought outside of himself that which he destroyed within himself."

Exactly. Very profound.

Another person asked, "How do we know our own mind and not run from it?"

It's a great question. I think making a commitment to yourself to be as honest as you can with yourself is the kindest and most courageous thing you can do. You're still going to be blind. There are just so many things we often just can't see. They're so cohesive in our mind that we don't see our own liabilities, especially if they were played out in our families of origin; they're so normalized that you don't see them as liabilities. Getting married helps you to see more of what you don't yet see about yourself. What's the feedback I get? What are the things I often am trying to get away from? What is it that my spouse or my child or my friend sees in me that I keep thinking I'm sneaking or getting away from? It's not a perfect process, but it's a very valuable process if you have the courage to think that way and to process information that way. Also, going to a good third party, somebody that's wise enough to look at you. I think the best coaching and therapy happens in marriage because the context of the marriage is very exposing about where each person is operating from and how their mind operates, rather than self-report. Because we go and self-report, we often just offer the best interpretation of ourselves that there is. We do it instinctively. We self-dilute in this way. To be able to really see who you are when you're in the crunch, when you're under pressure from somebody that's significant to you, that shows a lot more about how you operate. And so a smart, wise third party that can have a higher view of what is the actual system that's operating, and can often give both people more clarity about who they really are, who their spouse really is, and what the pattern is that they keep repeating. It frees them up to choose otherwise though it takes a ton of courage to do that.

The one other thing I want to say is that the biggest thing that

motivates me and clients of mine to change is not that I'm being so mean to my spouse. That does matter and if you see that you're hurting people that you love, that's good to recognize and that's self-confronting. But my point is that, at least for me, I find it more motivating that I don't want to be weak. I don't want to be running from myself. I don't want to be making other people reinforce something false in me because that's the behavior of a weak and fractured person. I want to live honestly. I want to be somebody who has that kind of courage. So it's not a fight with the spouse or the child. It's a fight within yourself about how you want to live. And the reason why I think that's better is that if you are afraid that, "Oh, I'm going to concede something, then they win," I think that appeals to the regressive part of us that says, "I don't want to lose." Instead, it's the ability to see that, "I'm not losing, but I'm actually gaining something by living more honestly, more courageously, and not having to pretend something or demand that others pretend something for me." And so I think it fuels this idea within yourself that, "I want to be strong and I want to be self-reliant and able to manage my reality. That will make me better. It will make the people I love better because they don't have to deal with me. And because I'm also able to offer more wisdom and clarity in the way that I live." So I think that's a motivating force in the face of those regressive pulls.

A group member says, "I love this question. Two things I have found that are helpful are writing about the topic I want to know what I think about, and talking with another safe person about the topic. Both of these, for me, are exploration activities."

Exactly—journal writing or talking to a wise friend. Help me with

what you think I'm missing about myself in this. You can be prayerful about it, "God help me to have the courage to see what I'm afraid to see. Help it to be revealed to me so that I can be more courageous and live better." And then if you're going to speak to your spouse about something that's been hard and you've gone through this process of self-confrontation, implicate yourself honestly as well. I'm talking about speaking about, "I this. I that. I feel. I want." That's an important thing. But if you're going to talk about your dynamic in the marriage or something that your spouse does, that's difficult. You can talk about how it impacts you, but you also want to implicate yourself in the dynamic. So, for example, this person that asked the question might say, "I've made it easy for you to fight back in an angry and attacking way because I know that I have also been provocative. I've also wanted to dominate and push back on you. And we have so many strengths and so much good, and I do love you. And we also come at each other in a way that I know I've been a part of and that I want so much to change for us to thrive and be more at peace." So you are self-defining. You are talking about your spouse's behavior, but you're talking about your part in that cycle so that it's not just accusing and saying, "When are you going to treat me the way I deserve to be treated?" That pulls for more defensiveness and so on.

