# EXHIBIT A

FILED DATE: 4/6/2021 9:09 PM    2021L003640

FILED
4/6/2021 9:09 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
12853929

STATE OF ILLINOIS        )
                         ) SS.        ATTORNEY CODE 44952
COUNTY OF COOK           )

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| **MEREDITH WEBER,** | |
| **Plaintiff,** | **COURT NO.** 2021L003640 |
| *versus* | |
| **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE, DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC.** | |
| **Defendants.** | |

<u>**COMPLAINT AT LAW AND JURY DEMAND**</u>

The Plaintiff, **MEREDITH WEBER**, through her attorneys, **THE FINN LAW FIRM** and **JENNER LAW, P.C.,** and complaining against Defendants, **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE**, **DR. JENNIFER FIFE**, **DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC**, states as follows:

<u>**COMMON ALLEGATIONS OF FACT**</u>

1.      Plaintiff, **MEREDITH WEBER**, currently resides at 2713 Maple Wood Road, Richmond, Henrico County, Virginia 23228.

2.      Defendant in this action, **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE**, **DR. JENNIFER FIFE**, and **DR.**

FILED DATE: 4/6/2021 9:09 PM    2021L003640

**JENNIFER FINLAYSON-FIFE) (**hereafter **"JENNIFER FINLAYSON-FIFE, PHD"),** upon information and belief, currently resides at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

3.      At all times material hereto, Defendant **JENNIFER FINALYSON-FIFE, PHD** was participating in psychotherapy treatment of her client, **MEREDITH WEBER**.

4.      At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD** was a licensed clinical professional counselor in the state of Illinois.

5.      At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD**, held herself out to the public as having a Doctor of Philosophy in Counseling Psychology conferred by Boston College.

6.      At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD**, held herself out to the public as a psychotherapist and counselor who specialized in treating members of The Church of Jesus Christ of Latter-day Saints ("LDS").

7.      At all times material hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD,** was a therapist and counselor, who engaged in psychotherapy counseling and otherwise engaged in mental health counseling including assessment, evaluation, diagnosis, monitoring, and treatment of psychological and psychiatric conditions including diagnosis of conditions such as narcissistic personality disorder and borderline personality disorder, of patients including **MEREDITH WEBER**.

8.      At all times material hereto, Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, accepted **MEREDITH WEBER** as a patient and undertook, intended and agreed, expressly or impliedly, to assess, evaluate, test, diagnose, monitor, care for, instruct, treat and provide psychotherapy and/or other mental health counseling and treatment to **MEREDITH WEBER**.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

9.     This is a professional malpractice action in which a licensed clinical professional counselor, **JENNIFER FINLAYSON-FIFE, PHD**, licensed in Illinois, provided clinical psychotherapy and counseling to **MEREDITH WEBER** and in doing so, engaged in multiple violations of the standard of care, including boundary violations, culminating in severe and lasting injuries to **MEREDITH WEBER**.

10.     In 2014, Plaintiff Meredith Weber was first introduced to Defendant **JENNIFER FINLAYSON-FIFE, PHD**, and her role as a counselor and therapist through **JENNIFER FINLAYSON-FIFE, PHD'S** Facebook advertising.

11.     In or around August 2017, **MEREDITH WEBER** reached out to Defendant requesting individual counseling with the goal of improving her life and her marriage.

12.     Initially, **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** she could not take on a regular client until October 2017 but offered **MEREDITH WEBER** a one-time appointment (something that was not publicly referenced on **JENNIFER FINLAYSON-FIFE, PHD'S** website) for which **MEREDITH WEBER** would have to fill out case paperwork prior to her one-time appointment.

13.     **MEREDITH WEBER** was instructed to fill out a life coaching agreement and a Beck Depression Inventory II ("BDI II"). The American Psychology Association recognizes the BDI II as a tool for measuring characteristic attitudes and symptoms of depression.

14.     **MEREDITH WEBER** filled out the requested documents including the BDI II noting, in part, she has "more the occasional death wish…I am way too wimpy to

FILED DATE: 4/6/2021 9:09 PM    2021L003640

consider self-harm." **MEREDITH WEBER** sought **JENNIFER FINLAYSON-FIFE, PHD'S** services due to both, "personal and marital problems."

15.     On those documents **JENNIFER FINLAYSON-FIFE, PHD'S** title was Jennifer Finlayson-Fife, Ph.D., LCPC, and under her name the title "Licensed Psychotherapist."

16.     **MREDITH WEBER** signed the contract with the understanding that she was entering into a therapy relationship with Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, a licensed psychotherapist.

17.     **JENNIFER FINLAYSON-FIFE, PHD** initiated the first appointment by Skype and thereafter took **MEREDITH WEBER** on as a regular therapy client. **JENNIFER FINLAYSON-FIFE, PHD** understood **MEREDITH WEBER'S** goal was to seek psychotherapy from **JENNIFER FINLAYSON-FIFE, PHD**, and in line with that goal, shortly after meeting her, diagnosed **MEREDITH WEBER** with depression. She continued to treat **MEREDITH WEBER** by Skype, by phone, by email and in-person until **JENNIFER FINLAYSON-FIFE, PHD** ended the therapeutic relationship on April 9, 2019.[1]

18.     **MEREDITH WEBER** was not provided with any information or warnings concerning the risks of engaging in psychotherapy or counseling. **MEREDITH WEBER** was never given the impression that **JENNIFER FINLAYSON-FIFE, PHD** was engaging in life coaching with her. **MEREDITH WEBER** always understood the relationship to be a therapeutic relationship, and **JENNIFER FINLAYSON-FIFE, PHD,**

---

[1] Prior to moving to Chicago, Ms. Weber participated in therapy with Dr. Fife from her home in Richmond, VA. Dr. Fife continued therapy in-person when Ms. Weber moved to Chicago. After leaving Chicago, Ms. Weber again participated in therapy from her home in Richmond, VA.

understood that.

19. During the first five months of treatment, **MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** convened approximately every other week for therapy. **MEREDITH WEBER** shared her family origin and her past history with other therapists. **MEREDITH WEBER** shared the current state of her marriage, as well as her close relationship to her in-laws. In only their third session, **JENNIFER FINLAYSON-FIFE, PHD** noted in her own therapy case notes the impression that **MEREDITH WEBER** felt no sense of family outside of her in-laws. **JENNIFER FINLAYSON-FIFE, PHD** also explored **MEREDITH WEBER'S** family history and understood **MEREDITH WEBER** had a difficult relationship with her parents, specifically her mom, and at times had a difficult childhood.

20. Shortly after beginning treatment with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER'S** marriage significantly worsened. **JENNIFER FINLAYSON-FIFE, PHD** first met **MEREDITH WEBER'S** husband during her fifth therapy session and observed he, "had little to say—mostly because he didn't want to validate M's desire to get professional help for the marriage. He knows she wants this and he doesn't want to give her what she wants. She does a lot of the work to solve the marriage or make it better and I think he enjoys this kind of control over her." **JENNIFER FINLAYSON-FIFE, PHD'S** initial impressions of Mr. Weber would carry through to her therapy of **MEREDITH WEBER**.

21. In October 2017, during a therapy session, **JENNIFER FINLAYSON-FIFE, PHD** mentioned to **MEREDITH WEBER** that **JENNIFER FINLAYSON-FIFE, PHD** needed extra help at her home in Chicago, and suggested **MEREDITH WEBER**

5

FILED DATE: 4/6/2021 9:09 PM   2021L003640

may be able to come and stay with **JENNIFER FINLAYSON-FIFE, PHD** and her family in Chicago. In speaking about this**, JENNIFER FINLAYSON-FIFE, PHD** would tell **MEREDITH WEBER** in an email on February 21, 2018 that **MEREDITH WEBER** would be "such a great help to the family**."**

22.     After **JENNIFER FINLAYSON-FIFE, PHD** proposed the possibility of **MEREDITH WEBER** moving to Chicago to help her family, **MEREDITH WEBER** took this option seriously. With this option in mind, and after an altercation with her husband in January 2018, **MEREDITH WEBER** moved out of her home and left her husband and moved into a family member's home.