So let me just spend a few minutes and just talk about the Facebook group and my hopes and expectations of everybody in it. We are ridiculously big at this point. I think it's around 20,000 members, which is great. I'm very glad for it because I want very much for this to be a group in which there are good resources being offered, places where people can have the freedom to really think through some of these really important issues around their relationships and their sexuality, and how they've been taught to

think about both and how they're operating in their most cherished relationships. So I'm grateful for that, and I do want to say that I am impressed in large part with how helpful people can be and the time that people will take to really respond to somebody who's struggling and really offer their experience and their resources and their thoughtfulness around things. I really respect and I'm grateful for people who are doing that for one another. It matters very much to me that this group is a respectful place and that you show respect for topics and people, and it's really important that that culture is really in place here and that we expect it of each other.

We're talking about really challenging topics with a really wide range of beliefs and experiences. And so it's really easy to get like, "That's the stupidest thing." Or, "You're a terrible person." It's very easy to do that. It's not acceptable to do that. So the skill that it requires to do well in this group, is the same skill it requires to do well in your marriage and in your most important relationships. So I feel absolutely fine about expecting it of you unequivocally. So practice it here. These people matter less, so it should be easier here. If you're going nuts online, it means you're going nuts at home. So it exposes you. You have to stay in your lane at all times. This is important in marriage. This is important in this group. That means do not talk about your spouse connected to your name. You can post anonymously. We strongly encourage you to post anonymously even if it's just about yourself. You have a responsibility to your own privacy. And so you want to be really thoughtful about what you're putting out there, but especially if it's involving a spouse or someone in connection to you. So no matter how hurt you feel by your spouse or how much you may think that they've lost the right to their privacy, you really need to respect other people's privacy here.

The other thing I mean by staying in your lane is please do not make it your job to get people to believe in the right way. That's over the line. And even though we all know you do know the right way, it's still over the line to tell people how they've got it wrong and you've got it right. You can't bear testimony of your church-backed position nor can you bear testimony of your woke and enlightened position—those are both bullying positions. That's the problem with it. You can absolutely and unequivocally define yourself. So you can say what you believe and why you believe it without apology. That's about showing who you are. "This is how I've come to see this. This has been my experience. This is why I think about it in this way." Not only is that not over the line, but that's also absolutely constructive and valuable because the goal is to understand the myriad experiences that have shaped why people think as they do because it expands understanding, it expands compassion and it allows you to think about your own point of view. "Is it too constricted? Is it too limited? Maybe this has made perfect sense for me, but it seems like it's not really been very valuable for this person who's not bullying me that I got it wrong with but they're just talking about how they have experienced this. And maybe my view doesn't really account for enough reality. Maybe I want to think about my view a little differently." But the way you do it is by showing up honestly and humbly. By humble, I don't mean like "I'm a loser," kind of humble. But humble as in, "I can only speak to my experience of this part of the elephant. I can speak to how I've put it together." That's always going to be limited for every single one of us. We're all still in development and sorting out what's true and what's real and we need some humility on that front and not assume that we can tell others how things really are. So it's always okay to be self-defining and self-revealing, but it's not designed to make people see the world as you do. It's not about winning, it's not about

prevailing. The goal is to share your honest perspective and experiences.

So, as an example, it's not OK to say things like, "Sex addiction isn't real." That's to pretend that you know realities and others do not, and you have a right and duty to set everybody straight.  It's superior. It's not respectful. And of course, it's only going to invite a fight. Who writes that without expecting that you're going to be in a toe to toe battle while dragging innocent bystanders in?  It's also not okay to say, "Anyone who views porn is clearly abusing their spouse and is misogynistic."  That is defining reality. That's saying how it is for everyone. You may believe any of these perspectives 100 percent with all your heart. However, you don't get to define reality and define others. So you can define your experience and your honest perspective, but own it only as that. Do you see the difference?  People feel the difference for sure. But seeing that difference in yourself is a big deal. So you might say, "The label of sex addiction has not been helpful for me because a, b, and c." That's perfectly legitimate because you're saying, "In my experience, that's not been helpful and this is why." That's going to expand understanding. You can say, "I do believe in sex addiction because my experience is I couldn't make myself stop viewing. Therefore, that label accounts for my experience in these ways."  Again, it expands understanding of why people might see it differently. Somebody can say, "The science I have read suggests that porn is addictive and makes people get hooked because of some response in their brain. And this fits with my experience in these ways. So it's hard for me when people say it's not real." Perfectly legitimate. You're even citing science or something, but you're not saying it as, "This is the last word." Rather you're saying, "This resonates with me for these reasons." And here's one that last one, "While I understand that some people may have been hurt by porn, I resonate with people who

people may have been hurt by porn, I resonate with people who challenge the usefulness of framing porn viewing as addictive because blah blah blah."  Again, you're pulling it into your experience, your view, this is how you see it.