23.     When **MEREDITH WEBER** moved out of the martial home, she brought up **JENNIFER FINLAYSON-FIFE, PHD'S** offer to move to Chicago and stay with her. **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** that it "could work at some point," but admitted at that *"...generally the guidelines to therapists are to not engage clients in more familiar activities (like employment) etc for a period (such as a year) following a therapeutic relationship."* (emphasis added) **JENNIFER FINLAYSON-FIFE, PHD** then acknowledged that that is not a "rigid rule" but one to be aware of. On the same day, upon information and believe, **JENNIFER FINLAYSON-FIFE, PHD** stopped using her work email address to communicate with **MEREDITH WEBER** and began emailing **MEREDITH WEBER** from her personal email – jennifife@gmail.com.

23.     After initially suggesting the move to Chicago, **JENNIFER FINLAYSON-FIFE, PHD** expressed reservations about the "mixing of roles." She told **MEREDITH WEBER**, "[i]f you had left your marriage months ago or were divorced I

think I would feel different about it, but because it looks like I'm facilitating your departure or invested in it, it feels off to me."

25.     Discussions about **MEREDITH WEBER** moving to Chicago continued and **JENNIFER FINLAYSON-FIFE, PHD** acknowledges ethical guidelines for therapists strongly advise that she not enter into dual role relationship such as a client and an employee. However, **JENNIFER FINLAYSON-FIFE, PHD** immediately justifies the move by telling **MEREDITH WEBER** that her own home would be "safe haven" and secure place**.**

26.     **JENNIFER FINLAYSON-FIFE, PHD** expands upon this by telling **MEREDITH WEBER** she believes "everything would be fine" if she did move in as she has *"worked happily with lots of helpers in our home who have been very happy living with us."*

27.     Although **JENNIFER FINLAYSON-FIFE, PHD** describes her home as a "safe haven," she did not provide **MEREDITH WEBER** with any resources for secure places or safe havens, other than moving to Chicago. **JENNIFER FINLAYSON-FIFE, PHD** did not refer **MEREDITH WEBER** to any alternative housing or employment options, throughout the five-month period from January 2018, when she left her husband, to when she ultimately moved to Illinois in June 2018.

28.     After **MEREDITH WEBER** expresses frustration that helping **JENNIFER FINLAYSON-FIFE, PHD** in her home is not an option and acknowledges **JENNIFER FINLAYSON-FIFE, PHD'S** fear that someone may report her, **JENNIFER FINLAYSON-FIFE, PHD** then tells **MEREDITH WEBER**, even after acknowledging ethical guidelines frown upon dual relationships, that she wants to find a way to

FILED DATE: 4/6/2021 9:09 PM    2021L003640

FILED DATE: 4/6/2021 9:09 PM    2021L003640

"legitimately" make it work.

29. **JENNIFER FINLAYSON-FIFE, PHD** subsequently asks **MEREDITH WEBER** to tell her who she has told about their relationship. **JENNIFER FINLAYSON-FIFE, PHD** also asks **MEREDITH WEBER** to tell her who knows that **MEREDITH WEBER** might come work in Chicago. She discloses to **MEREDITH WEBER** that she is most concerned with people who would have feelings about her leaving [Virginia]. **JENNIFER FINLAYSON-FIFE, PHD** is asking **MEREDITH WEBER** to keep secretes about their therapy relationship and plans to move to Chicago.

30. **MEREDITH WEBER**, believing that **JENNIFER FINLAYSON-FIFE, PHD** was acting in her best interest, disclosed that only a small number of people know about the "clinical" relationship and the two friends who know would never say anything. **MEREDITH WEBER** told **JENNIFER FINLAYSON-FIFE, PHD**, "I'd be happy to do or tell people whatever in order to make things safe." **MEREDITH WEBER** understood from **JENNIFER FINLAYSON-FIFE, PHD** that she was not to mention her plans to move to Chicago in connection with her clinical relationship with **JENNIFER FINLAYSON-FIFE, PHD** to anyone.

31. On March 15, 2018, **JENNIFER FINLAYSON-FIFE, PHD** secured **MEREDITH WEBER** a live-in nanny job at the home of another LDS family in her ward, but with the intention that **MEREDITH WEBER** would still work for her during her free time over the summer.

32. **JENNIFER FINLAYSON-FIFE, PHD** arranged **MEREDITH WEBER'S** employment and housing near her own house. Over email, **JENNIFER FINLAYSON-FIFE, PHD** specified that any work **MEREDITH WEBER** did for

JENNIFER FINLAYSON-FIFE, PHD would be secondary to the work she did for her primary employer, her nanny job. The clear plan was that MEREDITH WEBER would work as a nanny and a helper to JENNIFER FINLAYSON-FIFE, PHD and her family.

33.    MEREDITH WEBER was incredibly grateful for the opportunity and believed JENNIFER FINLAYSON-FIFE, PHD was treating her differently from her other clients because they held a different, closer relationship. While planning for their summer in Chicago, JENNIFER FINLAYSON-FIFE, PHD continued to provide MEREDITH WEBER with therapy and marriage counseling in the form of opinions about MEREDITH WEBER'S husband. JENNIFER FINLAYSON-FIFE, PHD told MEREDITH WEBER that she thought Mr. Weber was manipulating her and exploiting her fear of her in-law's disapproval. JENNIFER FINLAYSON-FIFE, PHD noted, "it shows his manipulativeness and self-service."

34.    During the discussions about her move to Chicago, MEREDITH WEBER offered to stop her sessions with JENNIFER FINLAYSON-FIFE, PHD and wondered whether it would help if she transitioned to another counselor. JENNIFER FINLAYSON-FIFE, PHD says if MEREDITH WEBER works for her over the summer it is a good idea, she says "blending too much can diffuse the therapeutic relationship." But she reassures MEREDITH WEBER even when working for her in Chicago, MEREDITH WEBER "would still get a lot of input from me as i am often working in the kitchen alongside helpers etc. So it would not be the end of conversations with me, just not the same therapy frame."

35.    JENNIFER FINLAYSON-FIFE, PHD and MEREDITH WEBER continue to have discussions and JENNIFER FINLAYSON-FIFE, PHD provides her

FILED DATE: 4/6/2021 9:09 PM    2021L003640

FILED DATE: 4/6/2021 9:09 PM    2021L003640

with the name of another therapist to have "as back up." Discussions continue and as **JENNIFER FINLAYSON-FIFE, PHD** helps prepare **MEREDITH WEBER** to confront her in-laws, Mr. Weber's parents, about deficiencies in their relationship. **JENNIFER FINLAYSON-FIFE, PHD** agrees to help **MEREDITH WEBER** prepare for this. On April 4, 2018, during this process, **JENNIFER FINLAYSON-FIFE, PHD** tells **MEREDITH WEBER**, "[m]aybe as you get closer to coming to Chicago, we can think about you switching to another therapist. This is a tenuous time so it Not the right time to switch anything yet." **MEREDITH WEBER** cannot recall any additional discussions about changing therapists until the end of their psychotherapy relationship. **JENNIFER FINLAYSON-FIFE, PHD** never referred **MEREDITH WEBER** to a new therapist and she never told her she had to find a new therapist.