I really do care about this because I want people's understanding and perspectives to be challenged in a respectful way and to be expanded so that we're all arriving at something that accounts for more reality, is more valuable, is more moral, and is helping us be better people. And that's the way to do it. It's a way of increasing the intelligence of the group. It's a way of increasing the intelligence in a marriage. That is you define your honest experience with a goal of being known and knowing others. Not prevailing. This is what horizontal relationships are versus vertical ones. So you define you. Use those "I" statements, I think, I believe, I feel, I have a hard time with. Don't use "you" statements. No calling names. No defining other people. No disrespect. And the moderators that have volunteered, and I'm so happy that they're here, are just going to be helping to remind people of these rules, remind them of these expectations. A disrespectful comment will get taken down, and there's sort of a "three strikes you're out policy." So if you're not able to do it, then you won't be able to be a part of the group. But my hope is that people can really do this and remind each other if needed when challenging topics are coming up and it's easy to start going into self-reinforcement. So compassion, kindness, and seeking to understand, then be understood. You could even say, "Help me with why you think about it this way because I've never been able to understand why somebody would see it that way." And it's not accusing. It's genuinely seeking to understand. Then you can say, "OK. I get that. I think the reason I think about it differently is I have tended to focus on this."  Recognizing that people are trying to make sense of the world and that we're all limited is a compassion we

owe to ourselves and each other.

---

NEXT POST            PREVIOUS POST

---



**ABOUT**

**BLOG**

**PODCAST**

**PUBLICATIONS**

**CONTACT**

**COURSES**

Strengthening Your Relationship

Enhancing Sexual Intimacy

The Art of Desire

The Art of Loving

How To Talk To Your Kids About Sex

Starting Strong: 7 Things Every Newlywed Should Know

10 Sex Myths That Are Undermining Your Happiness

Understanding Intimate Deception

**COACHING**

Room For Two

**WORKSHOPS**

2024 Couples' Tour - Spain and Southern France!

2024 Couples' Tour - Italy & Switzerland

The Art of Desire Women's Retreat in Oregon!

Two-Part Couples' Retreat In Oregon!

The Art of Loving Retreat - St. George, Utah

*Follow Me!*

© 2024 JFF Studios, LLC. All rights reserved.

Terms of Use      Privacy Policy

Be the FIRST to hear about new events and SALES, sign up here!

SIGN UP

menu

Dr. Jennifer
FINLAYSON-FIFE

cart (0)

DR. FINLAYSON-FIFE'S PUBLICATIONS



## In the Image of our Heavenly Parents

If you are ready to create a thriving marriage--one that is more collaborative, joyful, and committed to growth, you'll love this book!

Crafted by a team of dynamic LDS therapists and thought leaders, this interactive guidebook offers a comprehensive twelve-principle framework that empowers readers to forge deeper partnership and more connection in their marriages.

A digital version of this book is also available <u>HERE</u> (use code JENNIFER10 to save $10)

LEARN MORE



## Why I Stay 2

While familial and cultural factors may initially determine one's religious affiliation, the decision to maintain involvement is a deeply personal and multifaceted process. The personal stories shared in Why I Stay 2 capture the pivotal experiences, difficult decisions, and unique considerations that shaped the spiritual path of each of the authors.

Why I Stay 2 is a compelling snapshot of 21 personal and complex faith journeys.

LEARN MORE





## Women and Mormonism

Drawing on a broad range of perspectives, experiences, and challenges, this essay collection offers a nuanced exploration of the intersection of women and religion. Its contributors comprise an array of lay members and distinguished scholars across multiple disciplines, presenting both LDS and non-LDS viewpoints on this important and timely topic.