36.     **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER** met for the first time in-person in May 2018 in Boston for one of **JENNIFER FINLAYSON-FIFE, PHD'S** conferences. To make the conference more affordable, **JENNIFER FINLAYSON-FIFE, PHD** arranged for **MEREDITH WEBER** to stay with one of **JENNIFER FINLAYSON-FIFE, PHD's** friends. **MEREDITH WEBER'S** flight was delayed and so **JENNIFER FINLAYSON-FIFE, PHD** made special accommodations to allow her to participate virtually for part of the conference. At the conference, **MEREDITH WEBER** felt **JENNIFER FINLAYSON-FIFE, PHD** singled her out, making her a special and important person to **JENNIFER FINLAYSON-FIFE, PHD.** **MEREDITH WEBER** was invited to socialize with **JENNIFER FINLAYSON-FIFE, PHD** and her friends after hours during the conference, where she listened as **JENNIFER FINLAYSON-FIFE, PHD** and her friends shared personal stories about their lives,

FILED DATE: 4/6/2021 9:09 PM   2021L003640

completely unrelated to treatment. **MEREDITH WEBER** felt very special because **JENNIFER FINLAYSON-FIFE, PHD** took an interest in her outside of the therapy relationship and wanted **MEREDITH WEBER** to be a part of her life.

37.     **At JENNIFER FINLAYSON-FIFE, PHD's** invitation**, MEREDITH WEBER** moved to Chicago in June 2018 where she continued therapeutic treatment. **JENNIFER FINLAYSON-FIFE, PHD** did not encourage **MEREDITH WEBER** to seek therapy elsewhere and showed no hesitation to treat **MEREDITH WEBER** while also employing her in her home. **JENNIFER FINLAYSON-FIFE, PHD** continued to schedule sessions, and otherwise treat and bill **MEREDITH WEBER** for her therapy needs.

38.     **JENNIFER FINLAYSON-FIFE, PHD** kept a running "tab" of outstanding bills that **MEREDITH WEBER** had for therapy and allowed **MEREDITH WEBER** to "work off the tab" by working for **JENNIFER FINLAYSON-FIFE, PHD.** It was understood that **MEREDITH WEBER** would track her hours working for **JENNIFER FINLAYSON-FIFE, PHD** and **JENNIFER FINLAYSON-FIFE, PHD** would apply the pay for those hours to cover the outstanding therapy bill. To earn her hours, **MEREDITH WEBER** would babysit **JENNIFER FINLAYSON-FIFE, PHD's** children, take the children to music lessons, grocery shopping for the family, preparing meals for the family, organizing the house, taking the children out of the house for various activities, schedule doctor's appointments for **JENNIFER FINLAYSON-FIFE, PHD** or her family members, assist **JENNIFER FINLAYSON-FIFE, PHD** with selling personal property items online, and otherwise filling in any role **JENNIFER FINLAYSON-FIFE, PHD** needed. **JENNIFER FINLAYSON-FIFE, PHD** would then apply the money owed

FILED DATE: 4/6/2021 9:09 PM    2021L003640

to **MEREDITH WEBER** for her work to the running balance or tab that she kept for therapy. **JENNIFER FINLAYSON-FIFE, PHD** created a google sheet to track the hours and payment information.

39.     In addition to working off her therapy balance, **MEREDITH WEBER** would take **JENNIFER FINLAYSON-FIFE, PHD's** children on outings for ice cream, shopping, ice skating, and other activities. Sometimes, **MEREDITH WEBER** would use her own money to pay for the activities and **JENNIFER FINLAYSON-FIFE, PHD** would reimburse her via Venmo. **MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** attended LDS church services together and social events such as cook-outs. **MEREDITH WEBER** was the only non-family member invited to **JENNIFER FINLAYSON-FIFE, PHD's** fourth of July cookout, where she was introduced to many of **JENNIFER FINLAYSON-FIFE, PHD's** family members and integrated into her inner circle. **JENNIFER FINLAYSON-FIFE, PHD** provided **MEREDITH WEBER** with her own bicycle as a means of getting around the city. **JENNIFER FINLAYSON-FIFE, PHD** left a key for **MEREDITH WEBER** when she was not home that would allow **MEREDITH WEBER** to come and cook dinner for **JENNIFER FINLAYSON-FIFE, PHD** and her family during the day, while they were out, and **MEREDITH WEBER** would leave it in the refrigerator with instructions on how to heat it up. **MEREDITH WEBER** frequently came and made dinners for **JENNIFER FINLAYSON-FIFE, PHD's** family. **MEREDITH WEBER** was performing work for **JENNIFER FINLAYSON-FIFE, PHD** in her home at the same time **JENNIFER FINLAYSON-FIFE, PHD** was seeing other therapy clients. **MEREDITH WEBER** was referred to as a "helper" of **JENNIFER FINLAYSON-FIFE, PHD's. JENNIFER FINLAYSON-FIFE, PHD**

FILED DATE: 4/6/2021 9:09 PM   2021L003640

acknowledged she has had many helpers over the years.

40. During **MEREDITH WEBER's** time in Chicago from June to August 2018 she participated in ten therapy sessions with **JENNIFER FINLAYSON-FIFE, PHD.** Two of those therapy sessions included her husband, Mr. Weber. **JENNIFER FINLAYSON-FIFE, PHD** continued to formally treat **MEREDITH WEBER** as a patient even as **MEREDITH WEBER** worked as her employee, babysitter and confidant. **JENNIFER FINLAYSON-FIFE, PHD** also treated **MEREDITH WEBER** informally through conversations and social interactions throughout their time together in Chicago. **MEREDITH WEBER** also attended church with **JENNIFER FINLAYSON-FIFE, PHD,** social gatherings, and even exercise classes.

41. **JENNIFER FINLAYSON-FIFE, PHD** was scheduled to leave the country at the end of the summer of 2018 for work, but planned to continue therapy with **MEREDITH WEBER** via Skype, telephone and email. **JENNIFER FINLAYSON-FIFE, PHD** encouraged **MEREDITH WEBER** to live at **JENNIFER FINLAYSON-FIFE, PHD's** family home in Chicago while she was gone and manage her home, as well as AirBnB her home. **MEREDITH WEBER** elected to return to Virginia and attempt to work on her marriage. **MEREDITH WEBER** continued her therapy relationship with **JENNIFER FINLAYSON-FIFE, PHD** and saw her approximately once a week throughout September of 2018. **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER'S** sessions became a little less frequent per **JENNIFER FINLAYSON-FIFE, PHD's** busy schedule from October to December 2018.

42. Over the course of 2018, **MEREDITH WEBER** was integrated heavily into **JENNIFER FINLAYSON-FIFE, PHD's** personal life. **MEREDITH WEBER** and

13

FILED DATE: 4/6/2021 9:09 PM    2021L003640

**JENNIFER FINLAYSON-FIFE, PHD** were personal Facebook friends and Instagram friends. **MEREDITH WEBER** became friends with **JENNIFER FINLAYSON-FIFE, PHD's** son on Facebook and remains friends with **JENNIFER FINLAYSON-FIFE, PHD's** brother on Facebook. **JENNIFER FINLAYSON-FIFE, PHD** and **MEREDITH WEBER** exchanged communications via another social medium, Marco Polo, by sending videos to each other. At least some of these videos were personal videos, including one in which **JENNIFER FINLAYSON-FIFE, PHD**, her husband and her son were walking home from an ice cream shop and recording a video for **MEREDITH WEBER**.

43.     In December 2018, **JENNIFER FINLAYSON-FIFE, PHD** was traveling for a tour and less available to **MEREDITH WEBER**. During their scheduled sessions, **MEREDITH WEBER** was struggling to update **JENNIFER FINLAYSON-FIFE, PHD** on everything in her life. Therefore, in late December 2018, **JENNIFER FINLAYSON-FIFE, PHD** suggested that **MEREDITH WEBER** call her "off the clock" while she was driving with her family, to catch her up. **MEREDITH WEBER** felt again that she had a special relationship with **JENNIFER FINLAYSON-FIFE, PHD** and she did not treat every patient like she treated **MEREDITH WEBER**.