LEARN MORE

FEATURED ARTICLES



**A Peek Into The Mormon Bedroom: Dealing With Sex And Religion**

READ THE ARTICLE



**When Is Submission Good and When Is It Dangerous?**

READ THE ARTICLE

**Physical Intimacy Within Marriage**

READ THE ARTICLE



ABOUT

BLOG

PODCAST

PUBLICATIONS

CONTACT

## COURSES

Strengthening Your Relationship

Enhancing Sexual Intimacy

The Art of Desire

The Art of Loving

How To Talk To Your Kids About Sex

Starting Strong: 7 Things Every Newlywed Should Know

10 Sex Myths That Are Undermining Your Happiness

Understanding Intimate Deception

## COACHING

Room For Two

## WORKSHOPS

2024 Couples' Tour - Spain and Southern France!

2024 Couples' Tour - Italy & Switzerland

The Art of Desire Women's Retreat in Oregon!

Two-Part Couples' Retreat In Oregon!

The Art of Loving Retreat - St. George, Utah

*Follow Me!*

© 2024 JFF Studios, LLC. All rights reserved.

Terms of Use      Privacy Policy

# EXHIBIT 5

**facebook** Log In

 **Dr. Jennifer Finlayson-Fife**
April 16, 2021 · 🌐

Some of you have reached out asking me to share my thoughts about the potential excommunication of my friend and professional colleague Natasha Helfer.

So many of us feel for Natasha and the looming possibility of her being excommunicated. Others feel that Church leadership must have good reasons to take such a drastic measure towards one of our own. While I can understand how Natasha might be perceived by some as a threat because of views which diverge from traditional LDS notions of sexuality, revoking her membership is not constructive.

I have great respect for Natasha and the woman she is. She has been an honest and earnest voice in our Mormon community on topics that are much easier to avoid than speak to. Whether you agree with Natasha's perspectives or not, her desire to candidly address issues around sexuality and mental health have benefited our communal discourse. I know Natasha to be a person who is genuinely invested in living up to the responsibility of our profession and is invested in helping members of our faith.

I can understand that Natasha's sometimes unorthodox and unvarnished views might be uncomfortable or even offensive for some. We are in a time of massive transition in our culture and membership. I feel for Church leaders who are trying to navigate ever-changing social realities, dissent, and faith crises, while preserving the tenets of the faith we hold dear. It cannot be an easy time to lead; and managing our response to people's ideas that diverge from our own is not simple. Some might feel that removing the membership of someone who openly dissents would somehow protect us, but it won't.

As Joseph Smith said "By proving contraries, truth is made manifest." We need dissent, we need to be strong enough to let our view of truth be challenged. It helps us get clearer, it helps us really seek a deeper understanding of truth. It helps us love better in our efforts to understand others and how they see the world. We need the body of Christ, in all of it's variation, to become whole. Cutting Natasha out will only draw more hostility and anger towards the Church. It divides us from one another. It justifies simplistic perceptions by outsiders of faithful Latter-Day Saints.

We must be strong enough to tolerate dissenting views and discussion. We don't need to drive people out or shun them. The message of the gospel is one of inclusion, especially amongst those that are seeking to be a part of the fold. I believe Christ would not want her to go. We need her to stay. If we are going to become a Zion-like people, we need to not alienate. We need to hold onto those who are a part of us.

I hope and pray that her church leaders will be open-hearted and earnest in considering the impact of their choices on not just Natasha, but on all of us.

## Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

**facebook**                                                    Log In



👍❤️🥰 1.6K                                    320 comments   224 shares

Like                                        Comment

Most relevant ▪️

Jane Chatham

## Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

 **facebook** Log In

 **Miranda Mantilla**
It sounds like they're looking at communication for saying pornography and masterbation are not a sin. It would be one thing for her to believe that but she is publicly spreading blasphemy. While it seems a lot of what she is doing about reducing fears... **See more**

3y   Edited                                           6

■ View all 15 replies

 **Lars Splvd**
This message might be a good addendum to Natasha Helfer 's appeal that should go straight to the office of FP. It should also be sent as a petition with signatures from members who want to remain in good standing but plead with the leaders to consider ... **See more**

2y

 **Brian Stutzman**
Bethany Laural Anderson thanks for posting your views. Yes discussions about anxiety and mental health have come along way but not just in the church but also in society!