44.     In January 2019, **MEREDITH WEBER** expressed her wish to **JENNIFER FINLAYSON-FIFE, PHD** that she was interested in becoming a counselor or therapist one day and wished **JENNIFER FINLAYSON-FIFE, PHD** to mentor her while she worked towards that goal. **JENNIFER FINLAYSON-FIFE, PHD** admitted that she could not be a mentor or friend to **MEREDITH WEBER**, she was **MEREDITH WEBER'S** therapist and the relationship was a therapist/client relationship. **MEREDITH WEBER** continued to inquire further about their relationship, feeling as though she was

14

never treated as "just a patient" before she brought up the possibility of a mentor/mentee relationship.

45.　　In February 2019, **JENNIFER FINLAYSON-FIFE, PHD** acknowledged she had been neglectful of several of her clients including **MEREDITH WEBER** due to being unavailable over the past weeks. **JENNIFER FINLAYSON-FIFE, PHD** went on to tell **MEREDITH WEBER** that she no longer wished to do therapy "over email" and wanted to wait to address issues during their sessions.

46.　　Then, during a session in or around February 2019, **JENNIFER FINLAYSON-FIFE, PHD** told **MEREDITH WEBER** that she had features of borderline personality disorder**,** which had a deeply traumatic effect on **MEREDITH WEBER**. **MEREDITH WEBER** trusted **JENNIFER FINLAYSON-FIFE, PHD** more than anyone and felt as if this diagnosis meant she was "crazy" or "damaged." She did not understand it and did not understand where the diagnosis came from.

47.　　**MEREDITH WEBER** and **JENNIFER FINLAYSON-FIFE, PHD** continued to meet to participate in therapy through April 9, 2019, and **JENNIFER FINLAYSON-FIFE, PHD** continued to suggest that **MEREDITH WEBER** had either borderline personality disorder tendencies or otherwise had narcissistic personality disorder tendencies.

48.　　**JENNIFER FINLAYSON-FIFE, PHD** terminated her therapy relationship with **MEREDITH WEBER** on April 9, 2019. **JENNIFER FINLAYSON-FIFE, PHD** failed to provide **MEREDITH WEBER** with a personal referral to another therapist.

49.　　Throughout her treatment of **MEREDITH WEBER**, **JENNIFER**

FINLAYSON-FIFE, PHD, regularly referred to their relationship as "therapy," or "therapeutic." **JENNIFER FINLAYSON-FIFE, PHD** referred to herself as **MEREDITH WEBER'S** therapist, and to their work together as "therapy." **JENNIFER FINLAYSON-FIFE, PHD** did not refer to their work as "coaching" or refer to herself as **MEREDITH WEBER'S** life coach rather than therapist in their correspondence.

50.     The end of the professional and personal relationship was devastating to **MEREDITH WEBER**.

51.     Following the end of therapy with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** experienced a severe and debilitating trauma that prevented her from taking part in many of her normal activities and led her to consider self-harm.

52.     **MEREDITH WEBER** consulted with multiple therapists seeking help for the trauma she suffered. In May 2019 she began seeing Ellen Thurmond, LCSW who was able to treat her close to her home. Ms. Thurmond continues to provide psychotherapy to **MEREDITH WEBER** today approximately once or twice a week.

53.     **MEREDITH WEBER** was referred to Ms. Thurmond by Dr. David Schnarch's office. Dr. Schnarch's office provided Ms. Thurmond as an option for a therapist that practiced Dr. Schnarch's techniques and was close to **MEREDITH WEBER's** home in Virginia.

54.     **MEREDITH WEBER** continued to suffer from panic attacks and anxiety. In June 2019 she experienced severe chest pain and shortness of breath. A few days later she was treated at Patient First where it was noted that she suffered from a panic attack. She was referred to a psychiatrist for panic disorder.

55.     In August 2019, **MEREDITH WEBER** began treating with a licensed

FILED DATE: 4/6/2021 9:09 PM    2021L003640

FILED DATE: 4/6/2021 9:09 PM 2021L003640

psychiatrist, Dr. Steven Welton. **MEREDITH WEBER** presented to Dr. Welton with acute anxiety, depression, suicidal ideations, sleep issues and components of post-traumatic stress disorder ("PTSD"). Dr. Welton diagnosed **MEREDITH WEBER** with PTSD and symptoms consistent with dysthymia. **MEREDITH WEBER** was prescribed various mediations. Dr. Welton continues to treat **MEREDITH WEBER** for her injuries approximately once every other month.

56.     **MEREDITH WEBER** also consulted with other professionals including a trauma coach and other psychotherapists and psychiatrists to treat her injuries. Because of her experience with **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** had difficulty trusting her medical providers and often sought second opinions to verify the information provided. This was something she did not know to do when she was treating with **JENNIFER FINLAYSON-FIFE, PHD**.

57.     From late 2019 to early 2020, **MEREDITH WEBER'S** symptoms worsened. Around the one-year anniversary of **JENNIFER FINLAYSON-FIFE, PHD's** termination of care, **MEREDITH WEBER** experienced more severe stress, anxiety, depression and other behavioral symptoms. She entered a partial hospitalization program wherein she would spend a significant amount of time with professionals treating her injuries.

58.     In May 2020, **MEREDITH WEBER** presented for a check-in as part of her partial hospitalization program at Henrico Doctor's Hospital. At this appointment, she was suffering from severe anxiety and suicidal ideations. Her doctors were concerned about her health and immediate safety, and she agreed to check herself into the hospital for treatment.

17

FILED DATE: 4/6/2021 9:09 PM   2021L003640

59.    **MEREDITH WEBER** checked herself into the hospital for in-patient psychiatric treatment for approximately five days. She was incredibly anxious about admitting herself for many reasons, including the ongoing pandemic that was sweeping the country.

60.    **MEREDITH WEBER** was discharged from the hospital on May 11, 2020 with the primary diagnosis of major depressive disorder, recurrent severe, and generalized anxiety disorder. Upon discharge, she immediately restarted the partial hospitalization program. **MEREDITH WEBER'S** partial hospitalization programs generally involved spending her entire day in therapy but spending her nights at home.

61.    **MEREDITH WEBER** completed the partial hospitalization program in June 2020 and began a second program through another Tucker Pavilion Chippenham Hospital. She attended that program as an outpatient where she participated in frequent group and individual therapy sessions. Weber attended this program for approximately two months. These programs allowed **MEREDITH WEBER** to focus almost completely on her therapy. **MEREDITH WEBER** also found group therapy was helpful in overcoming some of her mistrust of her own medical providers, including Ms. Thurmond and Dr. Welton.

62.    In addition to in-patient and out-patient therapy and psychiatric care, **MEREDITH WEBER** has also required prescription medication including antidepressants, medications for anxiety and insomnia, and also an antipsychotic medication.

63.    **MEREDITH WEBER'S** stress and anxiety also manifested in various physical ways including skin problems and clenching of her jaw, both requiring special

FILED DATE: 4/6/2021 9:09 PM    2021L003640

treatment.

64.    While in the midst of completing the hospitalization programs, **MEREDITH WEBER** felt she made more progress during group therapy sessions, in addition to her one-on-one sessions. In September 2020, she began attending group therapy at Richmond Creative Counseling approximately once a week. She continues to participate in group therapy today.

65.    **MEREDITH WEBER** has suffered significant physical and psychological injuries because of **JENNIFER FINLAYSON-FIFE, PHD'S** treatment and subsequent termination including severe and debilitating emotional distress, pain and suffering, and loss of enjoyment of life. **MEREDITH WEBER** has been diagnosed with severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame. She experiences feelings of panic, anxiety, shame and traumatic loss and feelings as if she is not good enough.