3y

**Sharon Miles Wilkins**
I wish to lend my full support to Natasha. She has spent countless hours and untold energy in counseling members who are in distress and contemplating ending their lives because they feel they have been abandoned. They have been marginalized by the ver... **See more**

3y                                                     3

 **Anthony Durling**
I literally emailed my Bishop and went inactive over this. It is Bull crap that they are hiding this in the midwest when they have no authority to do so.

3y

 **Rob Smith**
I've read a LOT of Joseph Smith, but that quote sounds new to me. I'd appreciate a source. But for now, I'm going to look to see who Natasha Helfer is and what she's up to.

3y

■ View 1 reply

# Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

**facebook**                                                    Log In



3y

 View all 2 replies

 **Chris Enslow**
I've noticed so many comments following this page for several months that seem subversive to the church as a whole. There's a balance and there's a line, and there's crossing the line. People try to blur it but it really has not changed.

3y

 **Virginia Navarro Smout**
There has got to be more going on that is not being told in order for our leaders to consider ex-communicating an upstanding member?

3y    Edited

 **Becky Ahlborn**
Thank you for taking a stand and pointing out very legitimate reasons to promote more unity and love and less decisiveness.

3y                                                               5

 **Kelli Woodall-Uhrich**
Why is speaking truthfully considered to be "dissent" at all? This disciplinary court is truly disturbing. Her excommunication will be an equally disturbing act of shaming and silencing someone simply because she sees some dangerous problems in the chu... **See more**

3y    Edited                                                     6

 **Jessica Bergeson Call**
Thank you so much for sharing your thoughts in this. Reading yours helped me to sort through my own.

3y

# Log in or sign up for Facebook to connect with friends, family...

Log In            or            Create new account

**facebook**                                                                    Log In

 **Jennifer Ngahooro**
I do not know these women but have myself left the church after 30 years of adult membership due to it's views on sexuality. As soon as the church starts saying..we can still love "them".."they" are no longer part of "us". We are supposed to be "one"..... **See more**

3y

 **Fiona Wright**
I feel there is a great deal of misunderstanding and fear still surrounding the LGBTQ+ experience. These members of God's family and those who find themselves loving, supporting and advocating for them are on the front lines of uncharted territory. If ... **See more**

3y

 **Charla Majeran**
"We don't need to drive people out or shun them"...or declare them to be "lazy learners"(Nelson) who are "settling for second best lives" (also Nelson).

Excommunicating, shunning, demoting or insulting people who try to respectfully dissent or challen... **See more**

3y

 **Allison Bockholt**
This is beautiful. Thank you for sharing.

3y

 **Tammy Johnson Ellis**
Spoken as one with authority.

3y

 **View 1 reply**

 **Rachel Cooney Hoerman**
Thank you for boldly speaking out. Beautifully said.

3y   Edited

 **Sarah Peterson Whaley**
Beautifully said and could not agree more. I hope wisdom and sanity will prevail.

3y

 **Thomas Graff**
Very prudent counsel because fear of dissent fails to fully examine truth.

# Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

# facebook

Log In



**David Larsen**
Thank you, Jennifer, for modeling 'differentiation' so well in your post in this challenging situation.
Thank you for teaching me what 'real strength' is so I can recognize it when I see it!
... **See more**

3y   Edited



**Gail Harmon Berkey**
So well said - thank you! I've learned so much from both of you and you are doing Gods' work!

3y



**Brittany Sullenger**
I appreciate your words and thank you for speaking out in support of Natasha. My hearts aches for her and the turmoil this is causing in her professional and personal life. I too believe Christ would not want her to go. I hope the outcome of this membe... **See more**

3y



**Chantel Rhodes**
I hope this becomes an opportunity for these things to be HEARD by church leaders. These issues are so important that thoughtful inquiry needs to happen. Conversations and education need to happy. Study and pondering and seriously looking at the realit... **See more**

3y



**Logan Neilson**
I disagree, I will always show love to such individuals, but I have no problem with excommunication when needed. Love them all you want, but a wolf in sheep's clothing cannot be tolerated to teach false concepts within the fold no matter how innocent ... **See more**

3y

 **View all 17 replies**



**Grace Hatton**
Thank you so much for sharing. Agree 100%.

3y



**Cory Hill**
Beautifully and articulated! Thank you for sharing and for the much- needed guidance and example you and Natasha provide all of us.

## Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

 **facebook**

Log In

3y

 **Allison Jones Phelps**
I love this so much. One of the central reasons I left the LDS church was an institutional intolerance for different viewpoints and a consistent lack of skills among members when it comes to discussing views that contradict their own or those of the ch... **See more**

3y   Edited

 **Deirdre Lynn Davis**
And this uchtdorf

If you could see into our hearts, you would probably find that you fit in better than you suppose. You might be surprised to find that we have yearnings and struggles and hopes similar to yours. Your background or upbringing might s... **See more**

3y

 View 1 reply

 **Deirdre Lynn Davis**
Uchtdorf

What about this ... **See more**

3y

 **Dr. Jennifer Finlayson-Fife** replied · 5 Replies

 **Jennifer Buckwalter**
I personally have been through church councils. They are degrading and really don't feel like they come from a place of love. I'll never go through another one.
How can a church leader decide that someone has to go through a disciplinary council that ... **See more**

3y

 View 1 reply

 **Amanda Louder**
Such beautiful words. I echo your support or Natasha.

3y

 **Danielle Anderson**
Wholeheartedly agree with you. Thank you for sharing your thoughts.

3y

Jeffrey Mulcock

# Log in or sign up for Facebook to connect with friends, family...

Log In      or      Create new account

 **facebook**  Log In

 **Whitney Arnold**
I'm emotional reading your brave, honest and compassionate response. You women are my virtual mentors and I consider true disciples of Christ. Thank you for providing comfort to me as I've struggled this week.
Whitney Arnold

3y

 **Cathy Duhamell Gouge**
Men's hearts shall fail them. They will make mistakes just like we do.

3y

 **Benjamin Metcalfe Pacini**
I feel for her. She is by all accounts a brilliant therapist, and I appreciate that. I don't pretend to have any more knowledge about her situation (nor the grace to judge her) than anyone else.

But I think this is deeper than "she's right on modern p... **See more**

3y

 View all 15 replies

 **Rachel Kessler Birch**
My understanding of excommunication is one of love. It's relieves one of covenants made and gives them the opportunity to make their way back to those covenants. People who are excommunicated are still welcomed and encouraged to attend church.

3y

 View all 106 replies

 **Mike McEwan**
Thank you for speaking up. It's amazing to see members stick up for each other. Natasha Helfer was how I found you Jennifer Finlayson-Fife - way back in the day!

3y

 View all 2 replies

 **Cami Hurst**
Always touched by your eloquence.

3y

**Anarie White**
Thank you for speaking this truth!

## Log in or sign up for Facebook to connect with friends, family...

Log In          or          Create new account

**facebook**



**Heather Murie**
100%
It's a cruel process to ex-communicate, and I feel it's a huge mistake being made. She's helped so many when others would not, and gave safe space for people who have none. Honestly she gives hope to those on the fringe who also have more nuanced views ❤️

3y

◼ View all 2 replies



**Melisa M. Valentin**
Supporting and protecting echo-chambers is unproductive and could even lead to the setting turning into a breeding ground for extremism—this includes the Church. Excommunication should be focused on behaviors (action) not ideologies. You can yell words... **See more**

3y

View more comments

50 of 97

# Log in or sign up for Facebook to connect with friends, family...

Log In    or    Create new account

☰ Q The Salt Lake Tribune    SUBSCRIBE   LOG IN   SUBSCRIBE  👤

Report this ad

## 'Mormon Land': LDS therapist discusses the MTC scandal, new church interview guidelines and what more her faith should do to prevent sexual abuse and protect victims



| Courtesy photo Jennifer Finlayson-Fife, an LDS therapist in Chicago.

By The Salt Lake Tribune | March 28, 2018, 1:03 p.m. | Updated: 2:02 p.m.

💬 Comment

✕



In the latest edition of "Mormon Land," Jennifer Finlayson-Fife, a Latter-day Saint and a licensed therapist who specializes in working with Mormon couples on sexuality and relationship issues, discusses those topics and more.

Listen here:

Mormon Land

LDS relationship and sexuality counselor Jennifer Finlayson-Fife on the MTC assault | Episode 27

SOUNDCLOUD

Share

29:42

Privacy policy

The Holi Festival of Colors in Spanish Fork, Utah