66.    **JENNIFER FINLAYSON-FIFE, PHD's** improper and unprofessional therapy, and extreme boundary violations, devastated **MEREDITH WEBER**. Her reactions to **JENNIFER FINLAYSON-FIFE, PHD's** treatment are ongoing and are consistent with individuals suffering from trauma including depression, insomnia and anxiety. **MEREDITH WEBER** has suffered overwhelmingly harmful effects from the treatment that **JENNIFER FINLAYSON-FIFE, PHD** provided, including significant

FILED DATE: 4/6/2021 9:09 PM    2021L003640

psychological injuries that also manifested in a physical way. Perhaps most severe, **MEREDITH WEBER** experienced suicidal ideations.

67.     To this day, **MEREDITH WEBER** continues to suffer from anxiety, depression, insomnia, obsessive tendencies, and has difficulty concentrating and maintaining focus. **JENNIFER FINLAYSON-FIFE, PHD's** abuse, mistreatment and betrayal caused **MEREDITH WEBER** irreparable harm. The extreme feeling of shame, betrayal, and an overwhelming sense of helplessness and hopelessness has severely impacted her self-esteem and feelings of self-worth. **MEREDITH WEBER** has significant difficulty trusting her treating doctors and continues to seek out additional doctors for fear that if one support system falls, she will not be completely abandoned and lost as she was when **JENNIFER FINLAYSON-FIFE, PHD** abruptly terminated their relationship. **MEREDITH WEBER'S** lack of trust in her treating healthcare providers has made it significantly more difficult for her to open herself to the ameliorative treatment that her doctors recommend, and that she requires to improve her current condition. The lack of trust is a huge impairment to any offered treatment.

68.     **MEREDITH WEBER** continues to see her medical providers on a weekly basis and must continue her to see her providers regularly for the foreseeable future.

69.     Attached hereto as Exhibit "A" is the Affidavit of the attorney in this cause, filed pursuant to 735 ILCS 5/2-622(a)(1), together with a report from a reviewing Health Professional.

## JURISDICTION AND VENUE

70.     That from approximately September 2017 to April 9, 2019, **JENNIFER FINLAYSON-FIFE, PHD** provided therapy and counseling to **MEREDITH WEBER**

via skype, phone, email, text and in-person from or at the Defendant's home, 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

71.     This Court has jurisdiction over this action pursuant to Ill. Const. art. VI, § 9. The amount in controversy exceeds $50,000.00, exclusive of interest and costs.

72.     Venue is proper in this Court because the Defendants reside in Cook County, no real property is involved in this action, and a substantial part of the events or omissions giving rise to this claim occurred in this County.

## COUNT I – NEGLIGENCE

The Plaintiff, **MEREDITH WEBER**, for Count I of the Complaint at Law, complains against Defendant, **JENNIFER FINLAYSON-FIFE, PHD,** as follows:

1-72.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 72 above as paragraphs 1 through 72 of Count I, as if set forth in their entirety herein.

73.     At all times relevant hereto, it was the duty of the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, to possess and apply the knowledge and use the skill and care ordinarily used by a licensed clinical professional counselor providing services to clients such as **MEREDITH WEBER**.

74.     At all times relevant hereto, it was the duty of the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, to possess and apply the knowledge and use the skill and care ordinarily used by a psychotherapist or counselor providing services to clients such as **MEREDITH WEBER**.

FILED DATE: 4/6/2021 9:09 PM   2021L003640

FILED DATE: 4/6/2021 9:09 PM    2021L003640

75.     At all relevant times hereto, the Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, was under a duty to comply with various regulations and ethical codes in providing services to clients such as **MEREDITH WEBER**, including but not limited to:

(a)     Illinois statutes and regulations, including Illinois Administrative Code 68 ILAC § 1375, *et seq*.; 68 IL ADC 1375 *et seq*.;

(b)     American Counseling Association Code of Ethics; and

(c)     American Psychological Association, Ethical Principles of Psychologists and Code of Conduct.

76.     That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, violated her duties and was negligent in her care and treatment of **MEREDITH WEBER** in one or more of the following respects:

(a)     Carelessly and negligently engaging in a nonprofessional relationship with her client;

(b)     Carelessly and negligently engaging in psychotherapy while engaging in a dual relationship with Plaintiff;

(c)     Carelessly and negligently failing to offer all pertinent facts regarding services rendered prior to the administration of professional services;

(d)     Carelessly and negligently abandoning or neglecting Ms. Weber and failing to refer, transfer or make appropriate arrangements for the continuation of treatment following termination;

(e)     Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy;

(f)     Carelessly and negligently failed to enlist Ms. Weber's support network, which Dr. Fife should have known had important meaning in Ms. Weber's life, as a positive resource in her treatment of Ms. Weber;

(g)     Carelessly and negligently imposed her own personal values on Ms. Weber;

FILED DATE: 4/6/2021 9:09 PM    2021L003640

(h)    Carelessly and negligently engaged in a personal virtual relationship with Ms. Weber, while she was providing counseling and psychotherapy to Ms. Weber, through social media or otherwise;

(i)    Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries;

(j)    Carelessly and negligently exploited Ms. Weber as a personal "helper" to herself and her family while providing therapy and counseling to Ms. Weber;

(k)    Carelessly and negligently bartered with Ms. Weber for Ms. Weber's services to herself and her family in exchange for therapy services; and

(l)    Carelessly and negligently failed to ensure continuation of care or an appropriate clinical and administrative process, upon termination of care, and failed to maintain open communication to allow for Ms. Weber's continuation of care.

77.    That as a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

78.    As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

## COUNT II – INFORMED CONSENT

The Plaintiff, **MEREDITH WEBER**, for Count II of the Complaint at Law, complains against Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, as follows:

1 – 78.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 78 of Count I as paragraphs 1 through 78 of Count II, as if set forth in their entirety herein.

79.    At all times relevant hereto, the Defendant, J**ENNIFER FINLAYSON-FIFE, PHD**, was under a duty to provide informed consent to **MEREDITH WEBER**, including the risks, benefits and warnings of the nature of the care the Defendant would be providing to **MEREDITH WEBER** and this duty continued regarding all care administered by **JENNIFER FINLAYSON-FIFE, PHD** to **MEREDITH WEBER**.

80.    That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, breached her duty to provide informed consent in her care and treatment of **MEREDITH WEBER** in one or more of the following respects:

(a)    Failing to provide a written agreement that detailed the nature of the care and treatment to be rendered to Ms. Weber;

(b)    Carelessly and negligently asking Ms. Weber to sign a life coaching agreement prior to their first appointment, before Ms. Weber knew whether she would be able to engage Dr. Fife as her therapist, while Dr. Fife acknowledged on her website, "I refer to myself as a coach when working across state lines to avoid any potential licensing issues (that are currently undefined with Internet-based therapy)";

FILED DATE: 4/6/2021 9:09 PM   2021L003640

(c)    Carelessly and negligently asking Ms. Weber to sign a life coaching agreement prior to their first appointment, before Ms. Weber knew whether she would be able to engage Dr. Fife as her therapist, while Dr. Fife acknowledged on her website, "Note for clients outside of Illinois: Given the current ambiguity around licensing and providing out of state clinical services, all work with Dr. Finlayson-Fife across state lines will fall under the umbrella of "coaching" until further licensing regulation has been established. Just be aware that coaching sessions (and generally all out of state therapy services) are not reimbursed by insurance companies.";

(d)    Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy; and

(e)    Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries;

81.    That as a direct and proximate result of one or more of the aforementioned acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

82.    That as a direct and proximate result of one or more the aforementioned acts and/or omissions by Defendant **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** consented to treatment she otherwise would not have consented to.

83.    As a direct and proximate result of one or more of the aforementioned acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited

to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

## COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

1 – 83.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 83 of Count II as paragraphs 1 through 83 of Count III, as if set forth in their entirety herein.

84.   That Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, owed a duty to **MEREDITH WEBER** to refrain from activity which carries with it a foreseeable, and unreasonable, risk of causing emotional or mental harm to the patient, **MEREDITH WEBER**.

85.   That as a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

FILED DATE: 4/6/2021 9:09 PM   2021L003640

FILED DATE: 4/6/2021 9:09 PM    2021L003640

86.     As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC, and THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs

## COUNT IV – NEGLIGENCE PER SE

1 – 86.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 86 of Count III as paragraphs 1 through 86 of Count IV, as if set forth in their entirety herein.

87.     At all relevant times hereto, Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, a licensed clinical professional counselor, held herself out as a licensed psychotherapist, owed a duty to **MEREDITH WEBER** pursuant to state rules and regulations.

88.     At all relevant times hereto, Defendant **JENNIFER FINLAYSON-FIFE, PHD,** breached her duty to **MEREDITH WEBER** by failing to comply with the laws and regulations of State of Illinois and incorporated ethical regulations, including, but not limited to, the following:

(a)     Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68,

FILED DATE: 4/6/2021 9:09 PM    2021L003640

§ 1375.225(a)(2), Engaging in any action that violates or diminishes the civil or legal rights of clients.

(b)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(5), Bringing personal or professional biases into the counseling relationship.

(c)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(8), Engaging in any nonprofessional relationships with clients, former clients, client's romantic partners, or client's family members should be avoided, except when the interaction is potentially beneficial to the client. All potentially beneficial relationships must be documented in case notes, and conducted with full client consent. When unintentional harm occurs to the client, or former client, or to an individual significantly involved with the client or former client, due to the nonprofessional interaction, the counselor must show evidence of an attempt to remedy that harm.

(d)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(a)(9), Failing to offer all pertinent facts regarding services rendered to the client prior to administration of professional services.

(e)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(b)(c), Failing to take appropriate steps to protect the privacy of a client and avoid unnecessary disclosures of confidential information. The right to privacy belongs to clients and may be waived. A written waiver shall be signed by the client and the information revealed shall be in accordance with the terms of the waiver.

(f)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(1), Performing, or pretending to be able to perform, professional services beyond one's scope of practice and one's competency, as defined by education, training, supervised experience, State and national professional credentials, and appropriate professional experience.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

(g)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(2), Abandoning or neglecting clients and/or failing to refer and/or make appropriate arrangements for the continuation of treatment, when necessary, during interruptions, such as vacations or illness, and following termination.

(h)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(3), Failing to use techniques/procedures/modalities that are grounded in professionally accepted theory and/or have an empirical or scientific foundation.

(i)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(4), Failing to establish and maintain client records and case notes, including failing to inform clients of issues related to the difficulty of maintaining the confidentiality of electronically transmitted communication.

(j)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(5), Failing to inform clients of the benefits and limitations of using information technology applications in the counseling process and in business/billing procedures.

(k)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(6), Advertising shall not be deceptive, misleading or false. Counselors should claim or imply only professional credentials possessed and are responsible for correcting any misrepresentations of their credentials by others. Professional credentials include highest relevant degrees, accreditation of graduate programs, national voluntary certifications, government-issued certifications or licenses, professional membership, or any other credential that might indicate to the public specialized knowledge or expertise in professional counseling.

(l)  Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(c)(8), Knowingly offering or providing services to a client when

FILED DATE: 4/6/2021 9:09 PM    2021L003640

the counselor's ability to practice is impaired. Failing to seek assistance for problems that reach the level of professional impairment, and, if necessary, limiting, suspending or terminating his or her professional responsibilities until such time it is determined that it is safe to resume work. Causes of impairment may include, but are not limited to, the abuse of mood altering chemicals and physical or mental problems; offering professional services when the counselor's personal problems or conflicts may harm a client or others.

(m)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(f), The Division hereby incorporates by reference "The American Counseling Association Code of Ethics and Standards of Practice", April 2005, approved by the American Counseling Association, 5999 Stevenson Avenue, Alexandria, Virginia 22304, with no later amendments or editions.

(n)    Illinois Administrative Code, Title 68, Chapter VII, Subchapter B, Part 1375, Professional Counselor and Clinical Professional Counselor Licensing Act, Subpart C, Unprofessional Conduct, Ill. Admin. Code tit. 68, § 1375.225(g), Licensed Professional Counselors and Licensed Clinical Professional Counselors are responsible for professional conduct consistent with every standard, in addition to the ones summarized in this Section, published in the 2005 American Counseling Association Code of Ethics.

(o)    American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.1, Client Welfare, including Primary Responsibility and Support Network Involvement.

(p)    American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.2, Informed Consent in the Counseling Relationship, including Informed Consent, Types of Information Needed and Clients Served by Others.

(q)    American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.4, Avoiding Harm and Imposing Values, including Avoiding Harm and Personal Values.

(r)    American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.5, Prohibited Noncounseling Roles and Relationships including Personal Virtual Relationships with Current Clients.

(s)    American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.6, Managing and Maintaining

FILED DATE: 4/6/2021 9:09 PM    2021L003640

Boundaries and Professional Relationships, including Extending Counseling Boundaries, Documenting Boundary Extensions, Role Changes in a Professional Relationship, and Nonprofessional Interactions or Relationships (Other Than Sexual or Romantic Interactions or Relationships).

(t)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.10, Fees and Business Practices, including Bartering.

(u)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.11, Termination and Referral, including Appropriate Transfer of Services.

(v)     American Counseling Association Code of Ethics, Section A, The Counseling Relationship, Section A.12, Abandonment and Client Neglect.

(w)     American Counseling Association Code of Ethics, Section C, Professional Responsibility, Section C.1, Knowledge of and Compliance with Standards.

(x)     American Counseling Association Code of Ethics, Section H, Resolving Ethical Issues.

(y)     American Counseling Association Code of Ethics, 2014 Edition, Incorporating Relevant Sections including Section H, Distance Counseling, Technology and Social Media.

(z)     American Psychological Association: Ethical Principles of Psychologists and Code of Conduct, Principle A: Beneficence and Nonmaleficence, Section 3, Human Relations, including Avoiding Harm, Multiple Relationships, Exploitive Relationships, Informed consent and Bartering with Clients/Patients.

89.     The statutes, ordinances and administrative regulations outlined herein have the force of law.

90.     The statutes, ordinances and administrative regulations outlined herein are intended to protect against the type of injury suffered by **MEREDITH WEBER**.

91.     Plaintiff **MEREDITH WEBER** is within the class intended to be protected by the aforementioned statues, ordinances or administrative regulations.

FILED DATE: 4/6/2021 9:09 PM    2021L003640

92.     Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, is prima facie guilty of negligence due to her violations of the rules and regulations outlined herein.

93.     That as a direct and proximate result of one or more of the aforementioned violations by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered severe injuries including, but not limited to a severe depression, anxiety, intermittent paranoia, suicidal ideations, hopelessness, trauma symptoms, flashbacks, intrusive thoughts, post-traumatic stress disorder, sleep disturbance and insomnia, difficulty trusting people, difficulty maintaining a support system, triggering episodes inducing extreme anxiety and depression, dysthymia, panic attacks, heart palpitations, teeth grinding, obsessive tendencies, and intense shame.

94.     As a direct and proximate result of one or more of the aforementioned violations by Defendant, **JENNIFER FINLAYSON-FIFE, PHD**, **MEREDITH WEBER** suffered injuries of a personal and pecuniary nature, including, but not limited to, past and future hospital, medical, caretaking and related expenses, and pain and suffering and physical and emotional trauma.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

### COUNT V – DEFACTO MERGER, MERE CONTINUATION, SUCCESSOR LIABILITY

1 – 94.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 94 of Count IV as paragraphs 1 through 94 of Count V, as if set forth in their entirety herein.

FILED DATE: 4/6/2021 9:09 PM   2021L003640

95. Defendant, **FINLAYSON-FIFE, LLC**, is a limited liability company organized or admitted on June 25, 2020 in the State of Illinois. The managers for **FINLAYSON-FIFE, LLC** are Thriving Relationships, PLLC (#08745722), John Finlayson, and Jennifer Fife. **FINLAYSON-FIFE, LLC** and all managers have a place of business and conduct business at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

96. Defendant, **THRIVING RELATIONSHIPS, PLLC**, is a professional limited liability company organized or admitted on June 24, 2020 in the State of Illinois. The manager and registered agent for **THRIVING RELATIONSHIPS, PLLC** is Jennifer Fife. **THRIVING RELATIONSHIPS, PLLC** and its agent and manager have a place of business and conduct business at 530 Sunset Road, Winnetka, Cook County, Illinois 60093.

97. During her treatment of **MEREDITH WEBER**, Defendant, **JENNIFER FINLAYSON-FIFE, PHD** operated under the name **DR. JENNIFER FINLAYSON-FIFE** or **DR. JENNIFER FIFE**. During her treatment of **MEREDITH WEBER**, **JENNIFER FINLAYSON-FIFE, PHD's** website address was www.finlayson-fife.com and the copyright holder for the website was identified as **JENNIFER FINLAYSON-FIFE**.

98. Sometime after her treatment of **MEREDITH WEBER**, Defendant, **JENNIFER FINLAYSON-FIFE, PHD** changed the copyright holder for her website to **FINLAYSON-FIFE, LLC**. Upon information and belief, **JENNIFER FINLAYSON-FIFE'S** business is currently operated as **FINLAYSON-FIFE, LLC** and/or **THRIVING RELATIONSHIPS, PLLC**.

99. Defendants, **FINLAYSON-FIFE, LLC** and **THRIVING RELATIONSHIPS, PLLC**, are successors in interest to **JENNIFER FINLAYSON-**

FILED DATE: 4/6/2021 9:09 PM  2021L003640

**FIFE, PHD**, and liable for the debts and liabilities of **JENNIFER FINLAYSON-FIFE, PHD**.

100. Defendants, **FINLAYSON-FIFE, LLC** and **THRIVING RELATIONSHIPS, PLLC,** are liable as a defacto merger, mere continuation or under a theory of successor liability for the debts or liabilities of **JENNIFER FINLAYSON-FIFE, PHD**, because (a) there was an express or implied agreement of assumption of liability, (b) the transaction amounted to a consolidation or merger of the purchaser or seller corporation, (c) the purchaser is merely a continuation of the seller, or (d) the transaction was for the fraudulent purpose of escaping liability.

WHEREFORE, Plaintiff, **MEREDITH WEBER**, prays that judgment be entered in favor of **MEREDITH WEBER** and against Defendants, **JENNIFER FINLAYSON-FIFE, PHD, FINLAYSON-FIFE, LLC**, and **THRIVING RELATIONSHIPS, PLLC**, in an amount in excess of $50,000.00, exclusive of interest and costs.

**<u>JURY DEMAND</u>**

**PLAINTIFF DEMANDS A TRIAL BY A JURY OF TWELVE.**

**THE FINN LAW FIRM**
Attorneys for the Plaintiff

By: /s/ Lawrence B. Finn
**LAWRENCE B. FINN**

Firm I. D. No. 44952
**THE FINN LAW FIRM**
20 N. Clark Street
Suite 3300
Chicago, IL  60602
312-962-0425
312-332-3550 FAX
LFinn@FinnLawAssociates.com

FILED DATE: 4/6/2021 9:09 PM   2021L003640

Robert K. Jenner (*pro hac vice* to be filed)
Kathleen R. Kerner (*pro hac vice* to be filed)
JENNER LAW, P.C.
1829 Reisterstown Road, Suite 350
Baltimore, MD  21208
Telephone: (410) 413-2155
Facsimile: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

FILED
4/6/2021 9:09 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 4/6/2021 9:09 PM    2021L003640

| | | |
|---|---|---|
| **STATE OF ILLINOIS** | ) | |
| | ) SS. | **ATTORNEY CODE 44952** |
| **COUNTY OF COOK** | ) | |

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| **MEREDITH WEBER,** | |
| **Plaintiff,** | |
| *versus* | **COURT NO.** 2021L003640 |
| **JENNIFER FINLAYSON-FIFE, PH.D. (a/k/a JENNIFER FIFE, JENNIFER FINLAYSON-FIFE, DR. JENNIFER FIFE,** and **DR. JENNIFER FINLAYSON-FIFE), FINLAYSON-FIFE, LLC and THRIVING RELATIONSHIPS, PLLC.** | |
| **Defendants.** | |

### AFFIDAVIT OF KATHLEEN R. KERNER

I, Kathleen Kerner, being duly sworn, deposes and states that:

1. I am one of the attorneys for the Plaintiff, Meredith Weber, in this matter.

2. I have consulted and reviewed the facts surrounding the care and treatment of Meredith Weber, with a physician licensed to practice medicine in all its branches who I reasonably believe is (i) knowledgeable in the relevant issues involved in this particular action, (ii) practices or has practiced or teaches or has taught within the last 6 years in the same areas of health care or medicine that is at issue in this particular action, and (iii) qualified by experience or has demonstrated competence in the subject of this case; and who has determined in a written report, after a review of Meredith Weber's available medical records and other pertinent

1

FILED DATE: 4/6/2021 9:09 PM    2021L003640

materials that there is a reasonable and meritorious cause for the filing of this action.

3.   I have concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for the filing of this action.

4.   A true and correct copy of the report of the reviewing physician, with information that would identify the reviewing health professional redacted, is attached hereto as Exhibit A.

FURTHER AFFIANT SAYETH NOT.

_____
Kathleen R. Kerner


Under penalties as provided by law pursuant to Section 1-109 if the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be upon information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Kathleen R. Kerner

ARDC # 6200559
Lawrence B. Finn
**THE FINN LAW FIRM**
115 S. LaSalle St., Suite 2600
Chicago, IL  60603
Phone: 312-962-0425
Fax:    312-332-3550
LFinn@FinnLawAssociates.com

Robert K. Jenner (*pro hac vice* to be filed)
Kathleen R. Kerner (*pro hac vice* to be filed)
JENNER LAW, P.C.
1829 Reisterstown Road, Suite 350
Baltimore, MD  21208
Telephone: (410) 413-2155
Facsimile: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

FILED DATE: 4/6/2021 9:09 PM    2021L003640

**Meredith Weber v. Jennifer Finlayson-Fife, Ph.D.**

**HEALTH PROFESSIONAL REPORT PURSUANT TO 735 ILCS 5/2-622**

1.      I am a physician licensed to practice medicine in the State of Virginia in all its branches.  I am Board Certified in General Psychiatry and Child/Adolescent Psychiatry.

2.      I have practiced medicine in the same area of health care or medicine that is at issue in this particular action within the last six years.  I am knowledgeable in the relevant issues involved in this particular matter.  I am qualified by experience and I have demonstrated competence in the subject of this case. During my practice, I have regularly evaluated and treated patients with chronic debilitating medical conditions, including patients with severe and debilitating depression, anxiety, post-traumatic stress disorder, suicidal ideations, and other psychiatric conditions. I have also cared for patients who have been hospitalized through in-patient programs and out-patient partial hospitalization programs as a result of their psychiatric conditions.

3.      I have read and reviewed records pertaining to the care and treatment rendered to Meredith Weber by Jennifer Finlayson-Fife, PhD ("Dr. Fife"), a licensed clinical professional counselor, from August 8, 2017 to April 9, 2019. Those records also contained emails and text messages exchanged between Ms. Weber and Dr. Fife along with the original agreement entered into between Dr. Fife and Ms. Weber at the initiation of care.

4.      I understand that during the professional relationship between Dr. Fife and Ms. Weber, Dr. Fife flagrantly violated boundaries. Dr. Fife's practices of responding substantively to Ms. Weber email communications and requests, sometimes almost immediately, and habit of scheduling sessions or additional tasks on demand contributed to a perceived ever-present availability that solidified Ms. Weber's attachment to Dr. Fife in an intensive way. Dr. Fife then facilitates Ms. Weber's move out of state to a home nearby Dr. Fife and employs her as a part time nanny and to complete other tasks. Dr. Fife allows Ms. Weber to track her hours and applies the money to Ms. Weber's outstanding therapy bill. Dr. Fife continued to treat Ms. Weber throughout Ms. Weber's time employed in Dr. Fife's home. After Ms. Weber returns to Virginia and makes an effort to reconnect with her husband, Dr. Fife continues to provide support and encouragement, in essence being the good, kind, caring, maternal figure that the patient was seeking. When Dr. Fife later attempts to re-set the therapeutic frame, Ms. Weber is understandably confused and slowly begins to experience a sense of betrayal and disappointment. While Ms. Weber becomes increasingly obsessive, Dr. Fife becomes increasingly clinical, affectively distant, and begins to get consultation for herself. Dr. Fife pathologizes Ms. Weber by diagnosing her as borderline and in some ways tries to make Ms. Weber believe all she is experiencing is of her own making. It is really moot as to whether Ms. Weber may be borderline or not, but rather Dr. Fife uses this as a tool to justify her need for distance and ultimately termination of care. After Dr. Fife terminates Ms. Weber from care, Ms. Weber underwent significant treatment with Ellen Thurmond LCSW, me, and through inpatient and partial hospitalization programs. This treatment has centrally been

**EXHIBIT A**

FILED DATE: 4/6/2021 9:09 PM   2021L003640

about Ms. Weber's ambivalence in trusting mental health care professionals and how to attach when her fear of abandonment is so intense. This monumental hurdle for Ms. Weber continues to play out in her treatment today.

5.　　　I am familiar with the standard of care applicable to licensed clinical professional counselors, such as Dr. Fife, providing care and treatment to patients like Meredith Weber under the same or similar circumstances in this case. Dr. Fife was required to provide Ms. Weber the necessary psychotherapy care, treatment and services to help her meet her goals and improve her life and her marriage, in light of her needs. Dr. Fife knew that Ms. Weber had an intense, dysfunctional, emotionally abusive relationship with her own mother. Dr. Fife also knew that Ms. Weber indicated her intense need for her mother-in-law's love and approval as even a driving force to keep her in the relationship with her husband. Despite these clear signals, Dr. Fife then proceeded to suggest that Ms. Weber come to Chicago "to clear her head and determine the future of her marriage." Dr. Fife even outlines her own concerns that this would be a boundary violation, but then proceeds to violate the boundary. Dr. Fife asks Ms. Weber to collude with her in this violation by urging her not to speak of this to others or inform contacts in Chicago of the nature of their relationship. In this she reinforces Ms. Weber's very special role as a "special patient." Although Dr. Fife moved Ms. Weber to another person's house in Chicago, Dr. Fife began to put together an array of work for Ms. Weber to complete for Dr. Fife that included Ms. Weber caring for Dr. Fife's children, making dinner for Dr. Fife's family, cleaning, selling a piano, taking exercise classes together, and "hanging out" with Dr. Fife and her friends. In the midst of all of this, Dr. Fife continued to conduct "therapeutic sessions" at times with Ms. Weber, but also with Ms. Weber's husband at times. They "traded" therapy time for Ms. Weber's hourly wage. Dr. Fife expresses intense appreciation for Ms. Weber's care of her children trading text messages and clearly operating on some "friendship" level. Dr. Fife has created this idealized mother figure for Ms. Weber and in turn Ms. Weber was "all in." The standard of care requires that Dr. Fife set and maintain boundaries for the benefit of her client, Ms. Weber. Dr. Fife's actions violate the standard of care for a reasonable psychotherapist under similar circumstances.

6.　　　Based on my experience, training, and knowledge, and my review of the records, it is my opinion to a reasonable degree of medical and psychotherapeutic certainty, that the care provided to Ms. Weber from Dr. Fife was psychotherapeutic in nature. Although Dr. Fife labeled herself as a coach as well as a licensed clinical professional counselor, she clearly provided psychotherapy to Ms. Weber. Dr. Fife's own words reflected that she was practicing within a therapeutic frame and colluded to keep Ms. Weber from talking about the violations of the therapeutic frame.

7.　　　Based upon my experience, training, and knowledge, and my review of the above records, it is my opinion to a reasonable degree of medical and psychotherapeutic certainty, that the care provided to Ms. Weber from Dr. Fife fell below the minimum standard of care applicable to such a provider under the circumstances:

FILED DATE: 4/6/2021 9:09 PM   2021L003640

(a)   Carelessly and negligently engaging in a nonprofessional relationship with her client; or

(b)   Carelessly and negligently engaging in psychotherapy while engaging in a dual relationship with Ms. Weber; or

(c)   Carelessly and negligently failing to offer all pertinent facts regarding services rendered prior to the administration of professional services; or

(d)   Carelessly and negligently abandoning or neglecting Ms. Weber and failing to refer, transfer or make appropriate arrangements for the continuation of treatment following termination; or

(e)   Carelessly and negligently failed to inform Ms. Weber of the risks, limitations of engaging in psychotherapy, and in particular the limits of teletherapy or risks of teletherapy; or

(f)   Carelessly and negligently failed to enlist Ms. Weber's support network, which Dr. Fife should have known had important meaning in Ms. Weber's life, as a positive resource in her treatment of Ms. Weber; or

(g)   Carelessly and negligently imposed her own personal values on Ms. Weber; or

(h)   Carelessly and negligently engaged in a personal virtual relationship with Ms. Weber, while she was providing counseling and psychotherapy to Ms. Weber, through social media or otherwise; or

(i)   Carelessly and negligently engaged in and encouraged boundary violations, and negligently failed to institute, manage or maintain reasonable boundaries; or

(j)   Carelessly and negligently exploited Ms. Weber as a personal "helper" to herself and her family while providing therapy and counseling to Ms. Weber; or

(k)   Carelessly and negligently bartered with Ms. Weber for Ms. Weber's services to herself and her family in exchange for therapy services; or

(l)   Carelessly and negligently failed to ensure continuation of care or an appropriate clinical and administrative process, upon termination of

3

FILED DATE: 4/6/2021 9:09 PM   2021L003640

care, and failed to maintain open communication to allow for Ms. Weber's continuation of care.

8.      It is my further opinion that one or more of the above described deviations from the standard of care, whether individually, or in combination, caused or contributed to cause  Ms. Weber to suffer harm including severe depression, anxiety, components of post-traumatic stress disorder, sleep disturbance, suicidal ideations, and dysthymia, and require medical treatment from LCSW Ellen Thurmond, myself, partial hospitalization programs, in-patient hospitalization, as well as significant other counseling care and pharmaceutical care as a result of her injuries.

9.      In my opinion, for the reasons stated above, there is a reasonable and meritorious basis for filing a cause of action against Dr. Fife for her negligent actions and omissions as described above with respect to the care and treatment rendered to Ms. Weber.

Date:   April 2, 2021

_____
Steven J. Welton, M.D.
4801 Hermitage Road, Suite 103
Richmond, Virginia 23227

4